## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Brandywine Hospital, LLC, on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>CVS Health Corporation; CVS Pharmacy, Inc.; CVS Specialty, Inc.; and Wellpartner, LLC,<br><br>        Defendants. | Civil No. _____<br><br><br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Brandywine Hospital, LLC ("Plaintiff" or "Brandywine"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to itself, and upon information and belief and the investigation of counsel as to all other matters, brings this class action lawsuit against Defendants CVS Health Corporation ("CVS Health"); CVS Pharmacy, Inc. ("CVS Pharmacy"); CVS Specialty, Inc. ("CVS Specialty"); and Wellpartner, LLC ("Wellpartner") (collectively, "CVS" or "Defendants") for damages pursuant to the federal antitrust laws, and demands a trial by jury on all matters so triable.

### I.       NATURE OF THE CASE

1.      This lawsuit challenges CVS's anticompetitive scheme to limit competition among services provided to "safety net" healthcare providers in the United States—a scheme that ultimately harms providers of healthcare services for low-income people who otherwise would be largely unable to access critical health services.

2.      Safety net providers deliver healthcare to patients regardless of their ability to pay. They include public hospitals, community-based health centers, local health agencies,

emergency departments, academic medical centers, and free clinics that have a high proportion of patients who are either uninsured or covered by Medicare or Medicaid (both of which reimburse healthcare providers at lower rates than commercial insurance).

3.      Plaintiff was one such provider until it closed in January 2022. As State Representative Dan Williams put it, "the absence of Brandywine" in Chester County created "a health care desert." Representative Williams described the closure as "devastating." He noted that seniors and people of color would likely be hit especially hard because senior living facilities were specially built to be near a hospital and because people of color and people in difficult economic circumstances already had reduced healthcare access and equity.[1]

4.      Although the Coatesville VA Medical Center remains in the area, its urgent care center is not open at all hours, and even when it is open, it is largely not equipped to provide acute care. Chief of Staff Dr. Michael Gliatto explained, "If someone comes in with an infection and their blood pressure is too low, we can't take care of that. . . . We rely on Brandywine to help us with providing the acute care that's needed for our veterans."[2]

5.      The absence of a hospital to community members who depend on it for care can be "devastating," as State Representative Dianne Herrin remarked. Representative Herrin noted that Plaintiff was the county's only hospital with a behavioral health facility to house patients with mental illness. Nor is it easy for a hospital to simply be reopened, as Chester County Medical Society President Bruce Colley acknowledged.[3]

---

[1] Alan Yu & Kenny Cooper, *Closing Brandywine Hospital, Creating a Chester County 'Health Care Desert,'* WHYY News (Jan. 31, 2022), available at https://whyy.org/articles/closing-brandywine-hospital-creating-a-chester-county-health-care-desert/ (last visited Mar. 7, 2023).

[2] *Id.*

[3] *The Desperate Effort to Reopen Two Hospitals in Pennsylvania*, Chief Healthcare Executive (Mar. 11, 2022), available at https://www.chiefhealthcareexecutive.com/view/the-desperate-effort-to-reopen-two-hospitals-in-pa- (last visited Mar. 7, 2023).

2

6.     The financial challenges under which safety net providers, such as Plaintiff, must operate are real and constant. In 1992, Congress created the federal 340B Drug Pricing Program (the "340B Program") to ease one source of this financial pressure by insulating safety net providers from the full extent of steeply escalating drug prices through a program that allows them to purchase outpatient drugs at a significant discount from manufacturers. The 340B Program allows safety net providers to stretch their available financial resources as far as possible; they often use the drug savings to expand or enhance services to economically vulnerable patients. Thus, the savings available through the 340B Program play a critical role in the overall economic viability of those safety net providers (called "Covered Entities"), and thus, are critical to the health of the community.

7.     Under the 340B Program, participating drug manufacturers must provide significant discounts to Covered Entities as a condition of having their outpatient drugs covered by Medicaid. The 340B Program allows Covered Entities to purchase pharmaceuticals from manufacturers at a discount and to dispense the discounted medications through an affiliated pharmacy (e.g., through a hospital's own, in-house pharmacy) to patients with eligible prescriptions. In addition to the cost savings for prescriptions Covered Entities fill themselves, they also typically contract with a network of pharmacies ("Contract Pharmacies") that are frequented by their patient population. Covered Entities can obtain 340B Program discounts for medications their patients purchase at Contract Pharmacies. The Covered Entity typically pays an additional fee to the Contract Pharmacy for agreeing to this contractual relationship.

8.     Covered Entities must inform patients of their freedom to choose any pharmacy provider and are strictly prohibited from steering patients toward or away from specific pharmacies. If a patient chooses to fill a prescription with a pharmacy that is affiliated with

neither the Covered Entity nor one of the Covered Entity's Contract Pharmacies, the Covered Entity receives no 340B savings for that purchase.

9.      It is the Covered Entities, not the Contract Pharmacies, that are responsible for complying with the rules of the 340B Program, such as ensuring prescriptions are eligible and savings are properly tracked and calculated. To satisfy these obligations, Covered Entities typically retain a third-party administrator ("TPA") to ensure compliance with those requirements.

10.      Historically, each Covered Entity has retained a single TPA from among a variety of competing TPAs available in the market (the "TPA Services Market"), and the choice of which TPA to retain was not constrained by the Covered Entity's decision to contract with particular Contract Pharmacies. That changed in 2018, shortly after CVS acquired Wellpartner, a 340B TPA.

11.      Until that acquisition, CVS retail and specialty pharmacies worked with many different TPAs retained by Covered Entities. Since CVS acquired Wellpartner, however, CVS has permitted Covered Entities to participate in the 340B Program at CVS retail and specialty pharmacies only if the Covered Entities use Wellpartner as their TPA. This is an exclusive relationship—CVS stopped allowing rival TPAs to provide TPA services at CVS Contract Pharmacies.

12.      CVS owns and operates the largest chain of retail pharmacies in the United States through its wholly owned and controlled subsidiary, CVS Pharmacy. CVS also owns and operates the largest specialty pharmacy in the United States through its wholly owned and controlled subsidiary, CVS Specialty. Accordingly, Covered Entities must use—and pay fees

to—Wellpartner if they want to realize 340B savings for their patients who choose to, or who must, fill their prescriptions at CVS pharmacies or specialty pharmacies.

13.     Many patients *must* fill their prescriptions at CVS Pharmacy or CVS Specialty in order to access the pharmacy benefit provided by their health plan. CVS also owns the largest pharmacy benefit manager ("PBM") in the United States, CVS Caremark ("Caremark"), which is a wholly owned and controlled subsidiary of CVS. Caremark forces many insureds to fill specialty medications with CVS Specialty and certain non-specialty medications at CVS Pharmacy. Thus, while Covered Entities cannot, by law, steer patients to a particular pharmacy, CVS steers patients to its pharmacies through its control of their pharmacy insurance benefit.

14.     A Covered Entity enters Contract Pharmacy relationships based on where its patients fill their prescriptions. Since the Covered Entity cannot alter or impact its patients' choice of pharmacy, each Contract Pharmacy has substantial leverage to extract a percentage of the 340B Program benefits that the Covered Entity can obtain. This leverage is further compounded by CVS's ability to steer a Covered Entity's patients to CVS-owned pharmacies. A Contract Pharmacy, such as CVS, cannot be replaced because the Covered Entity cannot steer its patients elsewhere. A Covered Entity thus faces the choice of either contracting with a specific Contract Pharmacy or forfeiting any 340B Program benefits it could obtain for prescriptions filled there.

15.     Covered Entities had no choice but to use Wellpartner or forfeit any 340B Program benefit for patients who fill their prescriptions at CVS pharmacies. CVS has market power as to Contract Pharmacy services for 340B prescriptions filled at CVS retail and specialty pharmacies. There is no product substitute for Covered Entities to turn to—Covered Entities

cannot simply take their business to Walgreens, Walmart, Rite Aid, or some other pharmacy instead, because they cannot steer patients to other Contract Pharmacies.

16.     CVS is engaged in an anticompetitive scheme to force safety-net hospitals and other healthcare providers participating in the federal 340B Program to purchase administrative services from its recently acquired subsidiary, Wellpartner, as a condition for allowing Covered Entities to contract with CVS retail and specialty pharmacies to process 340B-eligible prescriptions filled by patients at CVS pharmacies.

17.     If CVS did not force Covered Entities to use Wellpartner to provide TPA services for 340B-eligible prescriptions filled at CVS pharmacies, TPAs would compete to provide those services. The TPAs would compete on price, and as a result, Covered Entities would pay less for TPA services. Unfortunately, due to CVS's anticompetitive conduct, Covered Entities suffered antitrust injury and economic damages by paying supracompetitive prices for the TPA services provided by Wellpartner.

18.     This also caused further competitive harm because CVS's conduct financially pressures Covered Entities to use Wellpartner for all of their 340B Program administration needs—not just with respect to CVS Contract Pharmacies—because there are costs associated with hosting, paying for, and integrating multiple TPA platforms.

19.     CVS illegally tied Wellpartner TPA services, which had previously been just one of many TPA products available in the TPA Services Market, to CVS's Contract Pharmacy Services (the "CVS Contract Pharmacy Market"). This tying arrangement is a per se illegal tie, in violation of Section 1 of the Sherman Antitrust Act, and an unreasonable restraint of trade that substantially lessens competition in the relevant markets, in violation of Section 2 of the Sherman Antitrust Act and Section 3 of the Clayton Act.

20.     Through this action, Plaintiff seeks to recover damages and other relief, for itself and the Class, to the full extent permitted by law from the time CVS implemented the tie alleged in this Complaint through judgment or the date on which CVS ends its illegal conduct (the "Class Period").

## II.     JURISDICTION AND VENUE

21.     Plaintiff brings this class action lawsuit pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the Class by virtue of Defendants' violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

23.     Additionally and alternatively, the Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action with more than 100 Class members, the amount in controversy exceeds $5 million exclusive of interest and costs, and there is minimal diversity.

24.     The Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k) and 15 U.S.C. § 22, which permits a lawsuit to be filed against a corporation in any district where the corporation may be found or transacts business and allows all process in such cases to be served in any district where the corporation may be found.

25.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants transacted business throughout the United States, including in this District; sold the products or services at issue throughout the United States, including in this District; had substantial contacts with the

United States, including this District; and engaged in an antitrust conspiracy that was directed at and had a foreseeable, direct, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

### III.    PARTIES

26.     Until January 2022, Plaintiff Brandywine Hospital operated as a hospital in Coatesville, Pennsylvania, and was a 340B "covered entity." Between 2016 and 2022, Brandywine Hospital contracted with various CVS Contract Pharmacies in Pennsylvania to receive discounts through the 340B Program. Brandywine Hospital was forced to purchase TPA services through Defendant Wellpartner with respect to its CVS Contract Pharmacy 340B transactions, and it suffered financial loss due to the additional expense as a result. Brandywine Hospital used its preferred TPA, Verity, for its other 340B pharmacy software needs.

27.     Defendant CVS Health Corporation is a Delaware corporation with its principal place of business located at 1 CVS Drive, Woonsocket, Rhode Island.

28.     Defendant CVS Pharmacy, Inc., is a Rhode Island corporation with its principal place of business located at 1 CVS Drive, Woonsocket, Rhode Island. CVS Pharmacy is a wholly owned subsidiary of CVS Health.

29.     Defendant CVS Specialty, Inc., is a Delaware corporation with its principal place of business located at 1 CVS Drive, Woonsocket, Rhode Island. CVS Specialty is a wholly owned subsidiary of CVS Health.

30.     Defendant Wellpartner, LLC, is a Delaware limited liability company with its principal place of business located at 1 CVS Drive, Woonsocket, Rhode Island. Wellpartner is a wholly owned subsidiary of CVS Health; it has been since CVS Health acquired it in 2017.

31.     CVS Health owns and controls its subsidiaries CVS Pharmacy, CVS Specialty, and Wellpartner, which operate together as a single commercial entity and act as the agents of

CVS Health. CVS admits as much to the public and its investors. For instance, in its Form 10-Q for the quarterly period ended June 30, 2022, CVS Health describes itself and its subsidiaries as an integrated healthcare company that "has more than 9,000 retail locations." It further states that "The Company has four reportable segments," one of which is "Pharmacy Services." The "Pharmacy Services segment" includes "specialty pharmacy and inclusion services, . . . medical spend management and pharmacy and/or other administrative services for providers and federal 340B drug pricing program covered entities."

## IV.    FACTUAL ALLEGATIONS

32.    The 340B Program was established by the Veterans Health Care Act of 1992 to help eligible healthcare providers "stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rept. No. 102-384(II), at 12 (1992). It is codified in, and named for, section 340B of the Public Health Service Act, 42 U.S.C. § 256b. *See* H.R. Rep. No. 102-384(II), at 11 (1992) (Conf. Rep.).

### A.  340B Covered Entities

1.    Background Concerning Covered Entities and 340B Savings

33.    The 340B Program lets Covered Entities "obtain lower prices on the drugs that they provide to their patients." H.R. Rep. No. 102-384(II), at 7 (1992) (Conf. Rep.). The U.S. Health Resources and Services Administration ("HRSA") calculates a 340B maximum prices ("340B Price") for each covered outpatient drug, which is usually substantially less than the wholesale or retail price of the drug. Covered Entities may purchase covered drugs from the manufacturer at the 340B Price. Most pharmaceutical manufacturers choose to provide drugs at

the 340B Price because the federal government requires them to offer such discounts to have their drugs covered by Medicaid.[4]

34.    Drugs the Covered Entity purchases at the 340B Price can be dispensed to fill eligible 340B prescriptions at its in-house pharmacy (e.g., an in-hospital pharmacy) or at an outside Contract Pharmacy (e.g., CVS).

35.    Eligible 340B prescriptions are typically dispensed at an in-house or Contract Pharmacy at the contract price that the pharmacy and drug manufacturer have negotiated with third-party payors. In other words, the pharmacy processes the prescription as a one paid by the patient's commercial or government insurance. The Covered Entity then retains the difference between the 340B Price and the insurance reimbursement, minus any fees paid to a TPA or Contract Pharmacy. This surplus is sometimes referred to as the Covered Entity's "340B Savings."

36.    The insured patient receives no information about this back-end bookkeeping and is not directly affected by whether the prescription is filled as a 340B prescription. The out-of-pocket amount paid by the patient is the same in either scenario.

37.    The Covered Entity realizes 340B Savings only if its 340B-eligible prescriptions are filled at its in-house pharmacy or one of its Contract Pharmacies. If the patient fills a 340B-eligible prescription at a pharmacy unaffiliated with and not under contract with the Covered Entity, the Covered Entity receives no benefit.

38.    The 340B Program does not permit Covered Entities to steer patients to any particular pharmacy.

---

[4] *See* https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/may-2015-report-to-the-congress-overview-of-the-340b-drug-pricing-program.pdf (last visited Mar. 7, 2023).

4864-8400-6982, v. 8

39.     Covered Entities rely on 340B Savings to fund patient care services to underserved and vulnerable populations. 340B Savings are essential to the hospitals and healthcare providers that participate in the 340B Program and their efforts to maintain and expand healthcare access for disadvantaged populations and communities.

2.     Covered Entities' Compliance

40.     HRSA verifies that a healthcare provider meets the statutory requirements to become a Covered Entity. The 340B Program defines the types of healthcare providers eligible to participate, which include Federally Qualified Health Centers ("FQHCs"), critical-access hospitals, Ryan White HIV/AIDs Program grantees, rural referral centers, sole community hospitals, black-lung clinics, community health centers, family planning clinics, and tuberculosis clinics. 42 U.S.C. §§ 256b, 256b(a)(4), 256(b)(4).

41.     Covered Entities have nondelegable legal responsibility for compliance with the regulatory requirements applicable to Covered Entities. They must meet preliminary enrollment criteria, annually re-register in the 340B Program, avoid duplicate discounts related to Medicaid programs, and avoid steering patients to fill eligible prescriptions at particular pharmacies. 42 U.S.C. § 256(b)(5).

42.     Covered Entities are responsible for making sure the drugs they purchase at the discounted rate are not diverted to patients filling ineligible prescriptions. 42 U.S.C. § 256(b)(5)(B); H.R. Rep. No. 102-384(II), at 16. The patient must (1) have an established relationship with the Covered Entity, such that the Covered Entity maintains the patient's healthcare records; (2) receive healthcare services from a provider employed by or affiliated with that Covered Entity; and (3) receive healthcare services in line with those for which the Covered Entity was granted funding or FQHC status (except that disproportionate share hospitals need not

11

meet the third requirement). *See* Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility, 61 Fed. Reg. 55157 (1996).

43.     Covered Entities must also ensure that 340B Program prescriptions are strictly segregated from prescriptions filled through Medicaid programs. Medicaid drug rebates must not be charged to drug manufacturers for drugs dispensed pursuant to the 340B Program. *See* 42 U.S.C. § 256(b)(5)(A); H.R. Rep. No. 102-384(II), at 16. Covered Entities must establish a mechanism to segregate Medicaid prescriptions from 340B prescriptions to ensure a prescription is not processed as both a Medicaid prescription (triggering a Medicaid drug rebate) and a 340B prescription (which is filled using drug stock purchased by the Covered Entity at the discounted 340B price). 42 U.S.C. § 256(b)(5)(A)(ii). The Covered Entity may not obtain such a "duplicate discount," and may be liable for damages to the drug manufacturer if it erroneously obtains duplicate discounts on a drug. 42 U.S.C. § 256(b)(5)(D); 75 Fed. Reg. 10272, 10277.

44.     The Covered Entity is fully responsible for compliance. In addition to liability to drug manufacturers, failure to comply with 340B Program requirements can result in the Covered Entity's removal from the 340B Program. 42 U.S.C. § 1320a-7(b)(1)(A). It is therefore critical for Covered Entities to comply with the 340B Program rules, and they accordingly make every effort to do so. By contrast, Contract Pharmacies do not bear legal liability for failure to comply with 340B Program regulatory requirements.

45.     Covered Entities cannot and do not steer patients to fill their 340B-eligible prescriptions at particular pharmacies. HRSA requirements direct Covered Entities to "inform the patient of [their] freedom to choose a pharmacy provider." Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,278. TPAs, including Wellpartner, understand this patient-choice provision in the same manner.

46.     HRSA's patient choice requirement is mandatory and failure to comply with the requirement can result in serious penalties. To be certified to use a Contract Pharmacy under the 340B program, Covered Entities must submit a signed certification to HRSA that attests to meeting the program's compliance requirements, including the anti-steering provision. *Id.* at 10,277. Accordingly, if a Covered Entity violates the steering requirements established by HRSA, it may face serious civil or even criminal liability for submitting false statements to the government, including civil monetary penalties, exclusion from federal health care programs, and criminal prosecution for knowing violations. In addition to the initial certification, Covered Entities must submit an annual recertification to continue participating in the 340B program. Thus, 340B program regulatory requirements and other state and federal anti-kickback laws prevent steering patients to specific pharmacies.

**B.   340B Contract Pharmacies**

1.     Background Concerning 340B Contract Pharmacies

47.     A Covered Entity may obtain cost savings if their patients' prescriptions are filled at the Covered Entity's in-house pharmacy or at one of the Covered Entity's Contract Pharmacies. Covered Entities enter written agreements with their Contract Pharmacies, which typically provide that the Covered Entity pay the Contract Pharmacy a per-prescription dispensing fee for filling 340B prescriptions.

48.     In March 2010, HRSA issued guidance allowing Covered Entities to contract with an unlimited number of third-party pharmacies. They quickly began doing so, and between April 1, 2010, and April 1, 2020, the number of Contract Pharmacy arrangements under the

340B Program increased from 2,321 to 100,451.[5] Approximately 75% of Contract Pharmacy arrangements are with large for-profit retail chain pharmacies, such as CVS.[6]

49.     Most Covered Entities work with Contract Pharmacies to maximize their 340B Savings. When selecting pharmacies to contract with, Covered Entities typically focus on contracting with pharmacies that fill the highest volume of the Covered Entity's 340B-eligible prescriptions. Covered Entities generally know where their patients' prescriptions are filled because most prescriptions issued today are electronically transmitted from the healthcare provider's office to the pharmacy.

50.     CVS is the largest retail pharmacy chain in the United States. Many 340B-eligible patients fill their prescriptions at CVS pharmacies. Covered Entities must contract with CVS pharmacies or lose substantial 340B Savings.

51.     With its power in the marketplace, CVS has been able to force Covered Entities to use Wellpartner to provide TPA services. Regardless of the price or quality of TPA services offered by other providers, Covered Entities must use CVS's own Wellpartner as their TPA to obtain any 340B Savings for the 340B-eligible prescriptions their patients fill at CVS pharmacies. In other words, CVS has exercised its market power among Contract Pharmacies to force Covered Entities to use a specific provider—Wellpartner—within the TPA Services Market. This tie costs Covered Entities a portion of the 340B funds meant to benefit the Covered Entities and the patients and communities they serve.

52.     Specialty pharmacies fill prescriptions for many high-cost treatments, some of which also require special handling. They dispense a large and increasing proportion of

---

[5] https://media.thinkbrg.com/wp-content/uploads/2020/10/06150726/BRG-ForProfitPharmacyParticipation340B_2020.pdf (last visited Mar. 7, 2023).
[6] https://340breform.org/wp-content/uploads/2021/04/AIR340B_340B-Contract-Pharmacies.pdf (last visited Mar. 7, 2023).

14

prescriptions in the United States. Specialty pharmacies made up nearly 40% of outpatient prescription revenues in 2021.[7] CVS is the largest specialty pharmacy in the United States; it accounted for 27% of specialty pharmacy prescription revenues in 2020.[8] CVS Specialty is a mail-order pharmacy that operates throughout the United States.

53.     The same dynamics exist in the specialty pharmacy market segment as in the retail market segment. Many Covered Entities have a significant market share of patients who use CVS Specialty as their specialty pharmacy, and thus must contract with CVS Specialty as a Contract Pharmacy, or else lose substantial 340B Savings.

2.     CVS Has Enhanced Market Power Because It Owns a Leading PBM

54.     CVS's market power in retail and specialty pharmacy services is enhanced by its ownership of CVS Caremark, which is the largest PBM in the United States and one of only three major PBMs in the United States. CVS Caremark, Express Scripts, and OptumRx together account for approximately 90% of the PBM market. CVS Caremark has about a 34% share of the PBM market.[9]

55.     PBMs coordinate prescription drug programs on behalf of health insurance plans. This includes negotiating drug prices and rebates from pharmaceutical manufacturers and establishing benefit structures for health insurance plan sponsors (such as co-pay and other price and fee structures for plan members).

56.     For patients whose health plans use CVS Caremark as their PBM, CVS Caremark (together with the health insurance plan sponsor) can effectively steer patients to CVS retail and

---

[7] https://drugchannelsinstitute.com/files/2022-PharmacyPBM-DCI-Overview.pdf (last visited Mar. 7, 2023).

[8] https://www.drugchannels.net/2021/05/dcis-top-15-specialty-pharmacies-of.html (last visited Mar. 7, 2023).

[9] https://www.beckershospitalreview.com/pharmacy/pbms-ranked-by-market-share-cvs-caremark-is-no-1.html (last visited Mar. 7, 2023).

specialty pharmacies by offering benefits to plan members for filling their prescriptions at those pharmacies. For instance, a patient may pay a lower co-pay on prescriptions filled at CVS pharmacies or may be able to fill a prescription for a 90-day supply of medication at a lower cost (rather than the conventional 30-day supply).

57.     This conduct sometimes goes beyond incentivization. For instance, over 200 Blue Cross/Blue Shield of Western New York plans use CVS Caremark as the plan PBM and make CVS Specialty the *exclusive* specialty pharmacy for patients.

3.     CVS Steers Patients to CVS Pharmacies.

58.     In recent years, CVS Caremark's practice of steering patients to CVS pharmacies has become increasingly prevalent and, in many cases, obviously unlawful. In 2014, for health plans for which CVS Caremark was the PBM, CVS specialty pharmacies dispensed nearly 60% of plan members' prescriptions, and CVS retail pharmacies dispensed nearly 40% of plan members' prescriptions.

59.     In 2020, the National Community Pharmacists Association survey identified that nearly 80% of community pharmacists reported that patients had been steered to a CVS pharmacy without the patient's consent. Patients may be told that they are required to use CVS or, because CVS Caremark has access to prescription information, a patient's prescription may simply be transferred to CVS. In some cases, the patient does not even know that the prescription has transferred.

60.     To protect patient choice, and combat the practices of PBMs, many states have enacted legislation expressly prohibiting PBMs from steering patients to pharmacies in which the

PBM has an ownership interest. *See, e.g.*, Minn. Stat. § 62W.07. Between 2019 and 2022, eighteen states passed anti-steering laws.[10]

61.    Defendants have continued to steer patients to CVS pharmacies without any regard to these state provisions. In 2022, the Minnesota Department of Commerce sought a $1.25 million fine against CVS for steering patients in violation of state law.

62.    Often, CVS uses mailings to patients so the patients will go along with the transfer of pharmacy benefits to CVS rather than a provider of the patient's choosing. As one representative example, on January 21, 2023, CVS sent a mailing to one patient stating that CVS Caremark had "determined that filling prescriptions in 90-day supplies at CVS Pharmacy or by mail is the most cost-effective way for you to get the medications you take regularly. This is now required by your plan. If you choose to fill at your current pharmacy or in 30-day supplies, the medications will not be covered and you'll have to pay 100 percent of the cost."

63.    In the context of the 340B program, this kind of patient steering allows CVS to expand the market power of CVS retail and specialty pharmacies. Covered Entities are aware that CVS steers 340B-eligible patients to CVS retail and specialty pharmacies through the design of health insurance plan pharmacy benefits by CVS Caremark.

64.    This creates the bizarre result that Covered Entities, who are supposed to benefit from 340B Savings, cannot steer patients to maximize the benefits intended by the 340B Program while CVS steers patients to CVS pharmacies. This reinforces CVS's market power.

---

[10] *See* https://www.rxbenefits.com/blogs/anti-steering-laws-grew-in-2022/#:~:text=Anti%2Dsteering%20in%20pharmacy%20benefits,%2Downed%20or%20%2Daffiliated%20pharmacy (last visited Mar. 7, 2023).

4864-8400-6982, v. 8

### C.  340B TPAs

65.     Covered Entities contract with TPAs to ensure compliance with the 340B Program requirements. TPAs provide billing software and compliance tools to administer the Covered Entities' participation in the 340B Program. TPAs also determine and confirm the 340B eligibility of prescriptions, maintain records of dispensed drugs, track and replenish inventory at Contract Pharmacies, and calculate the Covered Entity's 340B Savings and coordinate the transfer of those funds. TPA technology works by capturing and monitoring data concerning 340B-eligible prescriptions from both the Covered Entity and its Contract Pharmacies.

66.     TPAs charge Covered Entities a fee for providing TPA services.

67.     There is no close substitute available to Covered Entities for the specialized 340B workflow software and other technology provided by TPAs. This technology is optimized to reconcile data streams from multiple parties to ensure 340B Program compliance. Technology not specifically designed for that purpose cannot, in practice, be adapted for that use. Covered Entities generally purchase these services rather than attempt to have their internal information technology ("IT") department manage these complex issues and data streams.

68.     Covered Entities bear all 340B Program legal compliance risk. 42 U.S.C. § 256(b)(5)(D); 75 Fed. Reg. 10272, 10277. Accordingly, Covered Entities take great care in selecting a TPA, and they have a substantial interest in being able to select a TPA of their choice to ensure the TPA employs strong compliance mechanisms and oversight procedures.

69.     For Covered Entities that work with Contract Pharmacies, most of their 340B-eligible prescriptions are filled at those Contract Pharmacies. This means TPAs manage the bulk of Covered Entities' compliance risk.

70.     In a competitive market, Covered Entities can (and do) consider factors such as quality, price, and audit performance. When CVS is the Contract Pharmacy and requires the

Covered Entity to use Wellpartner as the TPA, the Covered Entity cannot consider such factors or bargain for a competitive price.

71.     Covered Entities also have an interest in carefully choosing their TPA and being able to select a single TPA to manage the data streams from their various Contract Pharmacies. Although it is technologically possible to work with multiple TPAs to manage this data, it is not efficient to do so because the Covered Entity will incur duplicative costs and because using a single TPA makes uniform the flow of information between the Covered Entity and its Contract Pharmacies. Covered Entities using multiple TPAs may not know which TPA is performing a particular function, making compliance more difficult and at greater risk of error.

72.     Before CVS Health acquired Wellpartner in 2017, Wellpartner worked with a variety of Contract Pharmacies on behalf of the Covered Entities that retained it. Those pharmacies included CVS retail and specialty pharmacies, as well as others.

73.     Similarly, before CVS Health acquired Wellpartner in 2017, CVS retail and specialty pharmacies contracted with Covered Entities that worked with a variety of TPAs, including MacroHelix, PSF, RxStrategies, Sentry, Verity Health, and Wellpartner. CVS did not condition access to its pharmacies on the Covered Entity's use of Wellpartner or any particular TPA.

74.     Before acquiring Wellpartner, CVS acted—and intended to continue to act—differently. In 2014, CVS engaged a different TPA (Sentry) to develop a "backbone" product that would provide CVS pharmacies with a single point of integration for the 340B Program. This would streamline pharmacy chain operations, inventory management, and financial reimbursements across all CVS retail and specialty pharmacy relationships with Covered Entities.

75.     Before acquiring Wellpartner, CVS did not contract with more than one Covered Entity per CVS retail location. This internal policy was implemented to facilitate inventory management at CVS retail locations.

76.     The Sentry backbone product was intended to make inventory management and other administrative functions easier so CVS retail locations would be able to contract with more than one Covered Entity, expanding CVS's Contract Pharmacy role in the 340B space. The Sentry backbone product was intended to be interoperable with a number of TPAs.

77.     CVS also had other expansion objectives related to the 340B Program. CVS internally recognized that 340B sales were "estimate[d] . . . at $16.2 billion" in 2016. It intended to "[e]xpand CVS Specialty 340B footprint by contracting 90% of Covered Entities by end of 2018." To capture additional 340B business at its pharmacies, CVS planned to "restructure [its] approach to client enrollment and pricing model" to encourage Covered Entities to use CVS Contract Pharmacies in order to "continue to grow CVS retail relationships." CVS planned to expand its activity related to the 340B Program even absent an acquisition of Wellpartner.

**D.  CVS Acquires Wellpartner and Ties TPA Services to Contract Pharmacy Services**

78.     Instead of using the Sentry "backbone" product CVS had been developing, CVS acquired Wellpartner and implemented a restrictive, anticompetitive tying scheme. CVS did this to extract more 340B Savings from Covered Entities.

79.     After acquiring Wellpartner in 2017, CVS announced that it would require all Covered Entities using CVS as a Contract Pharmacy to also use Wellpartner as their TPA for related 340B compliance services as a condition of using CVS Contract Pharmacies.

80.     This anticompetitive tie put Covered Entities in the position of having to either: (1) forgo 340B Savings for patients who choose to go to CVS; (2) use Wellpartner as their TPA for CVS Contract Pharmacies *and* pay additional fees to *a second* TPA to work with other

20

Contract Pharmacies, without the price, regulatory risk, and other benefits of competition; or (3) use Wellpartner as their sole TPA for all TPA services, with all Contract Pharmacies, without the price, regulatory risk, and other benefits of competition.

E. **Overview and History of Wellpartner**

81.    Wellpartner provided TPA services to some Covered Entities and operated a small number of mail-order pharmacies (approximately 100 as of 2015) before it was acquired by CVS Health in 2017.

82.    Before it was acquired by CVS, Wellpartner charged the Covered Entity a fee for each 340B prescription dispensed. This was the greater of a small flat fee per prescription or a percentage of the difference, or "spread," between the commercial reimbursement for the drug and the drug's 340B Price (i.e., the 340B Savings).

83.    The anticompetitive tie alleged in this case was part of CVS's goal in acquiring Wellpartner from the start. In internal documents, Wellpartner touted the positive strategic and financial impact that would flow to CVS following the Wellpartner acquisition, noting the acquisition would generate "approximately $1.9 billion of incremental revenue with very high margins." Wellpartner anticipated this revenue coming from CVS requiring Covered Entities to contract with Wellpartner as a TPA in order to use CVS Contract Pharmacies.

84.    Wellpartner planned the termination of Covered Entities' contracts with CVS Contract Pharmacies within 90 days after the acquisition, or alternatively, for them to accept that their Contract Pharmacy arrangements would need to be administered by Wellpartner. The requirement to use Wellpartner as the TPA would allow CVS to retain 40% of the Covered Entity's 340B Savings because CVS would both provide TPA services and dispense the medication to the patient. Wellpartner anticipated this to generate an "[i]ncremental revenue

opportunity" of $568 million related to CVS retail pharmacy sales and $1.37 billion related to CVS specialty pharmacy sales.

85.    CVS Health had the same plan in mind. CVS internally recognized that "340B Savings are more important to Covered Entities than ever," and that "[a]ccess to CVS Health retail and specialty pharmacies is critically important to Covered Entities." CVS planned to capture "'Top of the Market' pricing" for Wellpartner TPA services, including taking a percentage "of the 340B spread" as the Wellpartner administrative fee for all 340B-eligible prescriptions. CVS decided that "Wellpartner will evolve to the exclusive 340B TPA for all of CVS Health's retail and specialty pharmacies by December 31, 2018."

86.    CVS knew this would harm Covered Entities. A CVS senior vice president at the time testified that "[t]he hospital industry [is] a low margin business" and that hospitals do not have "big operating margins." He admitted "the 340B savings are . . . important to them to kind of help them continue to execute on their mission." He acknowledged that he had tried to "flag" that "there would be some providers or Covered Entities that might not be happy" about tying Wellpartner TPA services to CVS Contract Pharmacy services.

87.    Wellpartner increased its business significantly after CVS announced the tying arrangement described above. Many Covered Entities *must* have CVS Contract Pharmacies (whether retail, specialty, or both) in order to realize sufficient 340B Savings.

88.    The increase in Wellpartner business did not come from improved offerings by Wellpartner. Instead, it was forced on Covered Entities by the anticompetitive tie described in this Complaint. Many Covered Entities preferred to use other TPAs, but they were no longer left with that choice when working with CVS Contract Pharmacies. They were instead left with a Hobson's choice: accept Wellpartner as their TPA for CVS Contract Pharmacies, at additional

22

expense and increased regulatory risk; or forfeit an even larger share of their 340B Savings by no longer having CVS Contract Pharmacies. Covered Entities lost money and incurred additional regulatory risk as a result of this tie.

89.     Some Covered Entities converted all their TPA business to Wellpartner. Others continued to work with their legacy TPAs for all pharmacies other than CVS, despite the additional cost, administrative burden, and regulatory risk of working with two TPAs. As alleged above, working with multiple TPAs places Covered Entities at a higher risk of noncompliance with the requirements of the 340B Program. It also increases their internal IT costs, since they must have staff trained to interface with two different TPA technology platforms, maintain computer infrastructure sufficient to handle data exchanges with two TPAs, and have an in-house team capable of managing two TPA relationships.

90.     The Wellpartner TPA fees were higher for some Covered Entities than the fees charged by their legacy TPAs. Many competitor TPAs charge fees based on utilization (e.g., per prescription processed by the TPA). By contrast, the Wellpartner fees for all but the least expensive prescriptions are typically based on a percentage of the 340B Savings. This resulted in the transfer of a substantial amount of 340B Savings from Covered Entities to CVS—savings that are critical to their public health missions, including providing and expanding healthcare for underserved communities and populations.

### F.  Market Definitions

91.     The relevant markets at issue in this action are the CVS Contract Pharmacy Market and the TPA Services Market.

1.     The CVS Contract Pharmacy Market

92.     CVS's provision of Contract Pharmacy services to Covered Entities (the "CVS Contract Pharmacy Market") is a relevant market. This is the "tying" market over which CVS has market power.

93.     The 340B Program is unique in how it operates, which impacts the economic reality and appropriate definition of the relevant market.

94.     Covered Entities are not permitted to steer patients to, or away from, any particular pharmacy to fill 340B-eligible prescriptions. Patients receive no direct benefit from the 340B Program, and they generally do not even know that it exists. Patients pay no more or less depending on whether it is 340B-eligible, nor does the pharmacy's participation as a Contract Pharmacy or the fees it charges to the Covered Entity impact the price paid by the patient. As a result, patients choose where to fill their prescriptions based on other factors that matter to them, such as location and convenience.

95.     A Covered Entity cannot substitute one Contract Pharmacy for another in response to a price increase. As a result, each Contract Pharmacy (such as CVS) that provides substantial savings to a Covered Entity is its own relevant market.

96.     Other Contract Pharmacies are not reasonably interchangeable with CVS Contract Pharmacies for Covered Entities. Covered Entities know where their patients fill their 340B-eligible prescriptions, but the Covered Entities and prescribing physicians cannot steer those patients to fill their prescriptions at any particular pharmacy. If a Covered Entity does not contract with CVS as a Contract Pharmacy, it will not obtain *any* of the 340B Savings generated at that pharmacy that it otherwise would. The Covered Entity has no alternative but to engage with CVS as a Contract Pharmacy or else forgo those 340B savings.

24

97.     The cross-elasticity of demand for CVS 340B Contract Pharmacy services and any potential alternative Contract Pharmacy is zero. There are no substitutes (i.e., potential alternative Contract Pharmacies to which Covered Entities could instead direct this business because of supracompetitive prices or for any other reason). No other retail or specialty pharmacy offering Contract Pharmacy services to Covered Entities can competitively constrain CVS. Because Covered Entities cannot direct patient flow elsewhere, CVS has market power in the CVS Contract Pharmacy Market.

98.     The behavior of Covered Entities demonstrates CVS's market power. After CVS implemented the tie, many Covered Entities began using Wellpartner for TPA services, even though they did not want to. As one CVS official noted, "some provider groups . . . were not overjoyed with having to move" to Wellpartner.

99.     The geographic scope of the CVS Contract Pharmacy Market is the United States. CVS retail and specialty pharmacies nationwide can serve as Contract Pharmacies to Covered Entities located in the United States.

### 2.     The TPA Services Market

100.    The provision of TPA services to Covered Entities (the "TPA Services Market") is a relevant market. This is the "tied" market into which CVS is expanding and demanding supracompetitive fees by using its leverage in the tying market.

101.    The geographic scope of the TPA Services Market is the United States. Firms in the TPA Services Market do business with both Covered Entities and Contract Pharmacies across the country, and Covered Entities engage firms nationwide to provide TPA services.

### G.  CVS Illegally Ties TPA Services to Its Contract Pharmacy Services

102.    TPA services and Contract Pharmacy services are separate products in separate markets. Firms offering TPA services are generally distinct from the firms offering Contract

Pharmacy services, and Covered Entities have the ability to choose between TPAs—unless forced to do otherwise, as they now are by CVS. Covered Entities do not typically seek to purchase these two products from the same firm. Rather, they typically prefer to have a TPA that does not operate Contract Pharmacies, as having an independent TPA means the TPA is more likely to effectively advocate on the Covered Entity's behalf in its dealings with Contract Pharmacies.

103.    Since approximately 2018 and continuing through the present, CVS has tied access to the CVS Contract Pharmacy Market to Covered Entities' agreement to hire CVS's subsidiary, Wellpartner, in the independent TPA Services Market.

104.    By coercing Covered Entities to use CVS's own TPA services (the tied services) as a condition of accessing CVS Contract Pharmacy services (the tying services), CVS has effected a per se unlawful tying arrangement. The challenged tying arrangement also violates the rule-of-reason standard applied in certain antitrust cases.

105.    CVS's tying arrangement harmed, and continues to harm, competition. The tie has foreclosed other TPAs from competing to provide TPA services to Covered Entities using CVS Contract Pharmacies.

106.    The tie has had significant spillover effects on competition. Because Covered Entities often prefer to work with a single TPA, and because only Wellpartner can administer CVS Contract Pharmacy relationships, TPAs other than Wellpartner cannot compete for the entirety of a Covered Entity's Contract Pharmacy book of business if the Covered Entity engages CVS pharmacies as Contract Pharmacies.

107.    CVS's tying arrangement has affected a substantial volume of commerce in the TPA Services Market. Hundreds of Covered Entities have abandoned their legacy TPA and have

26

begun contracting with CVS for TPA services as a result of the tie. Covered Entities are harmed as they were forced to pay supracompetitive prices to CVS for a service they very well may have preferred to purchase from an independent third party. They also faced increased costs from being forced to switch to CVS's Wellpartner or to pay two TPAs.

108.    There is no valid procompetitive justification for CVS's implementation of this tie. CVS acquired Wellpartner and implemented the tying arrangement in order to collect a greater share of Covered Entities' 340B Savings than it could in a competitive marketplace.

## V.    INTERSTATE TRADE AND COMMERCE

109.    Billions of dollars of transactions in 340B sales are entered into each year. The parties to those transactions, such as CVS, operate nationwide or in several states. TPA services agreements are often multi-state or nationwide agreements.

110.    CVS's manipulation of the market had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

111.    CVS intentionally targeted its unlawful conduct to affect commerce, including interstate commerce within the United States, by tying Wellpartner TPA services to CVS Contract Pharmacy services nationwide.

112.    CVS's conduct has a substantial and adverse effect on interstate commerce.

## VI.    PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

113.    Defendants' anticompetitive tie had the following effects, among others:

  (a) Price competition for the provision of TPA services at CVS Contract Pharmacies has been restrained or eliminated;

  (b) Non-price competition for the provision of TPA services at CVS Contract Pharmacies has been restrained or foreclosed;

  (c) Covered Entities contracting with CVS Contract Pharmacies paid supracompetitive prices for TPA services during the Class Period; and

(d) Covered Entities contracting with CVS Contract Pharmacies suffered non-price injury when obtaining TPA services during the Class Period, including loss of choice and increased regulatory risk.

114. The purpose of CVS's conduct was to exclude competition and collect monopoly rents for the provision of TPA services at CVS Contract Pharmacies.

115. The precise amount of the overcharge impacting the price of CVS's provision of TPA services at CVS Contract Pharmacies during the Class Period can be measured and quantified using well-accepted models used by economists or econometricians.

116. By reason of the alleged violations of the antitrust laws, Plaintiff and Class members have sustained injury to their businesses or property, as described above, which they would not have suffered but for the tying arrangement described herein. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.   CLASS ACTION ALLEGATIONS

117. Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of the proposed Class defined as follows:

> All Covered Entities that directly purchased TPA services from Defendants during the Class Period.
>
> Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates.

118. The Class is so numerous that joinder of all members would be impracticable. While Plaintiff does not know the exact number of Class members, publicly available data from HRSA suggests that there are thousands of Class members.

119. Common questions of law and fact exist as to all Class members. Defendants' conduct was generally applicable to all Class members, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)  Whether Defendants own and operate CVS Contract Pharmacies;

(b)  Whether Defendants own and operate Wellpartner's TPA operations;

(c)  Whether Defendants possess market power in the CVS Contract Pharmacy Market;

(d)  Whether the CVS Contract Pharmacy Market exists and is correctly defined;

(e)  Whether the TPA Services Market exists and is correctly defined;

(f)  Whether those are distinct markets;

(g)  Whether Defendants tied TPA services to CVS Contract Pharmacy services;

(h)  Whether Defendants coerced Covered Entities to buy their own TPA services in order to purchase CVS Contract Pharmacy services;

(i)  Whether Defendants' conduct substantially and adversely affected interstate commerce;

(j)  Whether Defendants' conduct violated the federal antitrust laws;

(k)  Whether Defendants' conduct caused Class members to pay supracompetitive prices or to suffer non-price injury;

(l)  The appropriate relief for the Classes, including any equitable relief.

120.    Plaintiff's claims are typical of the claims of the absent Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class that Plaintiff seeks to represent were similarly affected by Defendants' wrongful conduct in that they paid supracompetitive prices for Wellpartner TPA services and suffered a loss of choice in selecting a TPA as the result of Defendants' conduct.

121.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class members that Plaintiff seeks to represent. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class that Plaintiff

seeks to represent. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust, class action, and healthcare-related litigation.

122.    The questions of law and fact common to the Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

123.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Among other things, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

124.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VIII.   CAUSES OF ACTION

### COUNT I

**Illegal Tying Arrangement in Violation of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14**

125.    Plaintiff incorporates the allegations set forth in the above numbered paragraphs as if fully set forth herein.

126.    There are a separate and distinct CVS Contract Pharmacy Market and TPA Services Market.

127.   Throughout the Class Period, CVS possessed market power in the CVS Contract Pharmacy Market.

128.   Throughout the Class Period, CVS tied Wellpartner TPA services to CVS's Contract Pharmacy Services. CVS coerced Covered Entities such as Plaintiff and Class members to purchase its own Wellpartner TPA services in order to participate in the CVS Contract Pharmacy Market.

129.   CVS's tying arrangement affected a substantial volume of commerce in the TPA Services Market.

130.   As a result of CVS's conduct, Plaintiff and Class members paid supracompetitive prices for Wellpartner TPA services during the Class Period. Plaintiff and Class members also suffered non-price injury in the loss of their ability to choose a preferred TPA and the increased regulatory risk that accompanied loss of that control.

131.   CVS's conduct in implementing this tying arrangement is a per se violation of Section 1 of the Sherman Antitrust Act. It also violates the rule-of-reason standard, to the extent that standard applies.

132.   CVS's conduct in implementing this tying arrangement unreasonably restrains trade and lessens competition, in violation of Section 2 of the Sherman Antitrust Act and Section 3 of the Clayton Act.

## IX.   PRAYER FOR RELIEF

Plaintiff demands judgment against Defendants as follows:

A.   The Court determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3), appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that at a practical time notice of this action be given to the Class.

B.   Judgment that Defendants' conduct constitutes violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14;

C.   Plaintiff and the Class recover damages to the maximum amount allowed under the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled under the antitrust laws;

D.   Plaintiff recover reasonable attorneys' fees and costs as allowed by law;

E.   Plaintiff recover pre-judgment and post-judgment interest at the highest rate allowed by law; and

F.   Plaintiff and the Class be granted such other and further relief as the Court deems just and proper.

## X.   JURY DEMAND

Plaintiff demands a trial by jury as to all matters so triable.

Respectfully submitted,

Dated: April 17, 2023

*/s/ Roberta D. Liebenberg*
Roberta D. Liebenberg, PA I.D. No. 31738
Adam J. Pessin, PA I.D. No. 92325
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Telephone: (215) 567-6565
Facsimile: (215) 568-5872
rliebenberg@finekaplan.com
apessin@finekaplan.com

W. Joseph Bruckner (*pro hac vice* forthcoming)
David W. Asp (*pro hac vice* forthcoming)
Kristen G. Marttila (*pro hac vice* forthcoming)
Joseph C. Bourne (*pro hac vice* forthcoming)
Derek C. Waller (*pro hac vice* forthcoming)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401

4864-8400-6982, v. 8

Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
dwasp@locklaw.com
kgmarttila@locklaw.com
jcboune@locklaw.com
dcwaller@locklaw.com

Marco Cercone (*pro hac vice* forthcoming)
Arthur N. Bailey (*pro hac vice* forthcoming)
**RUPP PFALZGRAF LLC**
111 West 2nd Street, Suite 1100
Jamestown, NY 14701
(716) 854-3400
cercone@RuppPfalzgraf.com
bailey@RuppPfalzgraf.com

*Counsel for Plaintiff and the Proposed Class*