# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRANDYWINE HOSPITAL, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:23-cv-1458-MRP |
| ) | **ORAL ARGUMENT** |
| CVS HEALTH CORPORATION, CVS ) | **REQUESTED** |
| PHARMACY, INC., CVS SPECIALTY,[1] ) | |
| INC., and WELLPARTNER, LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

---

[1] Today, the parties filed an Agreed Motion Regarding Substitution of CVS Specialty, Inc. for Caremark, L.L.C.  *See* ECF No. 17.  As part of that Motion, the parties agreed that "[a]ll references in the Complaint to CVS Specialty, Inc. shall be construed as references to Caremark, L.L.C."  *Id.* at 2.

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

    A.    Factual Background ...............................................................................................3

    B.    Brandywine Hospital's Participation in 340B ......................................................5

    C.    The Complaint .......................................................................................................5

    D.    NYAG Dismissal ...................................................................................................7

ARGUMENT ........................................................................................................................7

I.      Plaintiff Fails To Allege a Claim for Unlawful Tying........................................................7

    A.    Plaintiff Must Allege Market Power in a Valid Tying Product Market .................8

    B.    Plaintiff Fails To Allege a Proper Tying Product Market in Which CVS
           Has Market Power.................................................................................................10

           1.    Plaintiff's Alleged Market Fails as a Matter of Law Because It
                 Omits All Substitutes for CVS.....................................................................10

           2.    So-Called "Anti-Steering" Provisions Do Not Save Plaintiff's
                 Legally Deficient Market .............................................................................13

    C.    The Complaint Fails To Allege a Proper Relevant Geographic Market for
           the Tying Product.................................................................................................16

    D.    The Complaint Fails To Allege Market-Wide Anticompetitive Impact in
           the Tied Product Market ......................................................................................17

II.     Plaintiff Cannot Bring a Clayton Act Claim Based on the Sale of Services ....................20

III.    The Claims Against CVS Health Should Be Dismissed....................................................21

    A.    The Court Lacks Personal Jurisdiction over CVS Health....................................21

           1.    CVS Health Is Not Subject to General Jurisdiction in Pennsylvania ........22

           2.    CVS Health Is Not Subject to Specific Jurisdiction in Pennsylvania........23

           3.    CVS Health's Relationship with CVS Pharmacy, Wellpartner, and
                 Caremark Does Not Create Personal Jurisdiction.......................................23

    B.    The Complaint Fails To State a Claim Against CVS Health................................24

CONCLUSION....................................................................................................................25

**TABLE OF AUTHORITIES**

**CASES**

*Action Mfg. Co. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411 (E.D. Pa. 2005)............................24

*Andela v. Am. Ass'n for Cancer Rsch.*, 389 F. App'x 137 (3d Cir. 2010) (per curiam)...............16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .........................................................................................7

*Atl. Exposition Servs. Inc. v. SMG*, 262 F. App'x 449 (3d Cir. 2008)..........................................16

*Bass v. Howard*, 2020 WL 1332007 (D.N.J. Mar. 23, 2020) ........................................................25

*Bays v. Walmart Inc.*, 2022 WL 1297097 (S.D.W. Va. Apr. 29, 2022) .........................................5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................................7

*BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402 (2017) ....................................................................22, 23

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998)................ *passim*

*Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc.*, 2017 WL 4685359 (M.D. Pa. Oct. 18, 2017) ...........................................................................................................18

*Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817 (D.S.C. 2015)................................................21

*Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008).............................................12

*Church Ekklasia Sozo Inc. v. CVS Health Corp.*, 2022 WL 1572732 (W.D.N.C. Feb. 25, 2022) .............................................................................................................................21

*Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 696 F. Supp. 97 (D. Del. 1988) .............................................................................................................................14

*Commodity Futures Trading Comm'n v. Worldwide Commodity Corp.*, 366 F. Supp. 2d 276 (E.D. Pa. 2005).................................................................................................21

*Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970 (N.D. Cal. 2016)........................................21

*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005).............................................22

*Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399 (3d Cir. 2016) .................17, 18

*Dibidale of La., Inc. v. Am. Bank & Tr. Co.*, 916 F.2d 300 (5th Cir. 1990) .................................20

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir. 1984) .........................12

*Eichorn v. AT & T Corp.*, 248 F.3d 131 (3d Cir. 2001)...........................................................17, 18

ii

*Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971 (7th Cir. 1999)....................................15

*Greene Cnty. Mem'l Park v. Behm Funeral Homes, Inc.*, 797 F. Supp. 1276 (W.D. Pa. 1992) .....................................................................................................................20

*GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000).......................22

*Hanson v. Denckla*, 357 U.S. 235 (1958) ...............................................................23

*Holcomb v. Care One LLC*, 2022 WL 4300209 (D.N.J. Sept. 19, 2022)...............................25

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 516 F. Supp. 2d 324 (D. Del. 2007) .....................................................................................................................22

*Ill. Tool Works Inc. v. Ind. Ink, Inc.*, 547 U.S. 28 (2006) ...........................................8, 9

*In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288 (3d Cir. 2004)................................22

*In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403 (S.D.N.Y. 2005)...................18, 20

*In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016) ...................................25

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ......................................8, 11, 18, 20

*Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016) ..............................................9

*Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290 (3d Cir. 2008) ...........................................23

*Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677 (D. Del. 2013) ...................................19

*KM Enters., Inc. v. Global Traffic Techs., Inc.*, 725 F.3d 718 (7th Cir. 2013).............................22

*Kraus v. Alcatel-Lucent*, 441 F. Supp. 3d 68 (E.D. Pa. 2020) ...........................................22

*Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465 (S.D.N.Y. 2001) ...................................16

*Med. Diagnostic Lab'ys, LLC v. Indep. Blue Cross*, 2017 WL 3776619 (E.D. Pa. Aug. 30, 2017) .....................................................................................................................16

*Neff v. PKS Holdings, LLC*, 2019 WL 3729568 (E.D. Pa. Aug. 8, 2019) ...................................24

*New York v. CVS Pharmacy, Inc.*, No. 45197/2022 (N.Y. Sup. Ct. Mar. 14, 2023) ............ *passim*

*O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312 (3d Cir. 2007)...........................................21, 23

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ....................................................9

*Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248 (3d Cir. 1984)...................................16

*Park v. Temple Univ.*, 757 F. App'x 102 (3d Cir. 2018) ..............................................25

*Patterson by Patterson v. FBI*, 893 F.2d 595 (3d Cir. 1990).........................................21

*Pennsylvania v. NCAA*, 948 F. Supp. 2d 416 (M.D. Pa. 2013) ....................................18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) .................... *passim*

*Radio Music License Comm., Inc. v. Glob. Music Rts., LLC*, 2017 WL 8682117 (E.D. Pa. Nov. 29, 2017) ..........................................................................................................22

*Skepton v. Bucks County*, 613 F. Supp. 1013 (E.D. Pa. 1985).....................................20

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57 (1st Cir. 2004) ..............................................................................................................19

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961).......................................16

*Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059 (9th Cir. 2001) .........................................12

*Tashjian v. CVS Pharmacy, Inc.*, 2020 WL 1931859 (D. Mass. Mar. 13, 2020) ........................21

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468 (3d Cir. 1992)....9, 12, 18, 19

*Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir. 1991) ..............................9, 10, 17

*United States v. Kindred Healthcare, Inc.*, 517 F. Supp. 3d 367 (E.D. Pa. 2021)........................11

*Wendkos v. ABC Consol. Corp.*, 379 F. Supp. 15 (E.D. Pa. 1974)................................20

## STATUTES AND RULES

15 U.S.C. § 1...................................................................................................7

15 U.S.C. § 2...................................................................................................7

15 U.S.C. § 14.................................................................................................7

15 U.S.C. § 22.............................................................................................22, 24

Fed. R. Civ. P. 4(k).....................................................................................21, 24

Fed. R. Civ. P. 8..............................................................................................24

Fed. R. Civ. P. 12(b)(2)....................................................................................21

Fed. R. Civ. P. 12(b)(6)....................................................................................21

75 Fed. Reg. 10,272, 10278 (2010) ...........................................................................13

42 Pa. Cons. Stat. § 5301 ........................................................................................22

**OTHER AUTHORITIES**

Katherine Richardson, *The Bridge to 340B Comprehensive Pharmacy Services Solutions in Underserved Populations* (2004)........................................................................13

Health Res. & Servs. Admin. (HRSA), Office of Pharmacy Affairs 340B Data, Nov. 30, 2017 (current data available at https://340bopais.hrsa.gov/) ...................................10

**INTRODUCTION**

This putative class action lawsuit is nearly identical to a recent case brought in New York Supreme Court by the New York Attorney General ("NYAG"). The Supreme Court dismissed that case at the pleading stage, for reasons that apply equally here. This Court should do likewise.

Both lawsuits center on the federal 340B Prescription Drug Program, which allows certain healthcare providers ("Covered Entities") to purchase prescription drugs at discounted prices. Covered Entities may contract with participating pharmacies—such as Walgreens, Rite Aid, CVS, or numerous other chain and independent pharmacies ("Contract Pharmacies")—to dispense those drugs to their patients. Contract Pharmacies operate a number of models to handle the administrative services necessary to process 340B-eligible prescriptions. Walgreens—the largest 340B pharmacy in the country—uses an integrated model that requires Covered Entities to use its 340B administrative services when contracting with Walgreens pharmacies. Similarly, since November 2017, CVS Pharmacy has required Covered Entities to use its affiliate, Wellpartner, LLC, for 340B administrative services at CVS Pharmacy locations. Other Contract Pharmacies lack in-house 340B administrative services, and Covered Entities contract with third parties to provide them.

Plaintiff Brandywine Hospital was a Covered Entity that contracted with several Contract Pharmacies before its closure in January 2022. Plaintiff alleges Defendants CVS Health Corp., CVS Pharmacy, Inc., Caremark, L.L.C., and Wellpartner, LLC (which the Complaint lumps together as "Defendants" or "CVS") violated the antitrust laws by "tying" Wellpartner's 340B administrative services to CVS's 340B pharmacy services. To support this claim, Plaintiff alleges CVS pharmacies face no competition from other Contract Pharmacies that provide exactly the same services (even market-leader Walgreens); instead, Plaintiff asserts, CVS is a monopolist in a single-brand product market made up ***only*** of CVS Pharmacies. Plaintiff claims that, as a result, Covered Entities have no option but to purchase administrative services from Wellpartner.

1

Plaintiff's Complaint fails as a matter of law to state a claim under either the Sherman Act or the Clayton Act for several independent reasons justifying dismissal.

*First*, as an element of any tying claim, Plaintiff was required to plausibly define a relevant "tying" product market in which CVS possessed market power.[2] It has not done so. Instead, Plaintiff takes the remarkable position that ***every pharmacy*** (from Walgreens to an independent, mom-and-pop, neighborhood pharmacy) has ***nationwide monopoly power***. The New York Supreme Court rejected the NYAG's nearly identical case at the pleading stage on precisely this basis. Ex. 1, Decision and Order on Motion, *New York v. CVS Pharmacy, Inc.*, No. 45197/2022 (N.Y. Sup. Ct. Mar. 14, 2023) ("NYAG Dismissal"). In dismissing these claims, the Supreme Court held "that a covered entity may obtain its 340B savings from any pharmacy willing and able to serve as a contract pharmacy," that the vast majority of Covered Entities did not contract with CVS at all, and that NYAG's gerrymandered market definition limited to CVS pharmacy locations—the same one used by Plaintiff here—failed as a matter of law, because it "cannot be reconciled with the commercial realities on the ground." *Id.* at 52, 59-60; *see generally id.* at 52-60.

*Second*, and independently, Plaintiff's assertion that the geographical scope of the tying product market is nationwide is contradicted by Plaintiff's own allegations, which state that it is pharmacies closest to a Covered Entity's patients that offer the prospect of 340B benefits.

*Third*, Plaintiff fails to allege another element of a tying claim: market-wide harm in the "tied" product market (here, the market for 340B administrative services). Instead Plaintiff asserts harm only to the sliver of 340B administrative services that pertain to CVS pharmacy locations.

*Fourth*, the Clayton Act claim should be dismissed because CVS's 340B services are not

---

[2] In a tying claim, the "tying" product is what customers wish to buy; the "tied" product is what they allegedly must take along with it. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997) (citation omitted).

"commodities," and therefore fall outside the ambit of the Act.

**Finally**, irrespective of any other issue, all claims against Defendant CVS Health Corp. ("CVS Health") should be dismissed because the Court lacks personal jurisdiction as to that entity and Plaintiff fails to plausibly allege any conduct on the part of CVS Health.

These deficiencies doom the Complaint and necessitate dismissal with prejudice.

## BACKGROUND[3]

Over five years ago, CVS Pharmacy made a change in the way it worked with Covered Entities to maximize the 340B savings they received. Through its acquisition of Wellpartner, CVS Pharmacy adopted an integrated model through which Covered Entities could realize the financial and regulatory benefits of consolidating 340B-administration services for CVS Pharmacies. In doing so, CVS joined the likes of Walgreens other pharmacies that have realized the considerable benefits of joining forces with 340B administrators in similar arrangements. By adopting this model, CVS Pharmacy eliminated compliance risks that had prevented Covered Entities from realizing greater savings; expanded access to pharmacies; and added hundreds of millions of dollars in 340B savings to the coffers of the Covered Entities on whose behalf Plaintiff purports to sue.

Plaintiff Brandywine Hospital ignores these benefits, and instead implies this policy has somehow led to its demise (even though Brandywine did not contract with CVS until just months before its closure). But a full understanding of Plaintiff's allegations and the pertinent legal principles demonstrates that Plaintiff's lawsuit is misguided and compels dismissal.

### A.    Factual Background

The federal 340B Drug Pricing Program allows eligible providers—hospitals and health

---

[3] Well-pled allegations in the Complaint are assumed to be true solely for the purposes of this Motion; facts discussed in the Introduction and Background that are not taken from the Complaint are for context; the legal arguments in this Motion do not rely upon them.

clinics for underserved populations known as "Covered Entities"—to buy prescription drugs from manufacturers at discounted prices. Compl. ¶¶ 6-7. When a 340B drug is dispensed, the patient's insurance company pays for the drug according to its usual pricing. Compl. ¶ 35. The Covered Entity receives the difference between the insurer-paid drug price and the 340B drug price (minus administration and dispensing costs), often called "340B savings." Compl. ¶¶ 6-7, 35. Covered Entities may enter into contracts with Contract Pharmacies and 340B administrators (which the Complaint calls "third-party administrators," or "TPAs") to provide services, such as identifying 340B-eligible prescriptions and managing 340B drug inventories. Compl. ¶¶ 7-9, 47, 65.

In November 2017, CVS Pharmacy acquired Wellpartner and announced that the companies would offer contract-pharmacy and 340B-administration services on an integrated basis for CVS contract pharmacy locations. Compl. ¶ 79. Because of the administrative and inventory burdens on Contract Pharmacies, a number of different pharmacy-administrator models have become common in the industry. For example, Walgreens, the nation's largest pharmacy chain, uses an integrated model; other pharmacies have exclusive or preferred relationships with a single administrator. *See* https://www.walgreens.com/businesssolutions/payer/340BComplete.jsp. Covered Entities and Contract Pharmacies face considerable compliance risks under the complex 340B program requirements, so they often turn to 340B program administrators to help navigate the regulatory thicket and manage 340B drug inventory. Compl. ¶¶ 40-44. Integrated models offer Covered Entities a "one-stop shop" to access Contract Pharmacies and compliance procedures.

CVS adopted the integrated model because it offers exceptional benefits to Covered Entities, including the potential for dramatically increased 340B savings through expanded access to CVS pharmacy locations. *See* Compl. ¶ 75.[4] As the Complaint concedes, the integrated model

_____

[4] Before adopting the integrated model, CVS Pharmacy was effectively unable to offer contract

4

applies only to CVS pharmacy locations—Covered Entities remain free to obtain contract pharmacy services from other pharmacies using other 340B administrators.  Compl. ¶¶ 26, 89.

## B.    Brandywine Hospital's Participation in 340B

Plaintiff was a Covered Entity located in Coatesville, Pennsylvania until it closed in 2022. Compl. ¶ 26.  While the Complaint alleges that Plaintiff contracted with CVS for 340B savings "between 2016 and 2022," *id.*, the government-maintained public database of all contract pharmacy relationships in the United States (data upon which the Complaint itself relies, Compl. ¶ 118), reveals that is untrue.  In fact, despite alleging that CVS is a "must have" 340B pharmacy, and that Covered Entities "must contract with CVS Specialty as a Contract Pharmacy," Compl. ¶¶ 53, 87, Brandywine itself did not even begin to contract with CVS until ***April 2021***, and it ***never*** had a contract pharmacy relationship with any CVS specialty pharmacy.  Ex. 2, *DSH390076 Brandywine Hospital (Terminated)*, Health Res. & Servs. Admin. (HRSA), Office of Pharmacy Affairs 340B OPAIS, at https://340bopais.hrsa.gov/cedetails/77649 ("Contract Pharmacies" tab).

## C.    The Complaint

Although it has been more than five years since the Federal Trade Commission cleared CVS Pharmacy's acquisition of Wellpartner and CVS adopted its integrated model in November 2017, Compl. ¶ 79, Plaintiff did not file this Complaint until April 2023.  The Complaint asserts a

---

pharmacy services to more than one Covered Entity per store (and therefore unable to offer the savings those services would generate for the remaining Covered Entities) due to the compliance risks associated with doing so.  *See* Compl. ¶ 75.  While the Complaint severely downplays the compliance risks for pharmacies participating in the 340B program, *see Bays v. Walmart Inc.*, 2022 WL 1297097 (S.D.W. Va. Apr. 29, 2022) (lawsuit against pharmacy for data breach by TPA), it is undisputed that CVS Pharmacy routinely refused Covered Entity requests to contract with CVS pharmacy locations before the Wellpartner acquisition.  The integrated model cured that problem, enabling CVS pharmacies to contract with any number of Covered Entities (and, conversely, increasing the number of CVS pharmacies with whom many Covered Entities could contract), in many instances increasing the Covered Entities' 340B savings manifold.

single cause of action under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act: a purportedly anticompetitive "tie" of 340B-administration services to CVS's 340B contract-pharmacy services. Compl. ¶¶ 125-132.

The Complaint asserts—as it must, under controlling law—that "CVS possessed market power" in the "tying" product market. Compl. ¶ 127. But the "tying market" that Plaintiff alleges—"the CVS Contract Pharmacy Market," Compl. ¶ 127—is gerrymandered to exclude the vast majority of Contract Pharmacies offering 340B services: those not operated by CVS. To arrive at this crabbed market definition, the Complaint asserts, incredibly, that every Contract Pharmacy in America is a monopolist in "its own relevant market." Compl. ¶ 95.

The Complaint further asserts that this market for 340B pharmacy services is nationwide in scope. Compl. ¶ 99. That is, while Plaintiff alleges elsewhere that covered entities' "patients choose where to fill their prescriptions based on . . . location and convenience," Compl. ¶ 94, Plaintiff claims that from the perspective of a Covered Entity in Philadelphia, the Walgreens pharmacy located a block away on the one hand is a monopolist, not reasonably interchangeable with any other pharmacy, *see* Compl. ¶¶ 95-96, yet on the other hand somehow is equally convenient to that Covered Entity as a Rite Aid located in, say, Honolulu, Hawaii, *see* Compl. ¶ 99.

Finally, the Complaint asserts there is a separate tied product market for "TPA Services," that is not limited to CVS, since "firms in the TPA Services Market do business with both Covered Entities and Contract Pharmacies across the country." Compl. ¶¶ 100-101. But Plaintiff does not allege market-wide harm to ***that*** market, as required. Rather, in alleging harm to competition, the Complaint narrows its focus, stating only that "the tie has foreclosed other TPAs from competing to provide ***TPA services to Covered Entities using CVS Contract Pharmacies***." Compl. ¶ 105.[5]

---

[5] All emphases herein are supplied unless otherwise noted.

**D.     NYAG Dismissal**

As discussed above, prior to Plaintiff's Complaint, NYAG filed a materially identical claim under New York's antitrust laws (which are interpreted consistently with federal antitrust law).  In fact, much of Plaintiff's Complaint reproduces exactly the same language, and makes the same allegations, as the NYAG complaint.  Ex. 3 ("NYAG Compl.").  In March 2023, the New York Supreme Court dismissed that complaint, holding that NYAG's proposed single-brand product market limited to only CVS Pharmacies—the same product market alleged by Plaintiff here— "cannot be reconciled with the commercial realities on the ground."  Ex. 1 at 59-60.[6]

## ARGUMENT

Plaintiff must plausibly allege each element of its tying claim, including defining the relevant markets.  *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).  To survive dismissal, a complaint must "'state a claim to relief that is plausible on its face'" and contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This Complaint fails to do so in several respects.

## I.     Plaintiff Fails To Allege a Claim for Unlawful Tying

Plaintiff's claim that CVS engaged in an "illegal tying arrangement in violation of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14," Compl. ¶¶ 125-132, is deficient for numerous, independent reasons, each of which requires dismissal.  First, Plaintiff fails to credibly allege a single brand market consisting of CVS's contract pharmacy services.  Second, Plaintiff fails to plausibly allege that the market for an inherently local product (Contract Pharmacies) is nationwide in scope.  Third, Plaintiff fails to allege

---

[6] NYAG has filed a notice of appeal.

anticompetitive harm to the "tied" product market as a whole, as required for a tying claim. For each of these independent reasons, the Court should dismiss the tying claim.

### A.    Plaintiff Must Allege Market Power in a Valid Tying Product Market

"Tying" occurs when a seller conditions sales of a product (the "tying" product) upon customers' purchase of another, separate product (the "tied" product). *See Queen City Pizza*, 124 F.3d at 442. A tying arrangement cannot be condemned unless a "defendant seller . . . sell[s] two distinct products," "the seller . . . possess[es] market power in the tying product market," "a substantial amount of interstate commerce [is] affected," and the tie "'unreasonably restrain[s] competition'" by foreclosing a substantial portion of the tied product market. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 512-13, 519 (3d Cir. 1998) (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984)).

"Many tying arrangements . . . are fully consistent with a free, competitive market." *Ill. Tool Works Inc. v. Ind. Ink, Inc.*, 547 U.S. 28, 45 (2006); *see also Jefferson Parish*, 466 U.S. at 12 ("Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act."). Tying is commonplace in the economy, as "[a]ll but the simplest products can be broken down into two or more components that are 'tied together' in the final sale." *Jefferson Parish*, 466 U.S. at 39 (O'Connor, J., concurring). Thus, it is not "illegal to sell cars with engines or cameras with lenses." *Id.* Tying can be unlawful only where a seller has "sufficient power in the tying product market to restrain competition in the market for the tied product." *Ill. Tool Works*, 547 U.S. at 36.

As a result, "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Id.* at 46. A defendant that lacks market power in the tying product market cannot coerce customers into purchasing the tied product, and thus cannot harm competition. *See, e.g.*, *Queen City Pizza*, 124 F.3d at 442-43 ("[T]he antitrust concern

over tying arrangements is limited to those situations in which the seller can exploit its power in the market for the tying product to force buyers to purchase the tied product when they otherwise would not, thereby restraining competition in the tied product market.") (citation omitted). Put differently, a tie cannot violate the antitrust laws if customers have reasonable substitutes for the alleged tying product. "Without the leverage of market power, a seller's inefficient tie-in will fail because a rational consumer will buy the tying product from the seller's competitor." *Kaufman v. Time Warner*, 836 F.3d 137, 143 (2d Cir. 2016). As applied here, if CVS's integrated 340B services improve quality and grow savings compared to the separate services, Covered Entities will choose CVS; otherwise, they will choose its competitors.

Properly alleging market power over the tying product of course requires the plaintiff to properly *define* the tying product market. *Queen City Pizza*, 124 F.3d at 436, 443. To do so, the plaintiff must first define a relevant product market containing all products "reasonably interchangeable by consumers for the same purposes." *Tunis Bros. Co., Inc. v. Ford Motor Co*., 952 F.2d 715, 722 (3d Cir. 1991) (citation omitted). Second, the plaintiff must define a relevant geographic market "in which a potential buyer may rationally look for the goods or services he or she seeks." *Id.* (citation omitted). This requirement to properly define a relevant market is a requirement for both rule-of-reason and *per se* claims. *See Brokerage Concepts*, 140 F.3d at 513, 519.[7] "[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018).

---

[7] To the extent *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992), could be read to suggest a tying arrangement could, in certain cases, violate the rule of reason without market power in the tying product market, *id*. at 482-83, the Supreme Court has since foreclosed that possibility, *Ill. Tool Works*, 547 U.S. at 46. Indeed, the *Town Sound* court suggested that the market power requirement may be "sounder as a matter of economics" and "the direction in which the Supreme Court is heading," but said it felt compelled by its reading of what was, at the time, "still-binding precedent" from the Supreme Court. 959 F.2d at 485.

### B. Plaintiff Fails To Allege a Proper Tying Product Market in Which CVS Has Market Power

A relevant product market consists of all products that are "reasonably interchangeable by consumers for the same purposes." *Tunis Bros.*, 952 F.2d at 722. Plaintiff's tying product market definition—the "CVS Contract Pharmacy Market," Compl. ¶¶ 126-128—fails as a matter of law because it plainly omits the vast majority of substitutable products.

#### 1. Plaintiff's Alleged Market Fails as a Matter of Law Because It Omits All Substitutes for CVS

Plaintiff concedes that a Covered Entity may obtain its 340B savings from any pharmacy willing and able to serve as a contract pharmacy. *See* Compl. ¶ 48. Plaintiff further alleges that Covered Entities "typically contract with a network of pharmacies" for 340B services. Compl. ¶ 7. And Plaintiff itself contracted with multiple 340B pharmacies other than CVS, including Walmart, Rite Aid, and The Medicine Shoppe. Ex. 2. Yet Plaintiff rejects what the New York Supreme Court found to be "the most natural product market definition. That is, ***all*** pharmacies capable of serving as contract pharmacies to covered entities." Ex. 1 at 52.

The reason is clear: CVS lacks the market share, in a ***properly*** defined market, necessary to state a tying claim. Plaintiff tacitly acknowledges this, never alleging that CVS commands an outsized share of Contract Pharmacies when competitors are included. Indeed, were Plaintiff to use the HRSA data on which it otherwise relies in its complaint, *see* Compl. ¶ 118, to allege CVS's share, it would have to admit that at the time the challenged conduct went into effect, CVS accounted for ***just 6 percent*** of contract pharmacy/covered entity arrangements in the United States (while Walgreens' integrated 340B services accounted for 45 percent). *See* HRSA, Office of Pharmacy Affairs 340B Data, (Nov. 30, 2017), https://340bopais.hrsa.gov/ (current data available).[8]

---

[8] CVS's motion does not depend on this data. As discussed below, the Complaint must be dismissed because its product market "clearly does not encompass all interchangeable substitute

This low market share confirms that, as a matter of law, CVS would lack market power in a ***properly*** defined tying product market. *See Jefferson Parish*, 466 U.S. at 27 (explaining that hospital's 30 percent market share "does not establish the kind of dominant market position" needed for tying claim); *Brokerage Concepts*, 140 F.3d at 517 ("[S]ince *Jefferson Parish* no court has inferred substantial market power from a market share below 30 percent.") (collecting cases). In dismissing the NYAG Complaint, the New York Supreme Court took judicial notice of the same HRSA data and found "that at the time the challenged conduct went into effect, approximately 86 percent of New York covered entities that used contract pharmacies for 340B savings, did not contract with a single CVS pharmacy location." Ex. 1 at 57-58. This, the court said, demonstrates that "CVS did not have the power to coerce covered entities to use Wellpartner's administrative services as required for a tying claim, as any covered entity that wished not to use Wellpartner could join the 86 percent of New York covered entities that chose not to include CVS and their contract pharmacy network at all." *Id.* at 58.

To avoid this result and assert market power where none exists, Plaintiff alleges CVS has 100% monopoly power—not in a properly defined market, but in a gerrymandered "CVS Contract Pharmacy Market," Compl. ¶ 91, which simply draws a circle around CVS and ignores the overwhelming majority of Contract Pharmacies in the nation. But asserting that a defendant's business constitutes the entirety of a relevant market does not make it so—even at the pleading stage.

"Where the plaintiff . . . alleges a proposed relevant market that clearly does not encompass

---

products," such as Walgreens, Rite Aid, and the myriad of other 340B pharmacies available to Plaintiff. The HRSA data merely confirms this obvious point. In any event, the Court can and should take judicial notice of this data on a motion to dismiss because it is an undisputed public record of the U.S. Department of Health and Human Services (HHS). *See United States v. Kindred Healthcare, Inc.*, 517 F. Supp. 3d 367, 374 n.2 (E.D. Pa. 2021) ("[T]he Court may take judicial notice of public records such as those issued by CMS, HHS, and the California Department of Health Care Services.").

all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza*, 124 F.3d at 436. Courts routinely dismiss Sherman Act claims at the pleading stage where the alleged market definition leaves out obvious substitutes. *Id.* at 436-37 (collecting cases); *see also Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (affirming dismissal where "it is apparent that the proper market" was broader than plaintiffs' alleged market).

Allegations of single-brand markets—like Plaintiff's proposed market—are particularly disfavored, and regularly dismissed at the pleading stage. *See, e.g.*, *Queen City Pizza*, 124 F.3d at 443 (dismissing tying claim: "Domino's dough is reasonably interchangeable with other brands of pizza dough, and does not therefore constitute a relevant market of its own"); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063-64 (9th Cir. 2001) (affirming dismissal, rejecting "conclusory assertion that the 'UCLA women's soccer program' is 'unique' and hence 'not interchangeable with any other program in Los Angeles'"); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984) ("[A]bsent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market.").

As the Third Circuit reasoned in rejecting such a single-brand market, "[i]f the market were so defined, of course [that brand] would have market power, being the sole seller. But such a narrow definition makes no sense in terms of real world economics, and as a matter of law [a court] cannot adopt it." *Town Sound*, 959 F.2d at 479-80. So too here: Plaintiff alleges a market artificially limited to CVS pharmacies, but "give[s] no . . . plausible reasons why CVS contract pharmacies are . . . situated differently than the myriad of other pharmacies in the same region, that offer the same 340B contract pharmacy services to Covered Entities." Ex. 1 at 57.

### 2. So-Called "Anti-Steering" Provisions Do Not Save Plaintiff's Legally Deficient Market

Plaintiff attempts to justify its single-brand market based on certain HRSA guidance (which the Complaint labels "anti-steering" prohibitions): "Covered Entities and prescribing physicians cannot steer [their] patients to fill their prescriptions at any particular pharmacy," and therefore "[t]he Covered Entity has no alternative but to engage with CVS as a Contract Pharmacy or else forgo those 340B savings." Compl. ¶ 96. This is wrong for multiple reasons.

First, Plaintiff misunderstands what the HRSA guidance permits. The only provision Plaintiff points to is the requirement that Covered Entities "inform the patient of [their] freedom to choose a pharmacy provider." Compl. ¶ 45 (quoting 75 Fed. Reg. 10,272, 10,278). That language "does not appear to prevent covered entities from marketing or otherwise informing their patients about which pharmacies will provide 340B benefits." Ex. 1 at 59 (rejecting identical argument). "Through marketing, covered entities can make their patients aware of how filling a prescription at certain pharmacies benefits the covered entity that the patients use." *Id.* Tellingly, a manual for Covered Entities published with HRSA's support explains: "It is critical to establish a plan for marketing the service to patients." Katherine Richardson, *The Bridge to 340B Comprehensive Pharmacy Services Solutions in Underserved Populations*, 78, 98 (2004).[9]

Second, Plaintiff's argument that covered entities cannot dictate their patients' choices is not unique to 340B, but is true in many markets where consumers have preferences among competing products. Accepting Plaintiff's argument would, for example, mean treating retailer purchases of Coca-Cola as a single-brand market (rather than part of the larger soft drink market), because many end consumers prefer Coca-Cola, and therefore, in Plaintiff's words, "[t]he [retailer]

---

[9] https://web.archive.org/web/20121007120951/http://www.hrsa.gov/opa/files/bridgeto340b.pdf.

has no alternative but to engage with [Coca-Cola] or else forgo those [profits]." Compl. ¶ 96. That plainly cannot restrict the market to a single brand. *Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 696 F. Supp. 97, 131 (D. Del. 1988) ("There can be no serious dispute that Coca–Cola products are in competition with many other soft drinks.").

Third, Plaintiff's "theory contradicts what actually happens in the market and the realities of who the covered entities are choosing to contract with." Ex. 1 at 57 (rejecting identical argument by NYAG). The publicly available data upon which the Complaint relies show that most covered entities do not contract with even a single CVS location. *See id.* at 57-58. Thus, "any covered entity that wished not to use Wellpartner could join" the vast majority of "covered entities that chose not to include CVS and their contract pharmacy network at all." *Id.* at 58.

Ultimately, Plaintiff's argument proves too much. It would mean that every single contract pharmacy in America is a monopolist of its own "market," capable of forcing Covered Entities to accept unwanted services. Plaintiff boldly embraces this extraordinary "market" definition, alleging that because a "Covered Entity cannot substitute one Contract Pharmacy for another in response to a price increase[,] . . . *each Contract Pharmacy* (such as CVS) that provides substantial savings to a Covered Entity *is its own relevant market*." Compl. ¶ 95. In this way, Plaintiff attempts to go even further than plaintiffs in the hordes of cases in which courts reject single-brand markets: Plaintiff does not merely argue that CVS is a monopolist in its own market, but instead asserts *every* contract pharmacy—including small, neighborhood pharmacies—is a monopolist.

The implications of such a position are extreme, and blink at reality. As Plaintiff would have it, for example, a neighborhood pharmacy in the area—which, according to Plaintiff, is a "monopolist" of its own one-participant market—could not seek to manage its own 340B administration and drug inventory (rather than working with the TPAs hired by Covered Entities) without

incurring antitrust liability for an illegal "tie." And by Plaintiff's logic, that same neighborhood pharmacy could one day decide to double its prices, and major health systems such as Temple University Hospital—beholden to that pharmacy's "monopoly power"—would have no choice but to accept it (rather than, say, switch to Walgreens). The Court should reject this absurd "Everyone-Is-a-Monopolist" market definition. *See Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir. 1999) ("Not even the most zealous antitrust hawk has ever argued that Amoco gasoline, Mobil gasoline, and Shell gasoline are three separate product markets, yet that absurd result would follow if we recognized Olympian trademarked generator sets as a separate market in this case.").

Plaintiff's allegations about CVS "steering" patients via its relationship with a Pharmacy Benefit Manager (PBM), Compl. ¶¶ 58-64, are irrelevant to its "Everyone-is-a-Monopolist" market definition, which Plaintiff applies to *all* Contract Pharmacies regardless of PBM relationships, Compl. ¶ 95. And similar arguments in the NYAG case did not prevent dismissal. *See* Ex. 3 at ¶¶ 52-56; Ex. 1 at 27-28 (NYAG argument about PBM relationship). If CVS truly had the power to steer patients *from other pharmacies* in sufficient numbers to impact Covered Entities' 340B contracting decisions, that would be reflected in CVS's market share in the broader 340B market *including those other pharmacies*. But again, when the challenged conduct went into effect, CVS accounted for *just 6 percent* of Contract Pharmacy/Covered Entity arrangements in the United States. *See supra* at Part I.B.1. The publicly available data the Complaint relies on thus confirm that Plaintiff's market definition is far too narrow to survive. If CVS were a "must have" provider in this category, its contracts with Covered Entities would reflect that fact.[10] Plaintiff fails to allege

---

[10] The same goes for Plaintiff's allegations about CVS specialty pharmacies. Plaintiff claims that "[m]any Covered Entities have a significant market share of patients who use CVS Specialty as their specialty pharmacy, and thus must contract with CVS Specialty as a Contract Pharmacy, or else lose substantial 340B Savings." Compl. ¶ 53. But Plaintiff itself never contracted with a CVS specialty pharmacy. CVS specialty pharmacies cannot possibly be a "must have." Compl. ¶ 87.

a proper "tying" market in which CVS has market power; its claim must be dismissed.

**C.   The Complaint Fails To Allege a Proper Relevant Geographic Market for the Tying Product**

Plaintiff also fails to allege a plausible geographic market.  A geographic market is the "area of effective competition," *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961), "the area in which a potential buyer may rationally look for the goods or services he or she seeks," *Atl. Exposition Servs. Inc. v. SMG*, 262 F. App'x 449, 452 (3d Cir. 2008) (quoting *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir. 1984)).  Here, Plaintiff alleges "[t]he geographic scope of the CVS Contract Pharmacy Market is the United States," explaining that "CVS retail and specialty pharmacies nationwide can serve as Contract Pharmacies to Covered Entities located in the United States."  Compl. ¶ 99.

As with product markets, courts dismiss Sherman Act claims where the complaint's geographic market allegations are unsupported, implausible, or inconsistent with allegations in the complaint.  *See, e.g.*, *Andela v. Am. Ass'n for Cancer Rsch.*, 389 F. App'x 137, 141 (3d Cir. 2010) (per curiam) (Plaintiff's "allegation that '[t]he relevant geographic marketplace is the world' is insufficient") (citation omitted); *Med. Diagnostic Lab'ys, LLC v. Indep. Blue Cross*, 2017 WL 3776619, at *5 (E.D. Pa. Aug. 30, 2017) ("Although the Amended Complaint arguably alleges a plausible product market, it has not adequately alleged a relevant geographic market."); *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 483 (S.D.N.Y. 2001) (dismissing claim for failure to define "precise geographic market" where plaintiffs made "contradictory" allegations of "narrow, 'tri-state area' market" and "broader national market" (citation omitted)).  "A geographic market must be alleged in terms of consumer choices—that is, in terms of the area in which customers would look to purchase the product."  *Med. Diagnostic Lab'ys*, 2017 WL 3776619, at *6.

Here, Plaintiff's nationwide market definition cannot be squared with its other allegations

that "patients choose where to fill their prescriptions based on other factors that matter to them, *such as location and convenience*," Compl. ¶ 94, and that Covered Entities "typically contract with a network of pharmacies ('Contract Pharmacies') that are *frequented by their patient population*," Compl. ¶ 7. While it is theoretically possible that a Covered Entity like Brandywine in Pennsylvania could contract with a CVS pharmacy in Hawaii, that assertion defies common sense and does not reflect the market realities alleged in Plaintiff's complaint. *See Tunis Bros.*, 952 F.2d at 726 ("[T]he geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product."); *Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399, 403 (3d Cir. 2016) ("[T]he relevant geographic market is the area in which a potential buyer may *rationally* look for the goods or services he or she seeks.") (citation omitted). And Plaintiff's own pharmacy relationships confirm the overbreadth of its proposed market. During Plaintiff's participation in 340B, it contracted with only three CVS retail locations, all of which were a short distance from the hospital. Ex. 2.[11] The fact that Plaintiff itself contracted with CVS pharmacies only locally further confirms what Plaintiff's own allegations ineluctably demonstrate: The geographic market for the tying product is inherently local—it cannot be nationwide.

### D. The Complaint Fails To Allege Market-Wide Anticompetitive Impact in the Tied Product Market

Plaintiff's tying claims suffer from another fundamental problem. The Sherman Act "only" prohibits "activities that have anti-competitive effects *on the market as a whole*." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 148 (3d Cir. 2001). In the tying context, it is the "tied" product

---

[11] Again, while the Court can and should take judicial notice of the HRSA registration data, *supra* note 8, Defendants motion does not depend on it. This data provides confirmation that Plaintiff's allegation of a national market is implausible given its other, inconsistent allegations.

market in which this impact must be alleged.  *See Brokerage Concepts*, 140 F.3d at 519.  To state

a viable tying claim, a plaintiff must allege "competitive harm to the tied market as a whole."  *Id.*;

*see also, e.g.*, *id.* at 533 ("[f]ederal antitrust law" only prohibits tying arrangements that "substan-

tially foreclose competition in the tied product market"); *Town Sound*, 959 F.2d at 493 (requiring

foreclosure of a "substantial portion" of the tied market).  Put another way, "[f]or a tie to create an

anticompetitive effect there must be 'a substantial threat that the tying seller will acquire market

power *in the tied product market*.'"  *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d

403, 424 (S.D.N.Y. 2005) (quoting *Jefferson Parish*, 466 U.S. at 38) (O'Connor, J., concurring).

Yet Plaintiff's complaint never alleges any market-wide anticompetitive impact in the

"tied" product market it defines: TPA services.  Instead, its allegations are limited to a small subset

of the defined TPA services market—"TPA services *to Covered Entities using CVS*."  Compl.

¶ 105.  This is no mere technicality: Plaintiff does not point to harm to the "tied" product market

it defines because such market-wide harm cannot exist.

Dismissal is appropriate where a plaintiff "has not sufficiently alleged anticompetitive ef-

fects in the relevant markets identified in its complaint."  *Pennsylvania v. NCAA*, 948 F. Supp. 2d

416, 431 (M.D. Pa. 2013); *see, e.g.*, *Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc.*,

2017 WL 4685359, at *4, *8 (M.D. Pa. Oct. 18, 2017) (dismissing complaint that failed to allege

"any market-wide anticompetitive effects").  As the Third Circuit has held, the limitation of anti-

competitive effects to "a small subset" of the relevant market it is "fatal" to a plaintiff's claim.  *See*

*Deborah Heart & Lung Ctr.*, 833 F.3d at 405 (requiring "broader effects" to "market as a whole");

*see also Eichorn*, 248 F.3d at 147-48 (dismissing claim premised on market defined "so narrowly

that it only includes the defendants" where plaintiff failed to show "anti-competitive effect . . .

within th[e] broader telecommunications market").

Plaintiff's claim is fundamentally inconsistent: Although Plaintiff has gerrymandered the definition of the tying product market to include only **CVS** Contract Pharmacies, its tied product market definition includes **all** TPA services, regardless of the contract pharmacy being used. Given these inconsistent markets, Plaintiff does not, and cannot, allege that the CVS/Wellpartner integrated offering has market-wide effects in the tied product market. Instead, Plaintiff alleges only that this "tie has foreclosed . . . TPAs from competing to provide **TPA services to Covered Entities using CVS Contract Pharmacies**." Compl. ¶ 105; *see also* Compl. ¶ 113 (antitrust injury allegations limited to "provision of TPA services **at CVS Contract Pharmacies**" and "Covered Entities contracting **with CVS Contract Pharmacies**"). That still leaves other TPAs free to compete to provide administrative services for the almost 94 percent of contract pharmacy arrangements with pharmacies other than CVS. *See Town Sound*, 959 F.2d at 494 ("Even if Chrysler were to install sound systems on every car it sells, we see no reasonable possibility that Chrysler could establish a dominant position over the [tied] autosound market when Chrysler cars comprise **only a tenth** of the American automobile market."); *cf. Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) (in exclusive dealing context, rivals being foreclosed from "less than 30 or 40 percent" of the relevant market is "unlikely to be of concern. . . . [L]ow numbers make dismissal easy[.]"). And Plaintiff concedes that even the Covered Entities that use CVS pharmacies can and do use other TPAs for non-CVS pharmacies.

Most telling is what Plaintiff does **not** allege. It has been more than five years since CVS Pharmacy acquired Wellpartner and began offering an integrated solution. Yet Plaintiff provides **no** allegations that the asserted TPA services market is any less robust in terms of competitors. Plaintiff has **not** alleged that CVS has "essentially consumed the [TPA] market," *see Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677, 689 (D. Del. 2013), or that the "tying arrangements have

19

driven numerous [TPAs] from the market, have deterred entry into the [TPA] market, [or] have had deleterious effects on the development of [TPA] technology," *see In re Wireless Tel. Serv. Antitrust Litig.*, 385 F. Supp. 2d at 424, as some courts have found sufficient to survive a motion to dismiss. Just the opposite—Plaintiff's allegations show that Covered Entities continue to have a multitude of choices in this space, including "MacroHelix, PSF, RxStrategies, Sentry, Verity Health, and Wellpartner." Compl. ¶ 73; *see Jefferson Parish*, 466 U.S. at 38 (O'Connor, J., concurring) (No threat to competition exists "if the tied-product market is occupied by many stable sellers who are not likely to be driven out by the tying.").

Because Plaintiff has failed to allege market-wide effects in the alleged tied product market, its Sherman Act claims must be dismissed.

## II. Plaintiff Cannot Bring a Clayton Act Claim Based on the Sale of Services

Plaintiff's claim, to the extent it is premised on the Clayton Act, is subject to dismissal for an independent reason. Section 3 of the Clayton Act "proscribes tying only in sales of 'goods, wares, merchandise, machinery, supplies, or other commodities.'" *Skepton v. Bucks County*, 613 F. Supp. 1013, 1018 (E.D. Pa. 1985) (quoting 15 U.S.C. § 14). Yet Plaintiff does not allege that CVS tied "the sale or lease of goods." *Dibidale of La., Inc. v. Am. Bank & Tr. Co.*, 916 F.2d 300, 305 (5th Cir. 1990). Rather, Plaintiff's Clayton Act claim is based on allegations that CVS tied "Wellpartner TPA *services* to CVS Contract Pharmacy *services*." Compl. ¶¶ 86, 111.

"Courts have clearly and consistently held that transactions involving the sale of services are outside the scope of section 3 of the Clayton Act." *Greene Cnty. Mem'l Park v. Behm Funeral Homes, Inc.*, 797 F. Supp. 1276, 1284 (W.D. Pa. 1992) (collecting cases), *aff'd*, 993 F.2d 876 (3d Cir. 1993). Section 3 of the Clayton Act "does not apply to tying arrangements where services are involved." *Wendkos v. ABC Consol. Corp.*, 379 F. Supp. 15, 18 (E.D. Pa. 1974).

## III. The Claims Against CVS Health Should Be Dismissed

The Court also should dismiss all claims against CVS Health under Rules 12(b)(2) and 12(b)(6) because CVS Health has no connection to Pennsylvania and Plaintiff alleges no relevant actions of CVS Health in Pennsylvania or elsewhere. CVS Health is not incorporated or head-quartered in Pennsylvania; it did not engage in any of the conduct Plaintiff alleges occurred in Pennsylvania; and it does not direct, manage, or supervise its subsidiaries' (alleged) conduct there. *See generally* Declaration of Thomas Moffatt ("Moffatt Decl.") ¶¶ 4-7.[12] Plaintiff does not plausibly allege otherwise, but instead merges CVS Health, CVS Pharmacy, Wellpartner, and Caremark into a "single commercial entity" called "CVS." Compl. ¶ 31; *see, e.g.,* Compl. ¶¶ 10-20. These allegations do not distinguish among CVS Health, CVS Pharmacy, Wellpartner, and Caremark; they do not meet Plaintiff's burden to show CVS Health is subject to jurisdiction in Pennsylvania; and they provide no basis to allege CVS Health violated the antitrust laws.

### A. The Court Lacks Personal Jurisdiction over CVS Health

"Once challenged, the plaintiff bears the burden of establishing personal jurisdiction." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007). Plaintiff raises two bases for personal jurisdiction **over all defendants**, Compl. ¶ 24, neither of which provides a basis as to **CVS Health**. First, Plaintiff cannot meet its burden under Fed. R. Civ. P. 4(k) because Plaintiff cannot show general or specific jurisdiction in Pennsylvania. When faced with personal jurisdiction arguments based on the same entities, courts across the country have held that no jurisdiction exists over CVS Health based on the acts of its subsidiaries.[13] *See infra.*

---

[12] The Court may consider Mr. Moffatt's declaration pursuant to Rule 12(b)(2). *See, e.g.*, *Commodity Futures Trading Comm'n v. Worldwide Commodity Corp.*, 366 F. Supp. 2d 276, 278 n.1 (E.D. Pa. 2005); *Patterson by Patterson v. FBI*, 893 F.2d 595, 603-04 (3d Cir. 1990).

[13] *See Church Ekklasia Sozo Inc. v. CVS Health Corp.*, 2022 WL 1572732, at *4 (W.D.N.C. Feb. 25, 2022); *Tashjian v. CVS Pharmacy, Inc.*, 2020 WL 1931859, at **3-4 (D. Mass. Mar. 13, 2020),

Second, 15 U.S.C. § 22 does not apply because Plaintiff has not satisfied a necessary pre-requisite to invoking a nationwide-contacts personal jurisdiction analysis: the propriety of **venue** under the Clayton Act. *See KM Enters., Inc. v. Global Traffic Techs., Inc.*, 725 F.3d 718, 729-30 (7th Cir. 2013); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423-25 (2d Cir. 2005); *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1350 (D.C. Cir. 2000).[14] As Plaintiff acknowledges, Compl. ¶ 24, the venue provision of 15 U.S.C. § 22 requires a plaintiff to plead facts showing that the defendant is "an inhabitant," is "found," or "transacts business" in the Eastern District of Pennsylvania. None of these is the case as to CVS Health.

### 1. CVS Health Is Not Subject to General Jurisdiction in Pennsylvania

To establish general jurisdiction under Pennsylvania's long-arm statute, a plaintiff must demonstrate that a defendant "carries on 'a continuous and systematic part' of its business in Pennsylvania." *Kraus v. Alcatel-Lucent*, 441 F. Supp. 3d 68, 72 (E.D. Pa. 2020) (quoting 42 Pa. Cons. Stat. § 5301(a)(2)(iii)). A plaintiff also bears the burden of demonstrating that the court's exercise of general jurisdiction would be consistent with due process, which requires showing a defendant's "affiliations with the forum State" to be "so continuous and systematic as to render it essentially at home." *Id.* at 73 (alterations omitted) (quoting *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413

---

*report and recommendation adopted*, 2020 WL 2048456 (D. Mass. Mar. 30, 2020); *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 979-84 (N.D. Cal. 2016); *Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 835-37 (D.S.C. 2015).

[14] The Third Circuit has held "that the service of process provision **on foreign corporations** is independent of, and does not require satisfaction of, the specific venue provision under Section 12 of the Clayton Act." *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 297 (3d Cir. 2004). But that holding does not apply to "a challenge to personal jurisdiction brought by **domestic corporate defendants**" like CVS Health, because that "would counterindicate traditional long-arm jurisprudence with respect to such defendants." *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 516 F. Supp. 2d 324, 337-38 (D. Del. 2007), *aff'd*, 602 F.3d 237 (3d Cir. 2010); *see also Radio Music License Comm., Inc. v. Glob. Music Rts., LLC*, 2017 WL 8682117, at *13 (E.D. Pa. Nov. 29, 2017) ("[T]he Third Circuit has never applied a 'national contacts' test for establishing personal jurisdiction over a domestic antitrust defendant.") (citation omitted).

(2017)).  Absent exceptional circumstance, this is limited to a "corporation's place of incorporation and its principal place of business."  *BNSF Ry. Co.*, 581 U.S. at 413 (citations omitted).

CVS Health is a Rhode Island holding company whose primary functions are to issue stock and to file reports with the Securities and Exchange Commission.  Moffatt Decl. ¶ 4.  CVS Health does no business in Pennsylvania, for pecuniary benefit or otherwise, and CVS Health has no employees, no assets, and no physical presence in the state.  *Id.* ¶¶ 4-5.  It is not qualified as a foreign corporation under the laws of Pennsylvania, it does not have a registered agent for service of process in Pennsylvania, and it is not regulated by a Pennsylvania state agency.  *Id.* ¶ 5.  Plaintiff cannot establish that Pennsylvania courts have general jurisdiction over CVS Health.

### 2.  CVS Health Is Not Subject to Specific Jurisdiction in Pennsylvania

There is also no basis for finding specific jurisdiction over CVS Health because it took no action in Pennsylvania concerning the allegations in this case.  CVS Health has no operations unrelated to its limited functions as a holding company (e.g., issuing stock and filing SEC reports); as such, CVS Health did not have any part in the contracts or activities Plaintiff alleges occurred in Pennsylvania.  *See id.* ¶¶ 4-5.  CVS Health thus has not "purposefully availed itself of the privilege of conducting activities" in Pennsylvania, and this claim cannot arise out of or relate to any of CVS Health's forum-related activities, since no such activities exist.  *O'Connor*, 496 F.3d at 317 (alteration omitted) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

### 3.  CVS Health's Relationship with CVS Pharmacy, Wellpartner, and Caremark Does Not Create Personal Jurisdiction

Plaintiff cannot manufacture jurisdiction based on CVS Health's status as a parent of CVS Pharmacy, Wellpartner, and Caremark.  The law is well-established that a corporation's ownership of a subsidiary subject to personal jurisdiction in a forum is insufficient to create personal jurisdiction over the parent.  *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 301 (3d Cir. 2008) ("The

mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary.") (citation omitted); *Action Mfg. Co. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 420 (E.D. Pa. 2005).

Nor has Plaintiff established that the jurisdictional contacts of CVS Pharmacy, Wellpartner, or Caremark should be imputed to CVS Health. The Third Circuit has provided "factors to be considered," "for determining when contacts may be imputed to a parent entity," such as "whether the subsidiary corporation played any part in the transactions at issue, whether the subsidiary was merely the alter ego or agent of the parent, and whether the independence of the separate corporate entities was disregarded." *Neff v. PKS Holdings, LLC*, 2019 WL 3729568, at *6 (E.D. Pa. Aug. 8, 2019); *see Action Mfg. Co.*, 375 F. Supp. 2d at 421 ("[C]ontacts should be imputed when the subsidiary was either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself."). None of those factors is present here. CVS Health "is a separate and distinct company" that does not control the day-to-day activities and internal affairs of CVS Pharmacy, Wellpartner, or Caremark. Moffatt Decl. ¶¶ 6-7. And all four companies "observe and enforce corporate formalities." *Id.* ¶ 7. Plaintiff thus cannot establish that CVS Pharmacy's, Wellpartner's, or Caremark's contacts should be imputed to CVS Health.

\* \* \*

CVS Health is a separate and distinct entity with no contacts in Pennsylvania. Federal Rule of Civil Procedure 4(k) does not permit the exercise of personal jurisdiction as to CVS Health. And, as discussed above, 15 U.S.C. § 22 provides no basis for such jurisdiction either, because Plaintiff cannot meet that provision's venue requirements. *See supra*. The claims against CVS Health must be dismissed for lack of personal jurisdiction.

## B. The Complaint Fails To State a Claim Against CVS Health

The Complaint also fails to satisfy the requirements of Rule 8 or to state a claim against

CVS Health because it does not allege any facts with regards to the actions of CVS Health as distinct from CVS Pharmacy, Wellpartner, and Caremark. "Mere conclusory allegations against defendants as a group . . . are insufficient to survive a motion to dismiss." *Bass v. Howard,* 2020 WL 1332007, at *4 (D.N.J. Mar. 23, 2020) (citations and quotation marks omitted). Instead, "[a] plaintiff must allege facts that establish each individual defendant's liability for the misconduct alleged." *Id.* (alteration and quotation marks omitted); *see also Park v. Temple Univ.*, 757 F. App'x 102, 109 (3d Cir. 2018) ("[V]ague references to a group of 'defendants,' without specific allegations tying the individual defendants to the alleged . . . conduct cannot show the necessary personal involvement or meet the notice pleading standards of Federal Rule of Civil Procedure 8(a).") (citations and quotation omitted). This pleading requirement is even more important for corporate entities. *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) ("The fact that two separate legal entities may have a corporate affiliation—perhaps owned by the same holding company—does not alter this pleading requirement. Nor is it sufficient for plaintiffs to simply state in conclusory terms that separate legal entities are sometimes collectively referred to by a shared generic name.") (citations and quotation marks omitted); *see also, e.g., Holcomb v. Care One LLC*, 2022 WL 4300209, at *4 n.3 (D.N.J. Sept. 19, 2022) ("Plaintiffs are not absolved of adhering to the Rule 8 pleading requirements simply because [a named defendant] has some affiliation with the proper defendant to be named.").

Here, each of Plaintiff's substantive allegations brands all named Defendants as "CVS." *See, e.g.*, Compl. prefatory statement (defining "CVS" as Defendants "collectively"), ¶¶ 125-132 ("*CVS* tied Wellpartner TPA services to *CVS*'s Contract Pharmacy Services."). Absent any well-pled allegations specific to CVS Health, the claims against it must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

Dated: May 19, 2023

Respectfully Submitted,

*/s/ Craig D. Singer*
Enu A. Mainigi (*pro hac vice forthcoming*)
Craig D. Singer
Jonathan B. Pitt (*pro hac vice forthcoming*)
Katherine A. Trefz (*pro hac vice forthcoming*)
Thomas W. Ryan (*pro hac vice forthcoming*)
Noah C. McCullough[*] (*pro hac vice forthcoming*)
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue, S.W.,
Washington, DC 20024
Telephone: (202) 434-5000
emainigi@wc.com
csinger@wc.com
jpitt@wc.com
ktrefz@wc.com
tryan@wc.com
nmccullough@wc.com

Mike Cowie (*pro hac vice forthcoming*)
**DECHERT LLP**
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 261-3339
mike.cowie@dechert.com

*Attorneys for Defendants.*

---

[*] Practice is supervised by one or more D.C. Bar members; admitted to the Bar under D.C. App. R. 46-A (Emergency Examination Waiver).