# EXHIBIT 1

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 2 of 62

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL DIVISION PART 43

-------------------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

                    Plaintiff,

- v -

CVS PHARMACY, INC.,WELLPARTNER, LLC.,
CAREMARK, L.L.C., CVS ALBANY, L.L.C.

                    Defendant.

-------------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 452197/2022 |
| **MOTION DATE** | 03/02/2023 |
| **MOTION SEQ. NO.** | 001 |

**DECISION + ORDER ON MOTION**

**HON. ROBERT R. REED:**

The following e-filed documents, listed by NYSCEF document number (Motion 001) 8, 9, 10, 11, 12, 17, 19, 20, 52

were read on this motion to             DISMISS                 .

      Upon the foregoing documents, it is hereby

      ORDERED that defendants' motion to dismiss is granted in accordance with the attached

so-ordered transcript.

3/13/23
DATE

ROBERT R. REED, J.S.C.

| CHECK ONE: | [X] CASE DISPOSED | [ ] NON-FINAL DISPOSITION | |
|---|---|---|---|
| | [X] GRANTED | [ ] DENIED   [ ] GRANTED IN PART | [ ] OTHER |
| APPLICATION: | [ ] SETTLE ORDER | [ ] SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | [ ] INCLUDES TRANSFER/REASSIGN | [ ] FIDUCIARY APPOINTMENT | [ ] REFERENCE |

**452197/2022  PEOPLE OF THE STATE OF NEW YORK vs. CVS HEALTH CORP.**
**Motion No.  001**

Page 1 of 1

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 3 of 62

1

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK - CIVIL TERM - PART 43
2   - - - - - - - - - - - - - - - - - - - - - -X
                                              |
3    THE PEOPLE OF THE STATE OF NEW YORK,      |
                                              |
4      by and through LETITIA JAMES,          |
       Attorney General of the State of       |    INDEX NUMBER:
5      New York,                              |    452197/2022
                                              |
6                        Plaintiff,           |
                                              |
7          - against -                        |
                                              |
8    CVS PHARMACY, INC., WELLPARTNER, LLC.,    |
     CAREMARK, L.L.C., and CVS ALBANY,        |
9    L.L.C.,                                  |
                                              |
10                       Defendants.          |
     - - - - - - - - - - - - - - - - - - - - -X

11
                                  60 Centre Street
12     Proceedings              New York, New York
                                March 2, 2023
13

14   B E F O R E :

15          HONORABLE ROBERT R. REED,

16                    JUSTICE OF THE SUPREME COURT

17   A P P E A R A N C E S :

18

19          LETITIA JAMES
            Attorney General
20          State of New York
            Attorneys for the Plaintiff
21          28 Liberty Street
            New York, New York 10005
22          BY:  JEREMY R. KASHA, ASSISTANT ATTORNEY GENERAL
                 AMY McFARLANE, ANTITRUST DEPUTY BUREAU CHIEF
23               ELINOR R. HOFFMANN, ANTITRUST BUREAU CHIEF
                 BRYAN BLOOM, SENIOR ENFORCEMENT COUNSEL

24

25

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 4 of 62

2

```
 1   A P P E A R A N C E S: (continued)

 2

 3          WILLIAMS & CONNOLLY LLP
            Attorneys for the Defendants
 4          680 Maine Avenue SW
            Washington, DC 20024
 5          BY:  ENU A. MAINIGI, ESQ.
                 JONATHAN B. PITT, ESQ.
 6               TOM W. RYAN, ESQ.

 7

 8          LUPKIN PLLC
            Attorneys for the Defendants
 9          80 Broad Street, Suite 3103
            New York, New York 10004
10          BY:  JONATHAN D. LUPKIN, ESQ.

11

12

13                                ANNE BROWN, RPR
                                  SENIOR COURT REPORTER
14

15

16

17

18

19

20

21

22

23

24

25
```

ab

Proceedings

1            THE COURT:  If I could have appearances, plaintiff

2    first.

3            MR. KASHA:  Good morning, Your Honor.

4            My name is Jeremy Kasha.  I'm an Assistant Attorney

5    General in the Office of the New York Attorney General,

6    representing the plaintiff.

7            MS. McFARLANE:  Good afternoon, Your Honor.

8            Amy McFarlane, Deputy Bureau Chief of the Antitrust

9    Bureau, on behalf of the plaintiff, the People of the State

10   of New York.

11           MS. HOFFMANN:  Good afternoon, Your Honor.

12           My name is Elinor Hoffmann.  I'm the Bureau Chief

13   for the Antitrust Bureau of the New York Attorney General's

14   Office.

15           MR. BLOOM:  Your Honor, Bryan Bloom, Senior

16   Enforcement Counsel for the New York Attorney General.

17           MS. MAINIGI:  Good morning, Your Honor.

18           Enu Mainigi, Williams & Connolly, for the CVS

19   defendants.

20           MR. PITT:  Good morning -- or afternoon, Your

21   Honor.

22           Jonathan Pitt, also from Williams & Connolly, also

23   representing the CVS defendants.

24           MR. RYAN:  Good afternoon, Your Honor.

25           Tom Ryan, also from Williams & Connolly, also for

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 6 of 62

4

Proceedings

1    the defendants.

2            MR. LUPKIN:  Good afternoon, Your Honor.

3            Jonathan Lupkin of Lupkin PLLC, also on behalf of

4    the defendants.

5            Good afternoon.

6            MR. KASHA:  And I did mean to say good afternoon.

7    I apologize, Your Honor.

8            MS. MAINIGI:  I'm sure.  We all messed it up.

9            THE COURT:  Go ahead.

10           MS. MAINIGI:  So, Your Honor, are you ready to hear

11   argument on the motion to dismiss?

12           THE COURT:  Yes.

13           MS. MAINIGI:  Okay.  Mr. Pitt will do the argument

14   for us.

15           MR. PITT:  Thank you, Your Honor.  May I use the

16   podium?

17           THE COURT:  Yes.

18           MR. PITT:  Thank you.

19           And, Your Honor, may I -- I also brought just a

20   small demonstrative to just, sort of, allow me and hopefully

21   everyone else to follow along a little bit with --

22           THE COURT:  Do we have enough to share?

23           MR. PITT:  I did -- yes.  And I provided it to

24   opposing counsel.  We do, yes.

25           THE COURT:  All right.

ab

Proceedings

1       MR. PITT:  So good afternoon, Your Honor, again.

2   Jonathan Pitt for the defendants.

3       Your Honor, before I get into the substantive

4   arguments -- and there are three of them that I'd like to

5   discuss with Your Honor today -- I wanted to take a quick

6   step back and provide a little bit of background on the case

7   and the transaction that's at issue in the case, the policy

8   that's at issue, as well as this 340B program that the case

9   is, kind of, at least in part about.

10      So essentially, what 340B is, is it is a way that

11  Congress devised to help fund certain hospitals and health

12  clinics, which I'll refer to as "covered entities."  That's

13  how the Complaint refers to them.  That's, sort of, how

14  they're referred to generally in the industry.

15      And under this program, essentially what happens is

16  drug manufacturers give a, kind of, deep discount to certain

17  health facilities, these covered entities, who are able

18  effectively to buy the drugs for a discounted price, but

19  they get reimbursed by the payer, usually an insurer, at

20  full price.  And so there's a difference, and that

21  difference then goes to the covered entity, minus the

22  prescription dispensing fees and the administrative fees.

23      And because it's, kind of, a little bit complicated

24  to figure out eligibility and, kind of, if there are

25  inventory issues that the pharmacies have to figure out --

ab

Proceedings

1   it gets fairly complicated -- these entities called 340B

2   administrators came into existence.  The Complaint calls

3   them "TPAs" or third-party administrators.  And they help

4   covered entities and contract pharmacies.  That is, the

5   pharmacies that the covered entities use in order to get

6   these drugs and in order to get that difference that I was

7   talking about, which is called 340B savings.

8           These administrators help to, sort of, figure out

9   all of that, and they interface with the pharmacy and with

10  the covered entity.  And that's sort of how that industry

11  arose.

12          So why did CVS acquire Wellpartner, which used to

13  be an independent third-party administrator; and why did --

14  why was there a policy that involved the integration of

15  those administrative services into the contract pharmacy

16  services?

17          The basic reason, and I won't go too heavily into

18  it because this is really by way of background, our

19  arguments don't depend on it, but I did want to make sure

20  that I was being clear.

21          The purpose for the transaction was to enable CVS

22  to open up many, many more pharmacy locations than it had

23  previously been able to do due to compliance concerns that

24  CVS, as a healthcare company, had.  And so it integrated

25  the administrator into the services.  And once it did that,

ab

INDEX NO. 452197/2022
NYSCEF DOC. NO. 55
Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 9 of 62
RECEIVED NYSCEF: 03/14/2023

7

Proceedings

1    was able to allow any covered entity that wanted it, to

2    contract with any number of CVS pharmacy locations that they

3    wanted to do.  And that was really what underlied the

4    transaction.

5         And the fact is -- and I'm, I guess, sort of, now

6    on page -- it's called page 2.  It's the first, kind of,

7    real page of the presentation -- but it was successful.

8    That is, CEs, covered entities, have benefitted enormously

9    from this integration because they are now able to look for

10   more places to find savings.

11        So why then are we here today.  Why is there a

12   Complaint filed that is alleging -- so the contrary, that

13   somehow this was bad for covered entities, or covered

14   entities didn't want it or that it raised costs.  We believe

15   that's not the case.  Again, not what we're here for on a

16   motion to dismiss.

17        But I think part of the reason for that is we

18   discovered that in the pre Complaint investigation that was

19   done by the Attorney General's Office -- because they have

20   the ability as I'm sure Your Honor knows to take all kinds

21   of discovery before a Complaint, and they did that.  But

22   they did not take any testimony from the covered entities

23   and it's the covered entities that they say are the victims

24   on whose behalf they are suing.

25        So why am I going into all this?  Well, part of the

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 10 of 62

8

Proceedings

1    reason is, one of the things that, kind of, cuts through a

2    lot of our arguments is that New York is, kind of, a -- a

3    unique state in the sense that relatively few of these

4    covered entities actually use CVS pharmacies as contract

5    pharmacies.  CVS, just to be frank, just isn't all that

6    popular in New York.  Independent pharmacies are extremely

7    popular in New York.  There are other chains that are more

8    prevalent than CVS is.  But CVS has a very low portion of

9    business when it comes to these 340B contracts between

10   pharmacies and the hospitals or clinics, the covered

11   entities.

12          And one of our concerns and one of the reasons I

13   want to contextualize it this way is that the Complaint

14   focuses all upon national -- they described some national

15   numbers, and I'll get into those in a moment -- they talk

16   about a national policy.  They talk about a national market,

17   which we obviously take pretty strong issue with.  But by

18   focusing on the whole country, you miss what is actually

19   different about New York.  And so I want to get into that a

20   little bit.

21          So before I, sort of, get into the three major

22   arguments, what I'd like to do now while I'm, kind of, on

23   this page 3 is talk a little bit about the kind of claim

24   that the plaintiff has brought here.

25          So a tying claim under antitrust law, in its

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 11 of 62

9

Proceedings

1    simplest terms, is really just -- a tying arrangement just

2    means that someone is selling one product on the condition

3    that the customer also buy another product from that seller.

4         So we have a tying product, which they say is the

5    contract pharmacy.  We have the quote, unquote, "tied"

6    product, which is the product that they say covered entities

7    are required to take, and that, in this case, is 340B

8    administrative services.

9         And in both the New York Courts and the Federal

10   Courts, there is a really strong recognition that selling

11   two things together in a package, and only in a package, is

12   usually not a problem.  It's usually -- it usually does not

13   cause what's referred to as anticompetitive under the

14   antitrust laws.  It's usually not a problem and, in fact,

15   it's very often a great benefit for customers.  And the

16   reason for that is it can lead to better services.  It can

17   lead to better products.  It can lead to more efficiency.

18        So the Courts for that reason have laid out some

19   fairly stringent tests to figure out whether or not a

20   particular quote, unquote, "tie" actually violates or should

21   violate the antitrust laws.  And for our purposes here, I

22   think the key requirements are, there has to be a properly

23   defined market for the tie-in product, and that's the

24   contract pharmacy services here.

25        The defendant has to have what's referred to as

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 12 of 62

Proceedings

1    market power or dominance in that tying product market.  And

2    the plaintiff has to allege and prove anticompetitive harm

3    in the tied product market.  Again, here, the market for

4    340B administrative services.  And what that means under the

5    law that we cited in our papers is market-wide harm,

6    oftentimes referred to as substantial foreclosure.

7         In other words, it has to be the case that other

8    340B administrators have no genuine ability to compete

9    for -- to provide 340B services, administrative services.

10   And here, our argument here is that the plaintiff fails to

11   meet that test for three reasons, and they're independent

12   reasons, any one of which we believe merits dismissal of

13   this Complaint.

14        Those reasons are summarized on page 4 of the

15   handout here.  And what I'm going to do is I'm, sort of,

16   going to start with this last requirement that I talked

17   about, which is the requirement to allege and prove

18   market-wide anticompetitive harm.

19        So the first point just to be clear on, the

20   Donnelly Act.  New York's antitrust law is, as the cases

21   say, concerned with broad harm to a market.  Not with

22   conduct that is said to affect just a sliver of the market.

23   And the global reinsurance case that we've cited in our

24   papers speaks to that point.

25        So have a tying claim under New York or Federal

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 13 of 62

Proceedings

1   law, the plaintiff has to allege and prove substantial

2   foreclosure in tied product market, that is here, that 340B

3   administrators other than Wellpartner, are shut out of the

4   market and can't compete.

5        Now, the plaintiff actually agrees that it has to

6   allege market-wide harm in the tied product market, which it

7   says at page 7 of its opposition.  But even though they

8   agree with the requirement, they don't meet the requirement.

9   And the reason is this:

10        The plaintiff says that the tied product market is

11   the market for what it calls, again, TPA administrative

12   services or 340B TPA services -- third-party administrative

13   services -- that are provided to covered entities.  The only

14   allegations about harm in the tied product, in that market,

15   are about foreclosures in a very small subset of that

16   market, and that is the TPA services market.  Not at large,

17   but the TPA services that are provided specifically with

18   respect to CVS contract pharmacies.

19        And as we'll talk about in a second, that matters

20   because, as it happens, very few relatively speaking, very

21   few New York covered entities actually contract with even

22   one CVS pharmacy.  So we're talking about a very small

23   sliver of the market that they themselves say is the tied

24   product market.  And that's what the law says you can't do.

25   You can't bring a tying claim based upon harm that only

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 14 of 62

Proceedings

1   occurs in a small sliver of the tied product market.

2          Now, we've raised this issue in our motion.  The

3   plaintiff didn't respond to it in their opposition.  They

4   acknowledge the need to show market-wide harm, but at this

5   point it wasn't responded to.  It's been more than five

6   years since the policy that they're challenging went into

7   effect, since CVS started integrating its administrative

8   services with its contract pharmacy services, but there

9   aren't any allegations in the Complaint about whether this

10  has had an effect on that broader tied product market of

11  340B administrative services, kind of, at large.

12         And there isn't even an allegation in the Complaint

13  about whether a single covered entity has decided to move

14  all of its 340B TPA work to Wellpartner as opposed to just

15  the CVS related 340B TPA work.  And it's not a technicality.

16  It matters because it means that what they'd missed is the

17  key focus in the Donnelly Act and its purpose which is to

18  address, again, market-wide harm.  And in a tying case, that

19  means market-wide harm in the tied product market.

20         So the next point that I wanted to get to is on

21  page 6.  And this is now the other product market that's

22  defined, the tie-in product market, the one for contract

23  pharmacy services.  The plaintiff says that the tie-in

24  product market here is the market for CVS contract pharmacy

25  services.  And the first thing, Your Honor, to note about

ab

Case 2:23-cv-01458-MRP    Document 20-3    Filed 05/19/23    Page 15 of 62

Proceedings

1    that is the plaintiff has really strenuously avoided the

2    obvious market and, frankly, the correct market, which is

3    contract pharmacy services generally.

4         Instead, what they're trying to do is they're

5    trying to, sort of, gerrymander a CVS specific market as

6    though there aren't thousands of other pharmacies in New

7    York that provide these services.

8         So why are they doing this?  The reason is actually

9    pretty simple.  They don't want to acknowledge that CVS

10   pharmacies just aren't that popular in New York.  And that's

11   what this chart here, this pie chart is showing.  That the

12   sliver in the upper right shows, that at the time these

13   policies that they're challenging went into effect,

14   14 percent of covered entities in New York contracted with

15   even a single CVS pharmacy location.

16        So they have to allege for purposes of this tie-in

17   claim, that CVS contract pharmacies are a, sort of called,

18   must have for covered entities of New York.  That is, that

19   covered entities in New York don't have any choice but to

20   contract specifically with CVS pharmacies as contract

21   pharmacies.  And of course they can't do that because of

22   what's in this chart.  Because, again, the reality is that

23   very few covered entities in New York actually do contract

24   with CVS pharmacies.  So it's pretty difficult to call CVS a

25   so-called must-have pharmacy.

ab

Case 2:23-cv-01458-MRP    Document 20-3    Filed 05/19/23    Page 16 of 62

14

Proceedings

1          So what the plaintiff did was they -- they found a

2     way around the obvious and we say correct market definition,

3     which would be the one that would include all pharmacy

4     services -- they found a way around that by saying that

5     every pharmacy -- every single pharmacy, doesn't matter how

6     big or small.  The smallest independent pharmacy on the

7     corner, the, you know -- a great big Duane Reade -- all of

8     them are monopolists; have market power in their own little

9     market that just consists of that one pharmacy.

10          They spend a lot of time in their papers trying to

11     defend a so-called one brand market or single brand market.

12     And single brand markets are less favored in the case law.

13     It doesn't mean they never happen, but they are disfavored.

14     This is much more extreme than just a single brand market.

15     This is, as we've put it, an everyone-is-a-monopolist

16     theory.  And so on page 7 here, we describe a little bit

17     about that.

18          So first point about that theory, no Court that

19     we're aware of has ever accepted it.  No Court has ever

20     accepted that kind of market definition where every

21     participant is its own market, and, therefore, is a

22     monopolist, because there's no one to compete with because

23     the market consists just of that one store, that one

24     pharmacy.  And there's a good reason for that and it's

25     because it's simply not plausible.

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 17 of 62

15

Proceedings

1          So what the plaintiff says to that is, well, this

2     market is very different.  This market is different because

3     of Federal regulations and because of the way of the

4     regulations work, they say, you can't replace lost 340B

5     savings if you can't contract with a CVS, with anything

6     else, with another contract pharmacy or savings from another

7     contract pharmacy.  And they say the reason for this is that

8     it's not permissible for these hospitals, these covered

9     entities, to quote, unquote, "steer" patients to a

10    particular pharmacy.  And there are two answers to that.

11         The first answer is, even if the regulations say

12    that a covered entity cannot force a patient to go to the

13    pharmacy of the covered entity's choice, that doesn't mean

14    that they're not allowed to market to their patients.  And,

15    in fact, we know that covered entities do exactly that.

16    They market.  They tell patients which contract or which

17    pharmacies are or not in network.  They even give discount

18    cards in some instances to try to encourage patients to go

19    to a particular pharmacy.

20         So the first point is just because you can't force

21    a patient to go to a particular pharmacy, that, in itself,

22    does not mean that every single pharmacy is now suddenly its

23    own market and that there's no ability for patients to know

24    or understand what pharmacy they're going to and whether

25    it's a contract pharmacy.

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 18 of 62

Proceedings

1          But the second point is, it's just not true that a
2    covered entity is unable to replace savings that it would
3    lose if it no longer contracted with a CVS pharmacy.   A
4    covered entity can, in fact, replace those savings with
5    savings from any other contract pharmacy where its patients
6    go to fill prescriptions.   And that's why it matters so
7    much, that in New York, CVS has such a small percentage of
8    contract pharmacy relationships because there are lots of
9    other options for covered entities.

10          Now, importantly, the plaintiff does not allege
11    that there is any covered entity, much less all covered
12    entities, that contract already with every single pharmacy
13    at which their patients fill prescriptions.   They can't
14    allege that because it isn't the case.   And what that means
15    is that as long as there are other contract pharmacies where
16    their patients fill prescriptions, if they lose savings from
17    a CVS pharmacy, they can go to a different pharmacy and
18    replace those savings.   A final, just quick point about that
19    argument.

20          They refer to this regulatory structure as being
21    unique.   This is unusual.   That's why we have such an
22    unusual every-pharmacy-is-a-monopolist type of market.   But,
23    in fact, this kind of situation isn't really unique at all.
24    In fact, it happens all the time in our economy.   And I
25    think the Coke and Pepsi example that we included in our

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 19 of 62

Proceedings

1    reply brief is probably as good as any to show that.  Which

2    is, you know, if a retailer buys Coke and is unable to buy

3    Pepsi, but, you know, there are some of its customers who

4    would prefer Pepsi, that retailer will lose out on those

5    Pepsi sales.  If a customer will only drink Coke, they'll

6    lose out.  But nobody would ever suggest that Coke and Pepsi

7    are somehow in different markets, they're not all in the

8    soft drink market.

9         Last argument, and this begins on the following

10   page, page 8, is about the geographic market.  So two

11   dimensions to a profit -- to a market, rather, in an

12   antitrust case.  That the relevant market consists of a

13   product market dimension and a geographic market dimension.

14   Product market means what, in the eyes of a customer, which

15   products are substitutable for each other.  Geographic

16   markets refers to what's known as the effective area of

17   competition.  That is, where do customers go to look for the

18   products they want to buy.

19        Now, the plaintiff says that the geographic market

20   for contract pharmacy services is national, the whole

21   country.  And they say this, they say, because CVS operates

22   nationally; its integration was a national integration.  But

23   that isn't how a geographic market gets defined.  A

24   geographic market gets defined by where do customers

25   actually make their purchases?

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 20 of 62

Proceedings

1          So that's why we thought that, perhaps, the best

2    way to show why their geographic market is wrong is simply

3    to look at a map.  And, here, you know -- again, our concern

4    about this market definition is that what it means at the

5    end of the day is that a covered entity located in New York,

6    say, down the street here, is -- regards as a substitute.

7    It could just as easily in effect contract with the Duane

8    Reade down the street or the independent pharmacy down the

9    street, as it could with a contract pharmacy located in

10   Honolulu, Hawaii.  The whole country is the relevant

11   geographic market.  That's what that means.

12          And our point here is that that's both implausible,

13   and it's also inconsistent with the plaintiff's other

14   allegations.  Because the plaintiffs allege -- and this is

15   on page 9 here, in paragraph 8 of their Complaint -- they

16   say that patients use the pharmacies that tend to be closest

17   to where they live or work.  And we think that that's just

18   plainly inconsistent with the idea that there could possibly

19   be a national geographic market here.

20          So the plaintiff has two responses to this.  First,

21   they say, well, specialty pharmacies are national, even if

22   retail pharmacies aren't.  Specialty pharmacies are the

23   pharmacies that prescribe much more complicated, usually

24   more expensive drugs, oftentimes but not always, through

25   mail order, and other items.  And they say, well, especially

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 21 of 62

19

Proceedings

1    pharmacies are national, they say.  There are two problems

2    with that argument.

3          The first is even if you were to look at the

4    specialty pharmacy market, if it is one, again, specialty

5    pharmacies -- at the time of the integration here that's at

6    issue, only 14 percent of New York covered entities were

7    contracting with any CVS pharmacy, including specialty.

8          So what are their allegations about specialty

9    pharmacy.  How can they suggest that specialty is -- could

10   be a source of market power.  They allege that there's a

11   27 percent market share for CVS, nationwide.  They don't

12   allege for what we think are clear reasons.  They don't

13   allege what that percentage looks like for New York covered

14   entities.  And it's only been New York covered entities that

15   the Attorney General can sue over or on behalf of.

16         So they don't tell us that, but they do tell us

17   that nationwide, there's a 27 percent share.  Even

18   20 percent or 27 percent, though, as a matter of law, is too

19   small on its own to confer market power.  But the second

20   point about that argument is even if specialty pharmacies

21   were nationwide --

22         THE COURT:  Well, does it matter that if they have

23   27 percent but the next biggest -- next biggest share is

24   20 percent and then everyone else -- independent pharmacies.

25   So doesn't that matter?

ab

Proceedings

1      MR. PITT:  Well, it -- it could, but with those

2   kinds of numbers, the Courts have recognized that you're not

3   going to be able to exert market power with that small a

4   share.  That less than 30 percent number, that's been

5   recognized by a number of Courts, as being, sort of, the,

6   almost the bare minimum threshold.

7      But actually, I think Your Honor's question speaks

8   a little bit to my second point about this argument, which

9   is that, let's say that it is a nationwide -- specialty

10   pharmacies are nationwide.  Let's say 27 percent is correct.

11   The plaintiff doesn't define separate markets for specialty

12   and retail.  It defines one market for all the contract

13   pharmacies.  And specialty, they tell us in the Complaint,

14   constitutes only 40 percent of 340B pharmacy revenues.  So

15   again, you're talking still, about a tiny sliver of this

16   market that they're addressing when they talk about

17   specialty or CVS specialty.

18      The second thing that they tend to say or that they

19   have said about this geographic market definition, is they

20   say, well, it doesn't really matter anyway because they

21   chose the -- took a conservative approach, and so it doesn't

22   really matter whether the market is geographic or not.  We

23   think, Your Honor, respectfully, that it does matter.

24      As a general matter, geographic market is important

25   because, if you're not picking the right geographic area to

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 23 of 62

Proceedings

1    focus on, then you are not looking at the true market

2    realities for, in this case, the New York covered entities.

3    And a nationwide market doesn't do that and as I've, sort

4    of, said, that matters here for the reason that so many New

5    York covered entities tend not to contract with CVS

6    pharmacies.  New York is known for its lack of reliance on

7    big pharmacy chains.

8          So, Your Honor, I think that sort of summarizes

9    what our major points were.  I am very glad to respond to

10   any questions from Your Honor, but that was pretty much what

11   our arguments were.

12         Thank you.

13         MR. KASHA:   Good afternoon, Your Honor.

14         THE COURT:   Good afternoon.

15         MR. KASHA:   New York has properly pleaded a single

16   brand product market in this case, in the tying market,

17   because there is and can be no substitution, from the

18   perspective of safety net hospitals and other covered

19   entities.  This is not about the retail pharmacy market.

20   The market here concerns covered entities' access to 340B

21   benefits for which they need a 340B contract.  Only a 340B

22   contract with CVS will give covered entities access to

23   benefits associated with CVS customers.  There is,

24   therefore, no substitution under the commercial realities of

25   this market.

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 24 of 62

Proceedings

1      The context here is important.  The 340B program is

2  a Federal benefit specifically intended for safety net

3  hospitals and other eligible clinics known as covered

4  entities.  Here in New York, these clinics and covered

5  entities and hospitals are not-for-profits.  This system

6  exists for the broader public benefit, to improve health

7  services particularly in under-served and rural communities.

8      Patients are generally unaware that when they go to

9  pharmacies outside the hospital or clinic where they were

10 treated, their prescriptions sometimes give rise to a 340B

11 benefit that accrues to the hospital where it was

12 prescribed.  But it can only be accessed if that hospital

13 has a 340B contract with that pharmacy.

14      Permit me re-emphasize this.  To to access this

15 benefit for CVS customers, the covered entity must have a

16 340B contract with CVS.  No other pharmacy can give a

17 covered entity access to that 340B benefit that arises from

18 CVS' customers.  Without a 340B contract with CVS, the

19 benefit just goes away.  No one gets it.  You cannot get it

20 somewhere else.

21      This is easily illustrated.  Imagine there's a CVS

22 pharmacy on my left, and another brand of pharmacy on my

23 right.  To access the 340B benefit associated with the CVS

24 customers who go to the store on the left, the covered

25 entity must have a contract with CVS.  Just like to access

ab

Proceedings

1    the 340B benefit with the other pharmacy's customers on the

2    right, the covered entity needs a 340B contract with that

3    pharmacy.

4         They cannot give access to the 340B benefit that

5    arises for each other's customers.  It's not that they don't

6    want to, or that they choose not to, or it's a contractual

7    thing that they don't.  They cannot do it under the

8    regulatory scheme.

9         And to be clear here, the question is not whether

10   covered entities contract with more than one pharmacy.  They

11   very often do.  The question is that -- the question is are

12   they substitutes?  You can think of it like an access key.

13   CVS has the only key to the 340B benefit associated with its

14   customers.  There literally can be no substitute.  This, of

15   course, gives CVS quite a lot of power.  Market power,

16   probably monopoly power, though we don't have to prove that.

17        Now, CVS likes to make a big deal of the fact that

18   other pharmacies hold their own key to access those 340B

19   benefits.  This misses the point because it's not the

20   holding of the key that is the wrongful conduct here.  That

21   single brand product market that's created by the market

22   structure is just that, a result of the market structure:

23   The laws and regulations that govern this industry.

24        The problem here isn't the fact of the single brand

25   product market.  It's that CVS and Wellpartner have misused

INDEX NO. 452197/2022
NYSCEF DOC. NO. 55    Case 2:23-cv-01458-MRP    Document 20-3    Filed 05/19/23    Page 26 of 62    RECEIVED NYSCEF: 03/14/2023

24

Proceedings

1    their market power to force a tying on the covered entities

2    that, in very many cases, they do not want.  That is the

3    wrongful conduct.  Therefore, focusing on whether or not

4    other pharmacies also have a single brand product market is

5    neither here nor there.  The question is the tying.

6        Now, there cannot really be a serious question that

7    there is a tying.  They announced it in extremely explicit

8    words, nakedly using the word "exclusive."  There also can't

9    really be a serious question about substitution.  For those

10   CVS customers, no other pharmacy in the world could give

11   access to that key to unlock those 340B benefits.

12       Now, antitrust markets are determined by reference

13   to substitution, which is sometimes referred to as

14   interchangeability.  Not by a standard of must-haves or

15   something like that.  It's a question of substitution.

16       There's a term called cross-elasticity of demand,

17   which is the economist's way of measuring and quantifying

18   substitutability.  When cross-elasticity of demand is at

19   one, then two products are entirely interchangeable and they

20   are presumably in the same market.  When cross-elasticity is

21   at zero, which is what we have alleged in paragraph 99 of

22   our Complaint, then they're inherently not substitutable and

23   they are not in the same market.  This is the test used in

24   antitrust cases.

25       So the question as applied here is, which

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 27 of 62

Proceedings

1    pharmacies can be substituted for a covered entity's 340B

2    contract with CVS?  And the answer was none.  None can.  New

3    York alleges that under the commercial realities of this

4    market, there, therefore, is no substitution.

5          And just to drive home the point, I'm going to

6    refer to paragraphs 13, 51, 86 through 90, as well as 97

7    through 99, of our Complaint.  And paragraph 99 is the one

8    that specifically alleges that cross-elasticity of demand is

9    at or near zero.

10          Now, of course, if they take issue with some of

11   these facts, they're welcome to do that.  They're entitled

12   to their defense.  But a factual defense is not a basis to

13   dismiss the Complaint.  We are at the motion to dismiss

14   stage, so if they have a factual question about whether or

15   not cross-elasticity of demand is actually zero, or whether

16   or not another brand of pharmacy could, in fact, somehow

17   magically help a covered entity get access to CVS customers,

18   which they certainly can't, but if they want to challenge

19   that factually, that is a basis to deny the motion, not to

20   grant it.

21          Now, a word about the anti-steering rule, which

22   comes up a lot in the papers.  Counsel didn't mention it

23   much.  I just want to mention that the anti-steering rules

24   are part of the market structure.

25          First of all, HRSA guidance is quite clear.  The

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 28 of 62

26

Proceedings

1    patient gets to choose where to go, and the covered entity

2    has to inform the patient of that right.  And we think that

3    the Court can simply take judicial notice under CPLR 4511B

4    and that will appropriately end this part of the inquiry

5    right here.  However, to the degree there is a question of

6    fact about just how steerable patients are, once again, this

7    is a question of fact and would necessitate the denial of

8    the pending motion.

9         Now, I would also like to point out that CVS'

10   argument that small clinics and safety net hospitals can

11   control where their customers go, as a matter of common

12   sense, should be taken with a grain of salt, or two.

13        As we allege in our Complaint and mention in our

14   brief, patients typically go where it's convenient.  We all

15   know this.  Caregivers also have more important things to

16   discuss with their patients, like follow-up treatment,

17   follow-up appointments, physical therapy.  This probably is

18   not high on the priority list.

19        On the contrary, who would probably have more

20   control over its customers?  CVS.  In addition to the

21   rewards programs that many pharmacies employ, there are

22   allegations in our Complaint concerning CVS' relationship

23   with its corporate affiliate, Caremark, which is a pharmacy

24   benefit.

25        Now, I don't want to get too much in the weeds, but

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 29 of 62

Proceedings

1    pharmacy benefit manager -- there's only three in the

2    country and CVS and its corporate affiliates own one of

3    them -- they're the ones who help insurance plans determine

4    how much of a co-pay for this drug, as opposed to that.  Do

5    you have to try this one before that.  But they also can do

6    things -- and we have this allegation in our Complaint at

7    paragraph 54 and 55 -- that, for example, CVS can tell

8    patients on the plans for which the PBM, or CVS' affiliate,

9    their PBM, Caremark -- tells patients if you want a 90-day

10   supply of your prescription, you have to go to CVS.  If you

11   go to another pharmacy, you can only get a 30-day supply.

12   Well, that's not directly at issue in this case.  But what

13   it does show is that if anybody has control over their

14   customers, it's CVS, not the covered entities.

15            But before moving off this point, it's important to

16   say that if CVS wants to hang their defense on how much

17   factual flexibility there may actually be concerning the

18   anti-steering role, good luck to them.  However, it is a

19   factual question and definitely would require the denial of

20   the motion to dismiss.

21            Now, I'd like to turn to the authorities and,

22   particularly, the US Airways vs. Sabre Holdings case.  This

23   is the lead case.  It's not really new law, but it's a very

24   good example of what the law actually is.

25            The Second Circuit in that case in 2019 -- it's

ab

Proceedings

 1    relatively recent -- wrote:  "A single brand of a product or

 2    a service may be a relevant market if no substitute exists

 3    for that brand's product or services."  They didn't pull

 4    this out of thin air.  They pulled this out of Supreme Court

 5    authority.  And the Donnelly Act follows Federal law in most

 6    respects, and there are some small areas of difference.  But

 7    not here.  I think we are in agreement that in this respect,

 8    Federal and New York law are the same.

 9            Now, in the US Airways case, the Second Circuit

10    cites four factors that were alleged -- or four allegations

11    that were alleged by US Airways which justify the single

12    brand product market in that case.  The first one is

13    actually the exact same thing we have alleged here, that

14    cross-elasticity of demand is at or near zero.

15            The Second Circuit said that was enough to justify

16    the case going forward on the single brand product market,

17    and so it is here too.  And that could also end this portion

18    of the inquiry, but we have more to say on this.

19            The other three allegations that in US Airways the

20    Court focused on were allegations that were really questions

21    of degree.  It would be costly to multi-home.  It would be

22    hard to transition.  They might lose some benefits or

23    incentives if they use two different platforms.  That was

24    used enough to allow them to go forward.  But here, we're

25    not saying it's costly or expensive, although there are

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 31 of 62

29

Proceedings

1    costs and expenses associated with those few hospitals who

2    will hire TPAs.  What we're saying here, the single brand

3    product market arises from what I illustrated earlier.  That

4    the pharmacy on the right can never give access to a covered

5    entity for a CVS customer, and vice versa.  That's the

6    market structure here.

7            That's even stronger than it was in US Airways.

8    And that's why the appropriate, the only way to frame this

9    case is as a single brand product market -- or the correct

10   way.  And I will point out, it wasn't a discretionary call.

11   The Second Circuit remanded it.  The District Court would

12   proceed with it.  From what I can tell from following the

13   litigation, the plaintiff is proceeding well through summary

14   judgment there.

15           Now, defendants brief relies heavily on the Truetox

16   case.  Truetox was correctly decided by Justice Borrok, but

17   it is not a leading case.  It's not a reported case.  It's

18   an example of a poorly conceived and pleaded antitrust claim

19   that had to be thrown out.

20           In that case, Truetox, which is apparently a

21   medical testing laboratory, was suing Healthfirst because

22   Healthfirst network had decided to only contract with two

23   other labs -- I believe it was Quest Diagnostics and

24   Labcorp, who are the, from what I understand, the biggest

25   players there -- and chose not to include Truetox.

ab

Case 2:23-cv-01458-MRP    Document 20-3    Filed 05/19/23    Page 32 of 62

Proceedings

1        From that fact alone, they've concluded that the

2   product market only included two brands.  That doesn't fly,

3   and that's not what we're alleging here.  This was not a

4   situation of a regulatory market structure where, like, as I

5   point out, a store on the left and a store on the right --

6   access has to be gotten to independently through separate

7   contracts.

8        Indeed, when I went and looked up the Truetox

9   Complaint on NYSCEF, just to show how poorly it was pleaded,

10  and probably because the facts just weren't there, there was

11  no mention of substitution.  No mention of

12  interchangeability.  No mention of cross-elasticity of

13  demand.  So the Truetox case teaches nothing, other than

14  that the standard is substitution and interchangeability,

15  which is easily met here.

16        Now, I would like to talk about this market-wide

17  impact issue that counsel spent quite some time on.  You

18  know, we have widely asserted market-wide impact.  And I'd

19  like to point out that there seems to be an assumption in

20  CVS' discussion about that point.  That the market-wide

21  impact requires total foreclosure, complete exclusion from

22  the market, or something like that.

23        Well, we cite here in our brief -- and it's not at

24  all true that we didn't respond in our brief and I don't

25  follow this up with counsel.  Here on the -- just a

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 33 of 62

Proceedings

1    moment -- page 7 of our opposition brief, we cite two

2    authorities that point out, first of all, that for the

3    purposes of that test, a $600,000 effect on commerce in the

4    tied market was clearly enough; "clearly meets any test of

5    substantiability' [sic]."  The words, "clearly meets any

6    test of substantiality."  And that's the Gonzalez case, 880

7    F.2d 1502.

8         Now, here, we've alleged specifically that there

9    was market-wide impact in the tied market for TPA services.

10   And we cite paragraphs, among others, 107 through 108.

11   Covered entities switched away from Wellpartner's

12   competitors in the TPA services market.  That switching, as

13   long as it meets some, you know, test of substantiality, is

14   the market-wide impact, the fact that they were pushed away.

15        In terms of the dollar amount, I cannot right now

16   tell you what it is, but I do think it's going to be far in

17   excess of $600,000, market-wide.  Far in excess of that.  So

18   the idea that we haven't responded is wrong.

19        And I do want to emphasize that the impact in the

20   TPA services market does not require that all competitors of

21   Wellpartner simply cease to exist.  There is no such

22   requirement under tying law.  This is made up, so to speak.

23        Now, what I want to say about the Global Insurance

24   case that CVS likes to refer to, is that what that case

25   actually stands for is a very different proposition, that

ab

Proceedings

1    the individual injury to a particular person or entity is

2    not market-wide impact.  So if one company says wait a

3    minute.  I got cut out of this deal.  I was hurt -- that's

4    not market-wide impact.  We're not making any such

5    allegations.   We are here arguing for the economy of the

6    State of New York, talking about all safety net hospitals

7    and covered entities -- whether they are CVS customers or

8    could be CVS customers or used to be CVS customers -- under

9    these contracts.

10        So I should add here this 14 percent contract with

11   CVS, first of all, that number is not in our Complaint, so

12   it has no business playing any role on the motion to

13   dismiss.

14        Second of all, I don't know if the number is true

15   or not because it tells us very little.  It says nothing

16   about how big these covered entities are.  A small clinic

17   does not have any the same number of patients or dollar

18   volume as Mount Sinai or NYU Langone, or any of the other

19   larger hospital systems.  So this 14 percent, aside from not

20   being in the Complaint, and aside from being a question of

21   fact, tells us very little.

22        But the other thing it doesn't tell us is how many

23   covered entities just threw up their hands and gave up and

24   said we're not going to do this.  We're not going to buy

25   into this.  In antitrust law that's classic output

Proceedings

 1    restriction, and that's classic antitrust harm.

 2         Now, I'd like to talk about some of the other

 3    authorities and, in particular, in the context of the

 4    geographic market issue.  You know, we've heard the term

 5    "gerrymandering," and I know they were applying it to the

 6    product market, but it's curious, because it was CVS that

 7    was trying to gerrymander a very clear geographic market

 8    definition.  In paragraph 101, in extremely unambiguous

 9    terms, New York alleges:  "The geographic scope of a CVS

10    contract pharmacy market is the United States."

11         Now, to begin, if they have a question about the

12    scope of the geographic market and its impact on liability

13    or remedies, those are questions of facts that can be

14    resolved in the process of litigation.  It is not a basis to

15    dismiss the case.

16         But I'd like to call to the attention, an

17    authority --

18         THE COURT:  Does it matter for the Donnelly Act

19    that, that's -- what you said?

20         MR. KASHA:  I'm sorry, Your Honor?

21         THE COURT:  Does it matter what the Donnelly Act --

22    in terms of what your reach is, your reach of the Attorney

23    General's Office, that you're talking about?

24         MR. KASHA:  Well, I think there might be a separate

25    question at the remedies stage, and I do hope we get there,

ab

INDEX NO. 452197/2022
NYSCEF DOC. NO. 55
Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 36 of 62
RECEIVED NYSCEF: 03/14/2023

34

Proceedings

1    when we seek an injunction to enjoin this conduct and

2    enforce -- of Wellpartner, about whether or not that order

3    will only apply in New York or nationally.

4          And I think Your Honor is probably more familiar

5    with the outer bounds of this Court's authority than we are.

6    But I would respectfully submit that that particular issue

7    doesn't really have a place here on the motion to dismiss.

8          I'd like to talk about an authority that CVS cites,

9    and it's called Benjamin of Forest Hills Realty vs. Austin

10   Sheppard Realty, 823 NYS2d 79.  And on page 95 it talks

11   about what a geographic market is, and that is, quote, "The

12   area in which such reasonable interchangeability can occur."

13   In other words, this -- and that's correct.  Just like in

14   the product market, it is a question of substitution.

15   Interchangeability.

16         So the question here is, in what geography would a

17   covered entity have to look to find a substitute for a CVS,

18   for a CVS 340B contract.  If they don't like the tying, a

19   particular covered entity in New York doesn't like the

20   tying, can they get around the problem by talking to a

21   pharmacy in New Jersey, California, Pennsylvania, Hawaii?

22   No, they can't.  There is no geography within which that

23   substitution can happen, therefore, we pleaded a national

24   market.

25         Once again, if they have a question about this,

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 37 of 62

Proceedings

1   they can challenge it as a question of fact at trial.  It's

2   not a basis to dismiss.  We have very plausibly and clearly

3   pled that national market.

4        I'd also like to add that there are a lot of facts

5   that make the market very national.  First of all, contrary

6   to the way it's being depicted, covered entities do not

7   contract with individual CVS locations.  Does not happen.

8   They contract with CVS.  As we see it in New York, they do

9   it through one of their subsidiaries, CVS Albany.  And it's

10  a national contract which covers their national mail order

11  service; their at least partially national specialty

12  pharmacies, much of which is distributed by mail.  And then

13  they'll be an appendix listing which stores it applies to.

14       But coming back to the which geography would be a

15  substitute, if they don't like that contract which includes

16  the tying, can they go to New Jersey and say, hey, some

17  pharmacy, give me a contract without the tie-in, that would

18  give me access to the CVS customers' 340B benefit.  There is

19  no such substitution.  That is why we have pled a geographic

20  market nationally.

21       Now, I'd like to address some of the issues that

22  were raised in defendants' slides and presentation, much of

23  which I think covers what I've said, but I think it's worth

24  calling him out specifically on.

25       First of all, at the beginning of the presentation,

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 38 of 62

Proceedings

1   counsel was talking about using Wellpartner to increase

2   access for covered entities.  I just want to point out that

3   if you look at paragraph 70 and the following of our

4   Complaint, you will see that, before they choose to do that,

5   they have already set up a system to multi-home, meaning,

6   allowing individual pharmacy locations to serve multiple

7   safety net hospital, which is what they claim the benefit

8   was.  They've already set up a way to do that using what's

9   referred to as in the Complaint as the Sentry backbone.

10  Sentry is another one of the TPAs that competes with

11  Wellpartner and they do both sides of the business.  They

12  have helped CVS prepare a system to do the same thing

13  without an anticompetitive tie.  But instead, CVS chose to

14  implement an anticompetitive tie.

15       Now, I don't think those facts are at issue before

16  the Court, specifically on this motion to dismiss.  But

17  having it raised by the other side, I couldn't let that lie

18  without calling out that particular fact.

19       Now, I'd like to -- sorry.  I'm just going to skip

20  over the ones already covered in my presentation.

21       I'd like to talk about counsel's use of the "small

22  sliver" expression.  Now, one can't just start carving out

23  little portions of things and say, ah-ha, it's too small.

24  Or, this is a must-have.

25       First of all, on the must-have issue, must-have is

ab

Case 2:23-cv-01458-MRP    Document 20-3    Filed 05/19/23    Page 39 of 62

Proceedings

1    not the standard for market definition in antitrust cases.

2    It sometimes comes up to the factual issue in other kinds of

3    markets, but that is not the standard and it is not

4    applicable here.

5        Now, to pull up their 14 percent number, or any

6    other particular number, which is not in our Complaint and,

7    therefore, could not be the basis for a dismissal -- is to,

8    kind of, slice-and-dice to look for something.  They were

9    trying to prove a point, I guess, that the harm was small.

10   But the harm in a TPA market is substantial if it exceeds

11   $600,000, which it will by orders of magnitude.  And if

12   there's a question about that, once again, that's a question

13   of fact which would require a dismissal.

14       THE COURT:  Tell me again.  The 600,000 comes from

15   where?

16       MR. KASHA:  There is a case which specifically says

17   -- Gonzalez vs. St. Margaret's Housing Development Fund

18   Corporation, 880 F.2d 1514 at 1518.  And the quote is:

19   "$600,000 of commerce clearly meets any test of

20   substantiality."  And that's under the substantial effects

21   on commerce in the tied market.

22       Now, in this case here, although I couldn't give

23   you an exact number, we do know that the fees paid in the

24   TPA services market, at least -- and once again, this isn't

25   -- well, I think we do have numbers like this in the

ab

Case 2:23-cv-01458-MRP    Document 20-3    Filed 05/19/23    Page 40 of 62

38

Proceedings

1    Complaint.  The fees are in the hundreds of thousands of

2    dollars, monthly or quarterly.  And we're talking about, by

3    their own admission, at least 300 covered entities in New

4    York.

5        So 300, you know, per quarter, per month, something

6    measured in the hundreds of thousand dollars, across

7    hundreds of entities in the state, we're clearly beyond that

8    de minimus threshold.

9        Now, if -- if they have a question about that, if

10   they factually want to challenge that, we're not trying to

11   deprive CVS of the right to make factual challenges.  I

12   don't think it's going to get them far and I'm not very

13   worried about it.  But it is a question of fact that

14   requires dismissal of the motion -- a denial of the motion.

15       Now, I'd also like to take issue with the statement

16   that our theory has never been accepted by any Court.  This

17   is wrong.  The single brand product market theory has been

18   accepted by many Courts the best example being US Airways

19   and the cases cited therein.

20       Now, they're confusing the issue, because as I

21   pointed out when we talked about the access to the keys, the

22   market structure does create presumably a single brand

23   product market associated with each pharmacy.  But that's

24   not the wrongful conduct here.  In some antitrust cases, it

25   is.

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 41 of 62

Proceedings

1      It was like in that US Airways case, it was a

2   monopolization case.  So the single brand product market

3   wasn't just the tying market; it was the wrongful market in

4   that case because it was a Section 2 monopolization case.

5   But this is a tying case and the wrongful conduct is the

6   tie.

7      The monopoly that they have in the single brand

8   product market that's created by the market structure is not

9   the wrongful conduct, whether it's CVS or another pharmacy.

10  It's the tying that's the wrongful conduct.  That's what's

11  alleged to be wrong.  So they have market power and even

12  monopoly power in their single brand market, not by

13  wrongdoing; by virtue of the market structure.  However,

14  they choose to implement a tie, to the detriment of covered

15  entities, and that's what the wrongful conduct is.  So the

16  "everyone-is-a-monopolist has never been accepted by a

17  Court," this is really not right.

18     First of all, Courts do accept, in appropriate

19  circumstances, single brand product markets.

20     Second of all, the wrongful conduct here isn't the

21  monopolization.  We're not saying, therefore, every mom and

22  pop pharmacy in New York is also committing the same

23  violation here, unless they too are committing -- are

24  implementing a similar tie.  The issue is the tie.

25     And with that, Your Honor, I'll answer any

ab

Proceedings

1   questions you have or reserve the chance to oppose or

2   respond if opposing counsel has anything further to say.

3          THE COURT:  Someone goes first, someone goes

4   second, and then we have a reply.  That's usually how it

5   works.

6          Go ahead.

7          MR. PITT:  Thank you, Your Honor.

8          Thank you, Your Honor.  I'll try to be brief.

9   There's just a few things that Mr. Kasha had mentioned that

10  I'd like to respond to.

11         I'll start with the last thing he said.  The issue

12  is the tie.  Very clearly, under New York and Federal law, a

13  tie is not actionable, cannot be actionable, without market

14  power in the tie-in product market.  No claim without it.

15  And I just want to be very clear that, in addition to the

16  market-wide impact or market-wide harm argument that you're

17  making, that is what we are challenging.  That they have not

18  plausibly alleged market power.

19         Mr. Kasha mentioned many times it's a fact issue

20  and it can't be decided on a motion to dismiss.  Market

21  definition is a fact issue.  The cases recognize that

22  although market definition is often a fact issue where the

23  allegations are implausible or where they're inconsistent,

24  then it is absolutely appropriate.  And there are many cases

25  that do so.  We cited a number in our papers, but there are

ab

Proceedings

1    many more where Courts do indeed, and should, dismiss a

2    case, that has not stated in a proper legal claim because

3    there is no plausible claim of market power.

4         On the issue of substitution, so whether a covered

5    entity can substitute for a different contract pharmacy for

6    a particular customer who went to CVS is not the relevant

7    question.  The question is can a covered entity replace

8    savings that it won't get if it doesn't contract with CVS

9    with savings from a different contract pharmacy.  And our

10   answer to that is absolutely, they can, and they do.  And

11   the Complaint does not plausibly allege otherwise.

12        All they say is, well, for that patient who would

13   have gone to the CVS, you can't get the savings associated

14   with that prescription.  But that is not the test, and that

15   is why we focused on this 14 percent number and let me talk

16   about that for a brief minute.

17        For the first time now today, we hear from the

18   plaintiff that the 14 percent issue was something that

19   cannot be considered.  A couple of things on that.  First,

20   we brought that up in our opening brief.  At no time in

21   their opposition did they suggest that it would somehow be

22   improper for Your Honor to consider it.

23        Second, they rely on that same data in their

24   Complaint, which I think we point out in our reply brief.

25        Third, the Court can take judicial notice of these

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 44 of 62

Proceedings

1    government statistics, again, under a case law that we've

2    cited in our papers.  So we do think it's appropriate.  But

3    even if Your Honor didn't, it is still the case that every

4    pharmacy is its own monopolist, and that is what they

5    acknowledge in their opposition they are doing.  Because for

6    any given pharmacy, if you don't have a contract with that

7    one pharmacy, then you can't get access to the savings

8    unlocked, as they put it, by the key, because they don't

9    have the contract with it.  If a patient fulfills a

10   prescription at that one pharmacy, you miss out on the funds

11   associated with that one patient.  And I would again, raise

12   the Coke-Pepsi discussion that we had in our brief and that

13   I mentioned a moment ago, which is to say that doesn't mean

14   that they are each their own market.

15        Next point is PBMs.  Just a minor correction.  I'm

16   not sure whether Mr. Kasha misspoke, but I did hear him say

17   that there are only three PBMs.  That's not the case.  There

18   are, I believe, somewhere in the order of 40 or more PBMs.

19   It is certainly the case that there are three PBMs that are

20   larger than the others, but it is not at all the case, and I

21   don't believe they allege that there are only three PBMs.

22        And on that point about PBMs, if CVS' ownership of

23   a PBM gave it market power, which is what I believe they're

24   trying to suggest, then again, you would see many, many more

25   covered entities in New York contracted with CVS because

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 45 of 62

Proceedings

1    they would have to.

2           Let me talk briefly to this must-have issue.  It is

3    -- the reason I use the phrase "must-have" -- it's not my

4    phrase; I didn't come up with it.  It's in the case law --

5    is that the fundamental point about tying arrangement is it

6    has to be the case.  Again, most ties, not anticompetitive.

7    Not a problem.  Only a problem if the customer has no other

8    choice but to purchase the product, the tying product, from

9    the defendant.  That's what the standard is.

10          Now, when I say "no other choice," I'm speaking a

11   little bit euphemistically.  They have to have market power

12   or dominance in that tying product market.  And that's why I

13   refer to it as a must-have.

14          The Sabre case, very quickly.  They use it to say

15   that, well, a single brand market can be permissible.  I

16   agree.  A single -- under the right circumstances, a single

17   brand market can be permissible.  The allegations don't

18   support a single brand market here for the reasons that I

19   described.

20          And in any event, their idea of what it means to be

21   a single brand market is again, that every single pharmacy

22   has market power because the customers that go there are

23   associated with savings that can only be unlocked by

24   contracting with that particular pharmacy.  For the reasons

25   I've already said, that is, again, not how the market is

ab

Proceedings

1    defined.

2          I also heard that we were somehow suggesting that

3    complete, 100 percent foreclosure was a requirement in the

4    tied product market.  That is not our position.  It is not

5    what we were saying.

6          The test is substantial foreclosure.  And on this

7    point, I really do want to be clear because I think the

8    quote that you just heard from, I believe, it was the

9    Gonzalez case, that is actually referring to a different

10   prong of the test.

11         There is a prong in the test that the tie has to

12   affect a not insubstantial amount of commerce.  Frankly,

13   that is a prong that is almost always met in tying cases.

14   It is not controversial, and it is completely distinct from

15   the issue of whether or not there is market-wide

16   anticompetitive harm, which was the issue that we were

17   addressing.

18         On the geographic market question, again, the

19   question isn't whether it is possible for someone in New

20   York to contract with a pharmacy in California or Kansas or

21   Hawaii.  It is a question of whether it is a reasonable

22   substitute, and on basic plausibility standards, it is not.

23         And two more very quick points.  It was suggested

24   that covered entities have to contract with CVS, the entity

25   at large.  That is not the case.  I don't believe it's even

ab

INDEX NO. 452197/2022
NYSCEF DOC. NO. 55
Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 47 of 62
RECEIVED NYSCEF: 03/14/2023

45

Proceedings

 1    alleged in the Complaint that way nor it could it be because

 2    under the HRSA regulations, they have to have a contractual

 3    relationship with the pharmacy location; separate contracts

 4    with the pharmacy location.  So this is not the case, that

 5    contracting is a nationwide process.

 6            Final point, again, this is on a factual issue that

 7    I think, frankly, we agree is not relevant to the three

 8    arguments that we're presenting, but they raised this issue

 9    of the backbone and I simply want Your Honor to understand.

10            They say we just abandoned the backbone because we

11    wanted supposedly to dominate the different market.   In

12    fact, in 2017, the backbone was not a viable solution.  It's

13    certainly true, we tried to do that as a solution, and that

14    solution didn't work.  It was a failure in 2017, and that is

15    the reason why CVS then looked to acquire a third-party

16    administrator so that it could integrate the services.

17            And with that, Your Honor, I thank you again very

18    much for the time you've given us.

19            THE COURT:  Okay.

20            MR. KASHA:  Your Honor, we believe we've responded

21    to all of those points, so I have nothing further to add.

22    However, if you have any questions, I would be pleased to

23    respond.

24            THE COURT:  No.

25            MR. KASHA:  Thank you.

ab

Proceedings

1        MR. PITT:  Thank you.

2        THE COURT:  I have a motion that's come before me

3    which is to dismiss the Complaint.  We've heard from the

4    parties today.  I have the benefit of their papers in

5    support of opposition and reply.  The Court will rule.

6        To understand the State's antitrust claim as

7    asserted against CVS, we must first understand the

8    background of how the Federal 340B drug pricing program

9    works.  Namely, the program allows eligible providers --

10   these are hospitals and health clinics for underserved

11   populations, such as uninsured people or Medicaid recipients

12   -- to essentially buy prescription drugs at a discounted

13   price.

14       When a 340B drug gets dispensed, the patient's

15   insurance company pays for the drug according to its usual

16   pricing plan, but then the covered entity receives the

17   difference between the insurer-paid drug price and the 340B

18   drug price, often called the "340B savings."

19       The drugs can be dispensed at an inhouse pharmacy

20   associated with a covering entity, or at a regular

21   commercial non inhouse pharmacy.  If the patient goes to a

22   pharmacy other than a covered entity's own inhouse pharmacy,

23   then the covered entity can collect the 340B savings only if

24   the covered entity has a special contract with that store or

25   brand of pharmacy.  These are known as contract pharmacies.

ab

INDEX NO. 452197/2022
NYSCEF DOC. NO. 55
Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 49 of 62
RECEIVED NYSCEF: 03/14/2023

47

Proceedings

1     Plaintiff alleges that as of July 2021, there are 4,441

2     covered entities in New York enrolled in the 340B program.

3             Patients are typically unaware that their

4     prescription is classified as a 340B prescription, as

5     patients do not personally receive the benefits of the

6     program.  Those benefits instead flow to the covered

7     entities.  Another feature of the program is that the

8     covered entities are, according to plaintiff's reading of

9     the regulations, prohibited from directing or steering

10    patients to or away from a particular pharmacy.  The

11    relevant language reads as follows:  Covered entities must,

12    quote, "inform the patient of his or her freedom to choose a

13    pharmacy provider," unquote, and that, quote, "if the

14    patient does not elect to use the contracted service, the

15    patient may obtain the drugs from the pharmacy provider of

16    his or her choice," unquote.

17            Because of the complexity of the program, potential

18    compliance issues, and occasional difficulty in

19    administering the program, many covered entities hire 340B

20    program administrators -- also called "third-party

21    administrators" or shortened to "TPAs" -- to provide

22    administration services, identify 340B eligible

23    prescription -- prescriptions, and manage 340B drug

24    inventories on behalf of the covered entity.

25            In November of 2017, CVS pharmacy acquired,

ab

Proceedings

1    Wellpartner, a company that offers third-party administrator

2    services, and announced that the company would offer a

3    contract pharmacy and 340B administration services on an

4    integrated or -- excuse me, announced that the companies

5    would offer contract pharmacy and 340B administration

6    services on an integrated basis for CVS contract pharmacy

7    locations.  In other words, CVS began requiring covered

8    entities to use Wellpartner if the covered entity wanted to

9    have a 340B services contract with CVS.

10         According to the Complaint, many covered entities

11   had to switch from their preferred TPA to Wellpartner.  Some

12   of the covered entities, according to the Complaint, would

13   rather continue working with the TPAs they already have a

14   relationship with, both for financial and efficiency

15   reasons.  However, CVS is not the only pharmacy operating on

16   the integrated basis.  For example, Walgreens also uses an

17   integrated model.  The integrated model applies only to CVS

18   pharmacy locations.  That is, covered entities remain free

19   to obtain contract pharmacy services from other pharmacies

20   and to use other 340B administrators in connection with

21   non-CVS pharmacies.

22         Now, in the case before us, the Attorney General

23   for the State of New York takes issue with CVS' business

24   model which ties contract pharmacy services and 340B

25   administration services to one another.  The State asserts

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 51 of 62

49

Proceedings

1    two causes of action.  One, an allegedly anticompetitive tie

2    of 340B administration services to CVS' 340B contract

3    pharmacy services.  And that is alleged to violate the

4    Donnelly Act, which is at New York General Business Law

5    Section 340.

6          The second cause of action is a claim based upon

7    the same alleged conduct under the Executive Law, which is

8    at New York Executive Law Section 63 Subsection 12.  In this

9    motion, CVS seeks to dismiss for failure to state both

10   causes of action.

11         Now, in most contexts, including the law of tie-ins

12   -- T-I-E dash I-N-S, New York's Antitrust Law, the Donnelly

13   Act is interpreted consistently with Federal Antitrust Law

14   and precedent.  See Anheuser-Busch vs. Abrams at 71 NY2d

15   327, at 335.  There, the Court wrote:  "The Donnelly Act

16   should generally be construed and in light of Federal

17   precedent and given a different interpretation only where

18   State policy, differences in statutory language or the

19   legislative history justify such a result," unquote.

20         Now, to allege a per se antitrust tying claim,

21   T-Y-I-N-G, plaintiff must assert, one, Two distinct

22   products; a tying product and a tie product; and, two,

23   economic coercion; and, three, market power in the tying

24   product market; four, anticompetitive impact in the tied

25   market -- in the tied product market; and, five, involvement

ab

Proceedings

1    of a not insubstantial amount of commerce.  See Gonzalez vs.

2    St. Margaret's Housing Development Fund Incorporated --

3    Corporation, at 880 F.2d 1514.

4         The State argues that it has satisfied all five

5    elements of the claims, and although this Court is satisfied

6    that the State has successfully alleged four out of the five

7    elements of the claim, this Court holds that New York has

8    essentially erred by playing a -- by pleading a single brand

9    tying market.  That is, a tying market that includes only

10   the CVS brand of contract pharmacies.  Accordingly, in this

11   Court's view, the State has not successfully alleged the

12   third element of the tying claim.

13        "Tying" occurs when a seller conditions sales of a

14   product -- the tying product -- upon customers -- customers'

15   purchase of another separate product.  That is, the tie

16   product.  See Columbia Gas of New York vs. New York State

17   Electric and Gas Corp. at 28 NY2d 117 at 128.

18        However, not all tying arrangements violate the

19   Antitrust Laws.  Instead, many tying arrangements are fully

20   consistent with a free, competitive market.  See Illinois

21   Tool Works vs. Indiana, Inc. at 547 US 28 at 45.  For

22   example, it is not illegal to sell cars with engines or

23   cameras with lenses.  Rather, tying can be unlawful where a

24   seller has sufficient power in the tying product market to

25   restrain competition in the market for the tied product.

ab

Proceedings

1        The Donnelly Act requires plaintiff to properly

2    allege a tying product market and the possession of power

3    within that market.  A defendant that lacks market power in

4    the tying product market cannot coerce customers into

5    purchasing the tied product and, thus cannot harm

6    competition.

7        Put differently, a tie cannot violate the Donnelly

8    Act if customers have reasonable substitutes for the alleged

9    tying product.  Without the leverage of a market -- of

10   market power, a seller's inefficient tie-in will fail

11   because a rational consumer will buy the tying product from

12   the seller's competitor.  See Kaufman vs. Time Warner at 836

13   F.3d 137 at 143.

14       In light of these principles, the plaintiff's tying

15   claim is, in this Court's view, deficient.  More

16   specifically, this Court holds that plaintiff's claim fails

17   due to its failure to properly define the relevant market.

18       Plaintiff concedes that a covered entity may obtain

19   its 340B savings from any pharmacy willing and able to serve

20   as a contract pharmacy.  Yet, plaintiff rejects the most

21   natural product market definition.  That is, all pharmacies

22   capable of serving as contract pharmacies to covered

23   entities.  Instead, plaintiff asserts that tying product

24   market is the, quote, "CVS contract pharmacy market,"

25   unquote.

ab

INDEX NO. 452197/2022
NYSCEF DOC. NO. 55   Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 54 of 62   RECEIVED NYSCEF: 03/14/2023

52

Proceedings

1       According to the Complaint, the accuracy of this

2    product market definition is illustrated by the example of a

3    covered entity's patient who chooses to go to a CVS store to

4    fulfill their prescription.  If that covered entity does not

5    have a contract with CVS, then the covered entity cannot

6    collect the benefit.  A covered entity cannot, for example,

7    try to recover the benefit under a contract with Walgreens

8    or a local pharmacy for a patient who went to CVS.

9       And according to the State, in light of the

10    so-called anti-steering regulation, the covered entity

11    cannot even ask the patient to avoid CVS.  From the

12    perspective of the covered entity, there is, therefore, from

13    the patient -- from the plaintiff's standpoint, no

14    substitute for CVS.  The CVS contract services market is,

15    therefore, according to the plaintiff appropriately limited

16    to a single brand, and CVS necessarily has market power in

17    that market.

18       At the same time, plaintiff acknowledges that a

19    Donnelly Act claim should be dismissed where the alleged

20    product market is improperly and narrowly defined, and where

21    the definition, quote, "fails to take into account real

22    world interchangeable substitute products," unquote.

23    Moreover, plaintiff also does not dispute that single brand

24    markets are regularly dismissed at the pleading stage, as

25    the single brand markets theory is highly disfavored.  See,

ab

Proceedings

1   for example, Victoria T. Enterprises vs. Charmer Industries

2   at 881 NY2, 570 at 572-73.  Here, the Court noted that two

3   different brands of vodka were not each separate product

4   markets but rather part of a broader wine and liquor market.

5       Courts have reasoned that, quote, "If the market

6   were so narrowly defined, of course the brand company would

7   have market power being the sole seller.  But such a narrow

8   definition makes no sense in terms of real world economics,

9   and as a matter of law, a Court cannot adopt it."  See Town

10  Sound & Custom Tops vs. Chrysler Motors Corp., 959 F.2d, 468

11  at 479-80.

12      You should also see Tanaka vs. The University of

13  Southern California, at 252 F.3d 1059 at 1063-64.  There,

14  the Ninth Circuit, affirming dismissal, rejecting

15  plaintiff's conclusory assertion that the UCLA women's

16  soccer program is unique and hence not interchangeable with

17  any other program in Los Angeles.  You might also see Domed

18  Stadium Hotel, Inc. vs. Holiday Inn, at 732 F.2d 480 at 488,

19  where the Fifth Circuit wrote that, "Absent exceptional

20  market conditions, one brand in a market of competing brands

21  cannot constitute a relevant product market."

22      In defense of it's single brand definition,

23  plaintiff states that single brand markets are, quote,

24  "sometimes appropriate in antitrust cases and may be

25  permissible if no substitute exists for that brand's

Case 2:23-cv-01458-MRP    Document 20-3    Filed 05/19/23    Page 56 of 62

Proceedings

1    products or services."  Plaintiff then exclusively relies on

2    a Second Circuit case accepting a single brand market in US

3    Airways vs. Sabre Holdings Court, at 938 F.3d, 43 at

4    page 65.  But the facts in Sabre are different from those

5    herein.

6          In Sabre, the Court acknowledged that, quote,

7    "where the plaintiff alleges a proposed relevant market that

8    clearly does not encompass all interchangeable substitute

9    products, the relevant market is legally insufficient and a

10   motion to dismiss may be granted."  In that case, the Court

11   focused on actions taken by Sabre to lock customers into the

12   Sabre product and to impose exclusive use of its product,

13   making it switching to a competitor infeasible.  As a result

14   and the Court emphasized there, that, quote, "Travel agents

15   that use Sabre almost all use only Sabre services and they

16   rarely, if ever, switch to another provider," unquote.

17         Here, by contrast, the covered entities typically

18   work with multiple contract pharmacies and plaintiff's own

19   Complaint recognizes that reality.  See the Complaint at

20   paragraph 67 and 90.  And plaintiff does not allege that CVS

21   has done anything to prevent switching to competing

22   pharmacies or to make switching costly.  Plaintiff argues

23   that "the case for a single brand product market is even

24   stronger here than in Sabre because New York alleges total

25   exclusion of competitors from the market."  And that's from

ab

Proceedings

1    the Complaint at paragraph 12, 82 and 84.  But the

2    paragraphs plaintiff cites focus on CVS' exclusive use of

3    Wellpartner in an entirely different market.  That is, the

4    tied 340B services market.

5         Sabre was analyzing the costs of switching to a

6    competitor in the relevant market being analyzed.  CVS has

7    done nothing to exclude competitors from the tying contract

8    pharmacy product market.

9         Instead, this case more resembles Truetox Labs vs.

10   Healthfirst, at 129 NYS3d 728.  In that case, Justice Borrok

11   of the Commercial Division in the Supreme Court here granted

12   a motion to dismiss a Donnelly Act case for which the

13   plaintiff attempted to distort the relevant product market

14   for clinical laboratory services to include only those

15   services within defendant's network.  The citation again is

16   at 129 NYS3d 728.

17        Recognizing that the alleged market must be

18   plausible, the Court noted that there was no reason why

19   laboratory services that currently fall within the

20   defendant's network are not interchangeable with laboratory

21   services -- with laboratories that service other healthcare

22   insurers in the same region.  Based on the fact -- facts of

23   the Complaint, the Court ruled that a specific market for

24   clinical laboratory service that is constrained by the

25   defendant's network, is simply under-inclusive and too

ab

Proceedings

1    narrow to survive dismissal.

2         The same reasoning applies here.  Plaintiff alleges

3    the market for certain healthcare services that is

4    artificially limited to only CVS locations.  They give no

5    truly plausible reasons why CVS contract pharmacies are

6    somehow situated differently than the myriad of other

7    pharmacies in the same region, that offer the same 340B

8    contract pharmacy services to covered entities.

9         Plaintiff only asserts that covered entities have

10   no substitutes for any contract pharmacies because, one, the

11   anti-steering rule prohibits covered entities from directing

12   a patient to particular pharmacies; and, two, the patient

13   generally did not know that their prescriptions provide 340B

14   benefits to covered entities.

15        Based on these alleged conditions, plaintiff

16   hypothesizes that covered entities are forced or compelled

17   to contract with any contract pharmacies at which plaintiffs

18   fill prescriptions, regardless of the conditions imposed.

19   That theory contradicts what actually happens in the market

20   and the realities of who the covered entities are choosing

21   to contract with.

22        For example, the Court here will take judicial

23   notice of the publicly available data that would show that

24   at the time the challenged conduct went into effect,

25   approximately 86 percent of New York covered entities that

ab

Proceedings

1    used contract pharmacies for 340B savings, did not contract

2    with a single CVS pharmacy location.

3         And 71 percent of New York covered entities did not

4    contract with any of the major national chains:  Walgreens,

5    Walmart, Rite Aid, Albertsons, Safeway, CVS, Ahold,

6    A-H-O-L-D, Costco or Publix, P-U-B-L-I-X.  In other words,

7    CVS did not have the power to coerce covered entities to use

8    Wellpartner's administrative services as required for a

9    tying claim, as any covered entity that wished not to use

10   Wellpartner could join the 86 percent of New York covered

11   entities that chose not to include CVS and their contract

12   pharmacy network at all.  Because plaintiff fails to allege

13   a proper tying market in which CVS has market power, the

14   Donnelly Act claim is dismissed.

15        The plaintiff's assertion is about the

16   anti-steering rule and that patient incentives also lacked

17   merit.  First, and with regard to the anti-steering

18   allegations, plaintiff contests CVS' argument that HRSA

19   guidance, H-R-S-A, does not prevent covered entities from

20   encouraging patients to use certain pharmacies through

21   marketing and/or other efforts.  But the only guidance

22   plaintiff points to is a statement that covered entities

23   must inform the patient of his or her freedom to choose a

24   pharmacy provider, and that if the patient does not elect to

25   use the the contracted service, the patient may obtain the

ab

Proceedings

1   drugs from the pharmacy provider of his or her choice.  That

2   language does not appear to prevent covered entities from

3   marketing or otherwise informing their patients about which

4   pharmacies will provide 340B benefits.

5        Importantly, a manual for 340B program published

6   with the support of HRSA explains that, quote, "It is

7   critical to establish a plan for marketing 340B service to

8   patients," unquote.  In this Court's view, this is plain

9   language.  It's not a matter for discovery.  It's a matter

10  of simply for assessing the language as it is written on the

11  document.

12       Plaintiff also suggests that kickback statutes may

13  prevent steering, but the plaintiff does not explain how

14  these statutes could prevent marketing by covered entities

15  or why HRSA would endure such supposedly illegal actions.

16       Second, as to consumer awareness, plaintiff's

17  statement that, quote, "Patients generally do not know what

18  the 340B program is," or that their prescriptions are

19  somehow involved with the program, and that patients lack

20  personal incentives to use contract pharmacies is based on

21  plaintiff's presumption that marketing is not permitted.

22  Through marketing, covered entities can make their patients

23  aware of how filling a prescription at certain pharmacies

24  benefits the covered entity that the patients use.  Because

25  plaintiff's impermissibly narrow market definition cannot be

ab

Case 2:23-cv-01458-MRP   Document 20-3   Filed 05/19/23   Page 61 of 62

59

Proceedings

1    reconciled with the commercial realities on the ground, the

2    State's Donnelly Act claim is dismissed.

3         With respect to the plaintiff's second cause of

4    action, the plaintiff acknowledges that its Executive Law

5    claim rises or falls with the Donnelly Act claim.  That's

6    because the Donnelly Act claim is dismissed, so too is the

7    Executive Law claim.

8         Accordingly, the defendant's motion to dismiss is

9    granted in its entirety, and both causes of action are

10   dismissed.

11        I'm directing counsel for the moving party order a

12   copy of the transcript of today's proceedings and present it

13   to Mr. O'Connor, the clerk of Part 43.  Mr. O'Connor will

14   present it to the Court, and after review in chambers, the

15   transcript will be so-ordered and then uploaded with a gray

16   sheet order together, reflecting the Court's decision and

17   order of this date.

18        MR. LUPKIN:  Your Honor, would it be possible,

19   after the so-order of the transcript, that you put on the

20   record now that the clerk is directed to enter judgment in

21   accordance with the decision, so that we have one piece of

22   paper that is appealable and not two?

23        THE COURT:  That's fine.

24        MR. LUPKIN:  Thank you very much.  So the order

25   will reflect that the clerk will enter judgment accordingly.

ab

INDEX NO. 452197/2022
NYSCEF DOC. NO. 55    Case 2:23-cv-01458-MRP    Document 20-3    Filed 05/19/23    Page 62 of 62    RECEIVED NYSCEF: 03/14/2023

60

Proceedings

1    THE COURT:  Yes.

2    MR. LUPKIN:  Thank you very much, Your Honor.

3    MR. KASHA:  Your Honor, if I may, just to preserve

4    the State's rights, I'm not so familia  with the procedure

5    he referred to about so-ordering and sending up the judgment

6    at the same time.  I just want to make sure that that

7    wouldn't eliminate our chances to seek leave to replead or

8    to file an amended Complaint should we choose to do that.

9    We're obviously going to be thinking about whether we do

10   that or take it upstairs --

11   THE COURT:  I didn't say it was with prejudice.

12   MR. KASHA:  Okay.  Thank you very much, Your Honor.

13                    *      *      *

14

15   The foregoing is hereby certified to be a true and

16   accurate transcript of the proceedings as transcribed from

17   the stenographic notes.

18

19   _____
     ANNE BROWN, RPR
20   SENIOR COURT REPORTER

21

22

23   SO ORDERED:

24   

     Hon. Robert R. Read
25                               3/13/23

ab