## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Brandywine Hospital, LLC, on behalf of itself and all others similarly situated, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CVS Health Corporation; CVS Pharmacy, Inc.; Caremark L.L.C.; and Wellpartner, LLC, | ) ) ) |
| | ) |
| Defendants. | ) |
| | ) |

Case No. 2:23-cv-1458-MRP

**ORAL ARGUMENT REQUESTED**

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTS ........................................................................................................................... 2

ARGUMENT .................................................................................................................. 5

I.      THE COURT SHOULD DISREGARD DEFENDANTS' ALTERNATIVE FACTS ......... 6

II.     PLAINTIFF PLAUSIBLY ALLEGES AN ILLEGAL TIE ................................................ 7

   A.   Plaintiff States a Per Se Tying Claim .................................................................. 8

      1.   Plaintiff Plausibly Defines the Tying Market .................................................. 8

         a)   The Product Market: The CVS Contract Pharmacy Market ....................... 8

         b)   The Geographic Market: The United States ............................................ 14

      2.   Plaintiff Plausibly Alleges the Remaining Elements of a Per Se Tying Claim ............ 17

   B.   Plaintiff States a Tying Claim Under the Rule of Reason ................................. 17

III.    THE COURT HAS PERSONAL JURISDICTION OVER CVS HEALTH .................... 19

IV.     PLAINTIFF STATES A CLAIM AGAINST CVS HEALTH ........................................ 23

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*,
900 F.3d 623 (9th Cir. 2018) .................................................................23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).........................................................................5, 6

*In re Automotive Refinishing Paint Antitrust Litig.*,
358 F.3d 288 (3d Cir. 2004)......................................................... *passim*

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).........................................................................5, 6

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998).................................................................17

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999)...........................................................................18

*In re Chocolate Confectionary Antitrust Litig.*,
641 F. Supp. 2d 367 (M.D. Pa. 2009) ...................................................20

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984)...........................................................................23

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)...........................................................................10

*United States ex rel. Ellis v. CVS Health Corp.*,
Civil Action No. 16-1582, 2023 WL 3204015 (E.D. Pa. May 2, 2023).................................19

*United States ex rel. Ellsworth Assocs., LLP v. CVS Health Corp.*,
Civil Action No. 19-2553, 2023 WL 2467170 (E.D. Pa. Mar. 10, 2023)..............................19

*In re Fasteners Antitrust Litig.*,
Civil Action No. 08-md-1912, 2011 WL 3563989 (E.D. Pa. Aug. 12, 2011)........................21

*Fisher v. Fed'l Express Corp.*,
42 F.4th 366 (3d Cir. 2022) .................................................................19

*FTC v. Hackensack Meridian Health, Inc.*,
30 F.4th 160 (3d Cir. 2022) .................................................................16

*FTC v. Penn State Hershey Med. Ctr.*,
　838 F.3d 327 (3d Cir. 2016)........................................................9, 11, 15

*FTC v. Thomas Jefferson Univ.*,
　505 F. Supp. 3d 522 (E.D. Pa. 2020) .................................................15

*Go-Video, Inc. v. Akai Elec. Co., Ltd.*,
　885 F.2d 1406 (9th Cir. 1989) ...........................................................20

*Great W. Mining & Mineral Co. v. ADR Options, Inc.*,
　434 F. App'x 83 (3d Cir. 2011) .........................................................22

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
　199 F.3d 1343 (D.C. Cir. 2000) ........................................................20

*In re Heckmann Corp. Secs. Litig.*,
　869 F. Supp. 2d 519 (D. Del. 2012)...................................................22

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
　516 F. Supp.2d 321 (D. Del. 2007)................................................21, 22

*Howard Hess Dental Labs Inc. v. Dentsply Int'l, Inc.*,
　602 F.3d 237 (3d Cir. 2010)...............................................................21

*In re Ins. Brokerage Antitrust Litig.*,
　618 F.3d 300 (3d Cir. 2010)...........................................................8, 23

*Kenney v. Am. Bd. of Internal Med.*,
　847 F. App'x 137 (3d Cir. 2021) .........................................................8

*KM Enters., Inc. v. Global Traffic Technologies, Inc.*,
　725 F.3d 7181 (7th Cir. 2013) ...........................................................22

*Laurel Gardens, LLC v. Mckenna*,
　948 F.3d 105 (3d Cir. 2020)...............................................................19

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
　847 F.3d 1221 (10th Cir. 2017) .........................................................23

*Metzler v. Bear Auto. Serv. Equip. Co.*,
　19 F. Supp. 2d 1345 (S.D. Fla. 1998) ................................................18

*Fink ex rel. Nation Safe Drivers Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*,
　473 F. Supp. 3d 366 (D. Del. 2020)...................................................22

*Nibco Inc. v. Viega LLC*,
　354 F. Supp. 3d 566 (M.D. Pa. 2018) ..................................................6

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) ...................................................................................18

*Perry v. A.W. Chesteron Co., Inc.*,
985 F. Supp. 2d 669 (E.D. Pa. 2013) ...............................................................21

*Phillips v. Cnty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008).........................................................................2, 24

*Planned Parenthood of Se. Pa. v. Casey*,
947 F.2d 682 (3d Cir. 1991)..............................................................................21

*Premier Comp Sols. LLC v. UPMC*,
377 F. Supp. 3d 506 (W.D. Pa. 2019)...............................................................14

*Presque Isle Colon & Rectal Surgery v. Highmark Health*,
391 F. Supp. 3d 485 (W.D. Pa. 2019).................................................................8

*In re Processed Egg Prods. Antitrust Litig.*,
821 F. Supp. 2d 709 (E.D. Pa. 2011) ................................................................23

*Pure Oil v. Suarez*,
384 U.S. 202 (1966)..........................................................................................20

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997).....................................................................6, 9, 10

*Radio Music License Comm., Inc. v. Global Music Rights, LLC*,
Civil Action No. 16-6076, 2019 WL 1437981 (E.D. Pa. Mar. 29, 2019)..............22

*Ragner Tech. Corp. v. Berardi*,
324 F. Supp. 3d 491 (D.N.J. 2018) ...............................................................6, 14

*Rodriguez v. Nat'l City Bank*,
277 F.R.D. 148 (E.D. Pa. 2011).........................................................................21

*Sentry Data Sys., Inc. v. CVS Health*,
379 F. Supp. 3d 1320 (S.D. Fla. 2019) ...............................................14, 16, 17

*Siegel Transfer, Inc. v. Carrier Express, Inc.*,
54 F.3d 1125 (3d Cir. 1995)..............................................................................23

*Sturgeon v. Pharmerica Corp.*,
438 F. Supp. 3d 246 (E.D. Pa. 2020) ..................................................................7

*Synthes, Inc. v. Emerge Med., Inc.*,
Civil Action No. 11-1566, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012) .............15

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
    959 F.2d 468 (3d Cir. 1992).............................................................8

*Tunis Bros. Co. v. Ford Motor Co.*,
    952 F.2d 715 (3d Cir. 1991)...........................................................11

*In re Warfarin Sodium Antitrust Litig.*,
    214 F.3d 395 (3d Cir. 2000).........................................................6, 7

*Warren Gen. Hosp. v. Amgen Inc.*,
    643 F.3d 77 (3d Cir. 2011).........................................................8, 17

**Statutes**

15 U.S.C. § 12(a) ...........................................................................20

15 U.S.C. § 22 ................................................................................20

28 U.S.C. § 1391 .......................................................................20, 23

28 U.S.C. § 1406(a) .......................................................................22

28 U.S.C. § 1631 ............................................................................22

**Other Authorities**

CVS Health, Annual Report (Form 10-K), Ex. 13 at 49 (Feb. 14, 2018),
    https://www.sec.gov/Archives/edgar/data/64803/000155837018000707/cvs-
    20171231ex13075aa4b.htm .........................................................24

Fed. R. Civ. P. 12(h)(1).................................................................22

Katheryne Richardson, *The Bridge to 340B Comprehensive Pharmacy Services
    Solutions in Underserved Populations*, available at https://web.archive.org/
    web/20121007120951/http://www.hrsa.gov/opa/files/bridgeto340b.pdf (last
    visited May 26, 2023) ...................................................................12

# INTRODUCTION

Safety net healthcare providers, like Plaintiff, serve some of the most vulnerable populations in the country, including a disproportionate share of uninsured and low-income patients. These providers treat patients regardless of ability to pay, and as a result, the providers' financial resources are often strained. To help safety net providers stretch their financial resources as far as possible, Congress created the 340B Program. The program allows safety net providers to obtain a portion of the cost of prescriptions their patients fill ("340B Savings"), but only at pharmacies with which the safety net provider contracts. Safety net providers typically use 340B Savings to provide or expand services to indigent patients. The providers get no financial benefit when patients opt to fill prescriptions at pharmacies with which the providers have not contracted.

Defendants (collectively "CVS") own and operate the largest chain of retail pharmacies in the country, so Plaintiff had no practical choice but to contract with CVS, or else it—and its most vulnerable patients—would lose out on much-needed funds. The crux of this case is that CVS used its dominance in the market for pharmacy services to force Plaintiff and other safety net providers to also hire CVS's 340B Third-Party Administrator ("TPA"), Wellpartner, to provide 340B TPA Services,[1] even if other TPAs were preferable based on cost, quality, or other factors. Put simply, Plaintiff could not use CVS as a 340B contract pharmacy—and thus would forfeit its ability to obtain 340B Savings on any prescriptions Plaintiff's patients chose to fill with CVS—without also buying TPA services from Wellpartner. It is a quintessential antitrust tying claim.

The elements of a tying claim are readily satisfied here. First, Defendants tied two distinct products: CVS Contract Pharmacy Services and Wellpartner's TPA Services. Second, Defendants

---

[1] All capitalized terms have the same meaning given in Plaintiff's Complaint, ECF No. 1.

possess market power in the market for CVS Contract Pharmacy Services. Finally, Defendants' conduct affects a substantial amount of interstate commerce.

The heart of Defendants' argument is their factual attack on Plaintiff's definition of the relevant tying market. For this inquiry, antitrust law and economics require courts to focus on reasonably interchangeable products (i.e., substitutability) and cross-elasticity of demand. Yet Defendants fail to grapple with the simple, dispositive, well-pleaded facts that Plaintiff could not obtain any 340B Savings for prescriptions its patients fill at CVS pharmacies by contracting with other pharmacies, and that it could not switch its patients' 340B-eligible prescriptions to a different pharmacy where it could obtain 340B Savings, or even steer patients in that direction. As a result, Plaintiff could capture 340B Savings on prescriptions filled at CVS pharmacies only by contracting with Defendants. Thus, other contract pharmacies are not interchangeable with, or substitutes for, CVS Contract Pharmacies. There is zero cross-elasticity of demand.

Defendants seek to evade and twist these facts rather than address them head on. The Court should disregard Defendants' numerous alternative facts, conclude that Plaintiff has plausibly alleged an illegal tie, and reject Defendants' remaining kitchen-sink arguments.[2]

## FACTS

This case arises out of conduct related to a unique statutory and regulatory regime applicable to the federal 340B Program, which allows safety net healthcare providers ("Covered Entities") to obtain discounts for prescription drugs dispensed to their patients, either through their in-house pharmacies or their network of Contract Pharmacies. Compl. ¶¶ 6-7. Covered Entities'

---

[2] If, however, the Court grants Defendants' motion and dismisses the Sherman Act claim for any reason, then Plaintiff respectfully requests leave to amend to address any deficiencies identified by the Court. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) ("[I]f a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile.").

340B Savings are calculated as the difference between the discounted 340B price on the medications and the rate paid by the patient's commercial or government insurance, minus any fees paid to a Contract Pharmacy and TPA if the prescription is not filled in house. *Id.* ¶ 35.

The Covered Entity realizes 340B Savings only if its 340B-eligible prescriptions are filled at its in-house pharmacy or one of its Contract Pharmacies. *Id.* ¶ 37. If the patient fills their prescription at a pharmacy not under contract with the Covered Entity, the Covered Entity receives no benefit. *Id.* This back-end bookkeeping is invisible from the patient's perspective. *Id.* ¶ 36. The Covered Entity cannot steer its patients to any particular pharmacy. *Id.* ¶¶ 45-46 (explaining legal regime regarding steering); *see also id.* ¶¶ 8, 13-15, 38, 41, 94, 96. By contrast, Defendants can, and do, steer patients to their own pharmacies. *Id.* ¶¶ 58-64. Careful attention and technical expertise is required to ensure 340B Program compliance. *Id.* ¶¶ 9, 40-46. The Covered Entity—not its Contract Pharmacy—is responsible for compliance and bears the compliance risk. *Id.* Covered Entities typically retain a TPA to manage 340B transactions, which they historically have selected to work with their portfolio of Contract Pharmacies. *Id.* ¶¶ 9-11.

340B TPAs provide billing software and compliance tools to administer Covered Entities' participation in the 340B Program, and they determine and confirm whether prescriptions are 340B eligible, maintain records of dispensed drugs, calculate 340B Savings and coordinate transfer of those funds, among other services. *Id.* ¶ 65. TPA technology captures and monitors data from both the Covered Entity and its Contract Pharmacies. *Id.* In exchange, Covered Entities pay TPAs a fee. *Id.* ¶ 66. Covered Entities choose their TPAs carefully in order to minimize their own 340B Program compliance risk. *Id.* ¶ 68. In a competitive market, Covered Entities consider factors such as quality, price, and audit performance in selecting their TPAs. *Id.* ¶ 70.

Defendants are CVS Health Corporation and three of its wholly owned and controlled

subsidiaries—CVS Pharmacy, Inc.; Caremark, L.L.C.; and Wellpartner, LLC[3]—all of which act together (and as the agents of CVS Health) as a single commercial entity and integrated healthcare company with more than 9,000 retail pharmacy locations throughout the United States, a Pharmacy Benefit Manager ("PBM"), and a specialty mail-order pharmacy that operates nationwide. *Id.* ¶¶ 27-31, 52. CVS Health acquired Wellpartner in 2017 to give it an in-house TPA. *Id.* ¶ 30.

Before CVS Health acquired Wellpartner, Wellpartner worked with a variety of Contract Pharmacies on behalf of the Covered Entities that retained it. *Id.* ¶ 72. Similarly, before CVS Health acquired Wellpartner, CVS specialty and retail pharmacies contracted with Covered Entities that worked with a variety of TPAs, and CVS did not condition access to its pharmacies on the use of Wellpartner, or any other entity, as the TPA. *Id.* ¶ 73.

In 2014, CVS engaged a different TPA, Sentry, to develop a "backbone" product that would provide CVS pharmacies with a single point of integration for the 340B Program. *Id.* ¶ 74. The Sentry product would have been interoperable with a number of TPAs and facilitated CVS retail locations contracting with multiple Covered Entities. *Id.* ¶ 76. This would have enabled CVS to expand its activity related to the 340B Program even without acquiring Wellpartner. *Id.* ¶ 77.

But then in 2017, instead of using the Sentry backbone product, CVS Health acquired Wellpartner. *Id.* ¶ 78. At the same time, Defendants implemented their anticompetitive tying scheme. *Id.* Defendants began requiring all Covered Entities to use Wellpartner as their TPA as a condition of contracting with any CVS Contract Pharmacy. *Id.* ¶ 79. This meant that if a Covered Entity wanted to capture the 340B Savings for prescriptions dispensed to its patients at a CVS Contract Pharmacy, the Covered Entity was required to also purchase TPA Services from

---

[3] The parties have stipulated to, and the Court has approved, the substitution of Caremark, L.L.C., for previously named Defendant CVS Specialty, Inc. *See* ECF Nos. 17, 23. Caremark operates the specialty pharmacy business that holds itself out to the public under the name CVS Specialty, Inc.

Wellpartner, even if it preferred not to for quality, price, logistical, or other reasons. *Id.* ¶ 80. This was CVS Health's goal all along in acquiring Wellpartner, as this anticompetitive tie amounted to lucrative self-dealing and suppression of competition for Defendants. *Id.* ¶¶ 83-88.

As a result of Defendants' conduct, Covered Entities were forced to use Defendants' own TPA services (the tied product) as a condition of accessing CVS Contract Pharmacy services. *Id.* ¶ 104. This caused them to suffer antitrust injury in that they paid higher fees to Defendants for TPA services than they would have in a competitive marketplace. *Id.* ¶¶ 90, 107. They also suffered non-price injury in the form of additional cost, administrative burden, regulatory risk, and loss of choice of what TPA to work with. *Id.* ¶ 89.

Plaintiff now brings this action on behalf of itself and the proposed Class of Covered Entities that directly purchased TPA Services from Defendants, seeking damages and judgment that Defendants' conduct in implementing this tying arrangement is a per se violation of the antitrust laws, violates the rule-of-reason tying standard, and unreasonably restrains trade and lessens competition. *Id.* ¶¶ 117, 131-32.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556. "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (quotation omitted). Courts must "accept[] as true all of the facts

alleged in the complaint, and draw[] all reasonable inferences in the plaintiff's favor." *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 397 (3d Cir. 2000).

There is no heightened pleading standard for antitrust complaints. *Iqbal*, 556 U.S. at 684. "[I]n most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). However, a complaint may be dismissed for inadequate market allegations if it does not "plead the relevant market with reference to product interchangeability or cross-elasticity." *Ragner Tech. Corp. v. Berardi*, 324 F. Supp. 3d 491, 510 (D.N.J. 2018). "Courts have historically been reluctant to reject proposed relevant market definitions at the pleading stage." *Nibco Inc. v. Viega LLC*, 354 F. Supp. 3d 566, 576 (M.D. Pa. 2018).

## I. THE COURT SHOULD DISREGARD DEFENDANTS' ALTERNATIVE FACTS

Defendants weave throughout their brief numerous facts outside the Complaint, many of which contradict Plaintiff's factual allegations.[4] Defendants' dubious claim that such facts "are for context" and that their legal arguments "do not rely upon them" does not legitimize Defendants' improper effort to assert alternative facts in a motion to dismiss. ECF No. 20-1 ("Defs.' Mem.") at 3 n.3. Any fact not taken from the Complaint must be disregarded. *See, e.g.*, *Twombly*, 550 U.S. at 556 (holding "factual matter" in complaint must be "taken as true"); *Warfarin Sodium*, 214 F.3d at 397-98, 402 (holding that district court committed reversible error by considering facts outside complaint and drawing inferences in favor of party moving to dismiss).

The same is true of the materials Defendants ask the Court to judicially notice, notwithstanding their disclaimer that the "motion does not depend" on those materials. *See* Defs.'

---

[4] To visually demonstrate the extent of Defendants' reliance on improper factual assertions, Plaintiff has supplied a version of Defendants' opening brief with its improper, extraneous factual material redacted. *See* Ex. 1.

Mem. at 10 n.8, 17 n.11; *Warfarin Sodium*, 214 F.3d at 398 ("The facts cited by the District Court concerning third party payors not contained in the complaints do not fit the criteria of Rule 201(b) [governing judicial notice]."). At most, information found on government websites should be "judicially noticed only for [its] existence and not for [its] truth." *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 259 (E.D. Pa. 2020). This is particularly true here because Defendants do not cite a formal report; they merely claim, without explanation, that their use and interpretation of data purportedly contained in a government-maintained website is subject to judicial notice for the truth of certain matters the website does not directly assert. Defs.' Mem. at 10–11.

Some of Defendants' improper factual assertions appear to be false or misleading. For example, Defendants cite to the 340B Office of Pharmacy Affairs Information System ("OPAIS") database to make a claim about CVS's market share in 2017, and ask the Court to take judicial notice of that assertion. *Id*. That database does not contain market share information, nor does it contain data about the number of 340B prescriptions filled at each contract pharmacy. Even assuming Defendants had a good faith basis for that assertion, they did not arrive at that number without some analysis of the voluminous body of data hosted at the website. This type of data analysis, which typically requires expert testimony, is wholly improper at the motion to dismiss stage. Without the improper factual assertions using about OPAIS data, Defendants' lead argument about market share is wholly unsupported. *Id*.

The Court must disregard Defendants' additional factual contentions included in their brief. If Defendants' arguments truly do not depend on their additional factual contentions, then they cannot be heard to complain when those factual assertions are not considered.

## II.   PLAINTIFF PLAUSIBLY ALLEGES AN ILLEGAL TIE

Tying "is selling one good (the tying product) on the condition that the buyer also purchase

another, separate good (the tied product)."[5] *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 80 (3d Cir. 2011) (quotation omitted). A tie is a per se violation of the antitrust laws when "(1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is affected." *Warren Gen. Hosp.*, 643 F.3d at 81 n.2 (quotation omitted). Under the per se rule, "inquiry into tying product market structure . . . is still required, but if the defendant is found to have market power there, the plaintiff is . . . relieved of proving actual harm to competition and of rebutting justifications for the tie-in." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992).

Alternatively, a tying claim may be brought under the rule of reason. *Id.* at 482. This standard asks whether a restraint "unreasonably restrains trade" and requires the court to "weigh[] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (quotation omitted). The focus is on "an inquiry into the actual effect of the challenged conduct on competition in the tied market." *Kenney v. Am. Bd. of Internal Med.*, 847 F. App'x 137, 142 (3d Cir. 2021) (cleaned up).

### A.      **Plaintiff States a Per Se Tying Claim**

#### 1.      Plaintiff Plausibly Defines the Tying Market

##### a)      *The Product Market: The CVS Contract Pharmacy Market*

Plaintiff has properly, and plausibly, alleged that the CVS Contract Pharmacy Market is the relevant product market for its claims. Legally and economically, Contract Pharmacy services that non-CVS pharmacies may provide are outside the relevant market because they are not a substitute for CVS Contract Pharmacy services from the perspective of Covered Entities.

---

[5] Tying claims raise antitrust concerns for three reasons: (1) they "foreclose markets to competitors"; (2) "they create barriers to entry"; and (3) "they force [purchasers] to buy a product they do not want." *Presque Isle Colon & Rectal Surgery v. Highmark Health*, 391 F. Supp. 3d 485, 505-06 (W.D. Pa. 2019).

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Queen City Pizza*, 124 F.3d at 436. The proper market definition is determined from the perspective of the buyers who feel the impact of price increases. *See FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 342 (3d Cir. 2016). Interchangeability means "one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively." *Queen City Pizza*, 124 F.3d at 437. Factors considered "include price, use, and qualities." *Id.* Cross-elasticity of demand also indicates reasonable interchangeability. *Id.* Cross-elasticity of demand refers to when "the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Id.* at 438.

Covered Entities' participation in the 340B Program allows them to capture 340B Savings. These savings are additive. A Covered Entity can obtain 340B Savings for every 340B-eligible prescription its patients fill at a non-in-house pharmacy, but only if those prescriptions are filled at Contract Pharmacies. Compl. ¶ 35. This means that a Covered Entity can obtain 340B Savings for the prescriptions its patients fill through CVS pharmacies only if it contracts with those pharmacies. *Id.* ¶¶ 37, 96. Contracting with Walgreens does nothing to capture 340B Savings for prescriptions filled by CVS. And because the Covered Entity cannot steer its patients to Walgreens (or any other pharmacy), there is no such thing as substitution of Contract Pharmacy services. *Id.* ¶¶ 38, 94-95. Unless they contract with Defendants, Covered Entities' potential 340B Savings for prescriptions filled by CVS simply vanish into the ether. *Id.* ¶ 96.

Defendants studiously ignore these well-pleaded facts and economic realities. Plaintiff has properly defined the CVS Contract Pharmacy Market because 340B Savings at CVS Contract

Pharmacies are additive to any 340B Savings at other Contract Pharmacies. They cannot be switched. Contracting with Walgreens instead of CVS means forfeiting 340B Savings for eligible prescriptions filled at CVS; it does not mean obtaining a more competitive price. If a Covered Entity's patients fill enough 340B-eligible prescriptions at CVS to outweigh the transactional costs and administrative burdens of contracting with Defendants, then the economically rational decision is to contract with Defendants. If the Covered Entity's patients also fill enough 340B-eligible prescriptions at Walgreens to outweigh the transactional costs and administrative burdens of contracting with Walgreens, then the economically rational decision is to *also* contract with Walgreens. These are separate, additional savings. One cannot be substituted or replaced by the other, and Walgreens prices cannot discipline CVS prices. Cross-elasticity of demand is zero.

Defendants focus on other cases involving attempts to define "single-brand markets," but they ignore the legal standard. *See* Defs.' Mem. at 12. The Supreme Court has held that "a single brand of a product or service can . . . be a relevant market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992). Thus, "a plaintiff's proposed relevant market in a unique and non-interchangeable derivative product or service cannot be defeated on summary judgment" (let alone a motion to dismiss) if there is a fact question about whether "the proposed derivative market is cross-elastic with the primary market." *Queen City Pizza*, 124 F.3d at 439. Defendants do not even once mention cross-elasticity of demand in their brief. Their brief does not mention demand at all. And although the term "interchangeable" appears in their brief five times, in each instance, Defendants simply cite cases quoting that portion of the applicable legal standard. *See* Defs.' Mem. at 6, 10, 12. Defendants fail to address Plaintiff's allegations regarding reasonable interchangeability, substitutability, and cross-elasticity of demand. Compl. ¶¶ 93–99. Instead, they ignore the economic realities of the 340B Program and liken this case to those involving pizza

ingredients, college soccer programs, hotels, and soft drinks, suggesting that "pharmacies are pharmacies." *See* Defs.' Mem. at 10 n.8, 12-14. That may be true for consumers choosing between two pharmacies covered by their health insurance, but it is not true for Covered Entities trying to maximize 340B Savings, who have no ability to influence consumers' choice in that regard. The market must be defined from the Covered Entities' perspective. *Penn State Hershey Med. Ctr.*, 838 F.3d at 342.

While Defendants rely upon cases involving a simple brand preference, this case involves much more: an inherently non-interchangeable product. To be sure, a farmer may prefer Ford tractors over rivals' tractors, but they may nevertheless switch to John Deere if the price of Ford tractors rises too high; in those circumstances, a single-brand market is inappropriate. *See Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 724 (3d Cir. 1991) ("By looking, as we must, at the facts in the light most favorable to the plaintiffs, we find that although the mushroom farmers voiced their preference for Ford tractors, their own testimony established strong interbrand competition. The mere incantation of a 'Ford tractor only' relevant product market does not satisfy that minimum quantum of evidence necessary to uphold the jury's verdict."). Importantly, a farmer may want only one tractor. By contrast, a Covered Entity wants as many Contract Pharmacies as necessary to optimize its own 340B Savings, when weighed against administrative costs. The tractor scenario is fundamentally different than the present case. Here, it is factually, economically, and legally impossible for a Covered Entity to capture 340B Savings for prescriptions filled at non-Contract Pharmacies, and likewise impossible to switch where its patients fill prescriptions from CVS to Walgreens (or anywhere else) to capture 340B Savings for 340B-eligible prescriptions the customer prefers (or has been steered by CVS) to have filled by CVS.

Defendants also argue that Plaintiff is incorrect about its inability to steer patients. They

are wrong. Covered Entities do not, and cannot, steer patients to particular pharmacies to fill their 340B-eligible prescriptions. *See* Compl. ¶¶ 45-46 (citing regulatory requirements and describing industry understandings of them). Defendants have simply made up an ability to steer patients by improperly citing a document outside the Complaint, which is apparently available only on web.archive.org, never carried the force of law, and was published in 2004. Defs.' Mem. at 13 n.9. That timing is important, because although the 340B Program began in 1992, Covered Entities could contract with only a single Contract Pharmacy until 2010. Compl. ¶ 48.

Even if these other problems vanished, and even if this type of document theoretically could be properly relied upon by the Court in deciding this motion to dismiss, the document does not support Defendants' characterization. Instead, in a section captioned "In House Pharmacy: Helpful Hints," and under a subsection captioned "Market the pharmacy service," the author explains that Covered Entities may let their patients know that they *have* in-house pharmacies.[6] It does not say that Covered Entities may tell patients about 340B Savings, or which pharmacies they have contracted with, or that a patient can help fund the provision of healthcare services to underserved populations by filling their prescriptions with a Contract Pharmacy.

In addition to being wrong on the law, Defendants rely on an implicit factual inference they improperly seek to have drawn in their favor: that Covered Entities could *effectively* steer patients to their preferred Contract Pharmacies. Defs.' Mem. at 13. Even if Defendants were right about the law, this fact question cannot be resolved in Defendants' favor at the pleading stage. The cost to the patient does not change based on whether the Covered Entity receives 340B Savings. Compl. ¶ 36. Patients choose pharmacies based on their health plans' requirements, Defendants' steering

---

[6] *See* Katheryne Richardson, *The Bridge to 340B Comprehensive Pharmacy Services Solutions in Underserved Populations*, at 77-78, available at https://web.archive.org/web/20121007120951/http:/www.hrsa.gov/opa/files/bridgeto340b.pdf (last visited May 26, 2023).

efforts through plan benefit restrictions, and "other factors that matter to them, such as location and convenience." *See id.* ¶¶ 56-63, 94. Thus, even if this were relevant, it would present a fact question requiring discovery to resolve. For now, the facts in the Complaint must be accepted as true, and all inferences taken in favor of Plaintiff.

Defendants also argue that "most covered entities do not contract with even a single CVS location." Defs.' Mem. at 14 (citing transcript of state trial court motion to dismiss hearing). Again, Defendants cannot make up their own facts at the pleading stage. For this claim, they cite a HRSA website that appears to contain a database that can be queried, but nowhere on the face of the website does it state, as Defendants contend, that CVS accounts for "just 6 percent of contract pharmacy/covered entity arrangements in the United States." *Id.* at 10 (citing https://340bopais.hrsa.gov/) (emphasis omitted). Even assuming, arguendo, that the Court could properly take judicial notice of the content of this website and accept it as true, Defendants' interpretation and use of the data contained therein cannot be relied upon at this stage, particularly not for the truth of Defendants' self-serving assertions.

Substantively, Defendants' argument is misplaced for the reasons discussed above. Covered Entities cannot switch between CVS and other Contract Pharmacies for the 340B-eligible prescriptions their patients fill, as the choice of where to fill prescriptions rests with the patient (or, in some cases, with CVS Caremark requires some patients to use their pharmacy benefits at a CVS-owned pharmacy). Compl. ¶ 56. 340B Savings on those prescriptions are cumulative. For prescriptions filled by CVS pharmacies, Covered Entities can realize those savings only by contracting with Defendants. There is no "switch[ing] to Walgreens." *See* Defs.' Mem. at 15. Because other Contract Pharmacies cannot take away business from Defendants simply by contracting with a Covered Entity, those other Contract Pharmacies are in separate product markets

from Defendants. *See Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 526 (W.D. Pa. 2019) ("A relevant product market describes those groups of producers that have the actual or potential ability to take significant amounts of business away from each other because of the similarity of their products.").

In short, Plaintiff "plead[s] the relevant market with reference to product interchangeability or cross-elasticity," and beyond that, Defendants' factual challenges are premature. *See Ragner Tech.*, 324 F. Supp. 3d at 510. Plaintiff has properly alleged the relevant product market of CVS Contract Pharmacy Services because CVS Contract Pharmacies are not interchangeable with other pharmacies, and there is zero cross-elasticity of demand.

### b) *The Geographic Market: The United States*

Defendants contend "the geographic market for the tying product is inherently local—it cannot be nationwide." Defs.' Mem. at 17. This conclusion ignores Plaintiff's well-pleaded factual allegations and misconstrues the relevant law. Notably, one federal court has upheld similar allegations of a nationwide market in a lawsuit brought against Defendants by Sentry, a competitor to Wellpartner that Defendants initially worked with to develop a "backbone" TPA product. *See Sentry Data Sys., Inc. v. CVS Health*, 379 F. Supp. 3d 1320, 1328 (S.D. Fla. 2019).

Plaintiff alleges that the geographic scope of the CVS Contract Pharmacy Market is the United States as a whole, noting that "CVS retail and specialty pharmacies nationwide can serve as Contract Pharmacies to Covered Entities listed in the United States." Compl. ¶ 99. Defendants' specialty pharmacy business "is a mail-order pharmacy that operates throughout the United States." *Id.* ¶ 52. Defendants do not have separate specialty pharmacy locations from the perspective of patients or Covered Entities; it is a single business operating nationwide by mail. *See id.* Defendants also own and operate "the largest chain of retail pharmacies in the United States," with more than 9,000 retail pharmacy locations. *Id.* ¶¶ 12, 31.

The relevant geographic market "is that area in which a potential buyer may rationally look for the goods or services he seeks." *Penn State Hershey Med. Ctr.*, 838 F.3d at 338. This is a fact-specific determination that requires consideration of "the commercial realities of the industry," and it must be "economically significant." *Id.* Courts often use the "hypothetical monopolist test" to determine the relevant geographic market. *Id.* Under this test, "if a hypothetical monopolist could impose a small but significant non-transitory increase in price ('SSNIP') in the proposed market, the market is properly defined." *Id.* "If, however, consumers would respond to a SSNIP by purchasing the product from outside the proposed market, thereby making the SSNIP unprofitable, the proposed market definition is too narrow." *Id.* The relevant "consumers" in this type of healthcare setting are Covered Entities, not patients. *See id.* at 339. In defining the relevant market, courts focus on "elasticity of demand" and do not "arbitrarily limit the geographic market." *Synthes, Inc. v. Emerge Med., Inc.*, Civil Action No. 11-1566, 2012 WL 4473228, at *6 (E.D. Pa. Sept. 28, 2012).

Plaintiff's geographic market definition, to the extent it is necessary, suffices, particularly here at the pleading stage. *See Synthes*, 2012 WL 4473228, at *6 (noting fact-intensive nature of geographic market inquiry). Defendants can raise prices above competitive levels without Covered Entities switching to other sellers—because there are none. *See* Compl. ¶¶ 17, 97, 100, 130; *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 540 (E.D. Pa. 2020) ("If that single firm—the hypothetical monopolist—could profitably raise prices above competitive levels, the candidate geographic region is a relevant geographic market."). If Covered Entities do not like Defendants' fees, they nevertheless must pay them, or else they must forego any 340B Savings for prescriptions their patients fill at CVS pharmacies. There is no substitute to obtain those 340B Savings by switching to any other location in the United States, and thus, the geographic market is properly

defined.[7] *Cf. FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 169 (3d Cir. 2022) ("As already explained, the market is properly defined under this test if a hypothetical monopolist could impose a SSNIP, typically about five percent, in the proposed market.").

Defendants' argument that patients fill their prescriptions locally, and therefore Covered Entities contract locally, misses the mark. First, Defendants' specialty pharmacy business operates by mail and nationwide. Defendants are conspicuously silent on their nationwide mail-order specialty pharmacy segment.

Second, Defendants' argument asks the Court to improperly credit Defendants' assertions as true, rather than crediting the Complaint's factual allegations as true. Plaintiff has not pleaded that contracting with CVS retail pharmacies is local, rather than national. *See* Defs.' Mem. at 17 ("While it is theoretically possible that a Covered Entity like Brandywine in Pennsylvania could contract with a CVS pharmacy in Hawaii, that assertion defies common sense and does not reflect the market realities alleged in Plaintiff's complaint."). Instead, Plaintiff alleges that Defendants "operate together as a single commercial entity and act as the agents of CVS Health," and that they are "an integrated healthcare company that 'has more than 9,000 retail locations.'" Compl. ¶ 31. No individual retail pharmacies are named as Defendants. Indeed, the *Sentry* court upheld similar allegations of a nationwide geographic market "because CVS operates nationally, competes with other national pharmacy chains, contracts with national and regional health insurers, and contracts with covered entities for provision of 340B contract pharmacy services nationally." *Sentry Data Sys.*, 379 F. Supp. 3d at 1328. Further, the court held that even if some pharmacy operations are local, "the allegations of a national market are not incongruous with allegations regarding local

---

[7] To the extent Defendants suggest a hyper-local geographic market is necessary, such a market definition likely would also pass the hypothetical monopolist test because the 340B Program creates a unique circumstance where Defendants face no competition in *any* geographic market.

markets." *Id.* at 1329.

Finally, Defendants fail to address elasticity of demand or the hypothetical monopolist test. This is the legally required focus of this analysis, and as described above, it means Plaintiff has properly defined a relevant geographic market.

2.     Plaintiff Plausibly Alleges the Remaining Elements of a Per Se Tying Claim

Defendants' only challenge to the market power element of a tying claim is based on its challenge to market definition, which the Court should reject for the reasons described above. *See* Defs.' Mem. at 11 ("This low market share confirms that, as a matter of law, CVS would lack market power in a properly defined tying product market."). If Plaintiff has properly defined the relevant product market (the CVS Contract Pharmacy Market), then Defendants necessarily possess market power. *See id.* ("Plaintiff alleges CVS has 100% monopoly power . . . .").

Defendants also do not challenge the third element of a per se tying claim: that "a substantial amount of interstate commerce is affected." *Warren Gen. Hosp.*, 643 F.3d at 81 n.2. Plaintiff pleads just that. *See* Compl. ¶¶ 107, 129.

In short, Plaintiff plausibly alleges the relevant product market, Defendants do not dispute that they possess market power in that market, and Defendants also do not dispute that a substantial amount of interstate commerce is affected. Therefore, Plaintiff has stated a per se tying claim.

**B.     Plaintiff States a Tying Claim Under the Rule of Reason**

Defendants' only challenge to Plaintiff's rule-of-reason tying claim is their contention that Plaintiff has not pleaded anticompetitive effects in the tied product market.[8] This argument fails.

---

[8] Defendants do not separately address Plaintiff's rule-of-reason and per se tying claims. *See* Defs.' Mem. at 9, 9 n.7. Importantly, anticompetitive effects are presumed as part of a per se claim, but not as part of a rule-of-reason claim. *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 511 (3d Cir. 1998). Because Plaintiff has plausibly pleaded a per se claim, the Court need not analyze any allegations relating to anticompetitive effects.

Plaintiff alleges that it and the other Class members paid supracompetitive prices to Defendants for TPA Services as a result of the illegal tie. *See* Compl. ¶¶ 17, 100, 107, 120, 130. They also suffered non-price injury in the loss of their ability to choose a preferred TPA and the increased regulatory risk that accompanied that loss of control. *Id.* ¶¶ 68, 88, 130. These injuries arise from harm to competition in the TPA Services Market. "In a competitive market, Covered entities can (and do) consider factors such as quality, price, and audit performance. When CVS is the Contract Pharmacy and requires the Covered Entity to use Wellpartner as the TPA, the Covered Entity cannot consider such factors or bargain for a competitive price." *Id.* ¶ 70.

Defendants argue that Plaintiff has failed to show "competitive harm to the tied market as a whole." Defs.' Mem. at 18 (quoting *Brokerage Concepts*, 140 F.3d at 519). But that is exactly what Plaintiff has alleged. Defendants' conduct has lessened competition in the tied market, which is why Defendants have been able to charge supracompetitive prices for TPA Services. Although Defendants cite cases discussing the foreclosure of rivals in the tied market or acquisition of market power in the tied market, Supreme Court precedent does not require those particular types of anticompetitive harm. Rather, higher prices are a quintessential anticompetitive effect. *See, e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (describing anticompetitive effects to include "reduced output, increased prices, or decreased quality in the relevant market"); *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 777 (1999) (noting "anticompetitive effect of artificially raising prices"); *see also Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1361-62 (S.D. Fla. 1998) (explaining payment of supracompetitive prices caused by tying arrangement constitutes anticompetitive effect on tied market). Thus, Plaintiff's allegations are sufficient to state a tying claim under the rule of reason.

**III.   THE COURT HAS PERSONAL JURISDICTION OVER CVS HEALTH**

Under Third Circuit precedent, personal jurisdiction under the antitrust laws is determined by a nationwide contacts test, a test CVS Health clearly satisfies.[9] "Although the plaintiff bears the burden of demonstrating the facts that establish personal jurisdiction, in reviewing a motion to dismiss under Rule 12(b)(2), [the court] must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 113 n.5 (3d Cir. 2020) (citation omitted).

Personal jurisdiction under the antitrust laws is determined based on a defendant's contacts with the United States as a whole, not the forum state. The Third Circuit has been unequivocal on this point: "We hold that personal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole." *In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 289 (3d Cir. 2004). The Third Circuit has repeatedly reaffirmed the rule that personal jurisdiction is established by nationwide contacts where Congress has authorized nationwide service of process. *See Fisher v. Fed'l Express Corp.*, 42 F.4th 366, 385 (3d Cir. 2022) ("Personal jurisdiction established pursuant to Rule 4(k)(1)(C) traditionally involves a federal statute authorizing nationwide service of process and is constitutionally limited only by the Fifth Amendment (i.e., a nationwide minimum contacts analysis), not the Fourteenth Amendment."); *Laurel Gardens*, 948 F.3d at 122 ("Where Congress

---

[9] CVS Health's challenge to personal jurisdiction is especially perplexing here because CVS Health has recently consented to jurisdiction in this district in multiple cases, including a case where it is being represented by the same counsel as in this case. *See United States ex rel. Ellis v. CVS Health Corp.*, Civil Action No. 16-1582, 2023 WL 3204015, at *3 (E.D. Pa. May 2, 2023) (dismissing CVS Health subsidiaries on a motion to dismiss for failure to state a claim, but allowing claim to proceed against CVS Health where CVS Health did not object to personal jurisdiction); *see also United States ex rel. Ellsworth Assocs., LLP v. CVS Health Corp.*, Civil Action No. 19-2553, 2023 WL 2467170, at *1 (E.D. Pa. Mar. 10, 2023) (granting motion to dismiss for failure to state a claim in part where CVS Health did not object to personal jurisdiction).

has statutorily authorized nationwide service of process, such service establishes personal jurisdiction, provided that the federal court's exercise of jurisdiction comports with Fifth Amendment due process."). Applying the national contacts test, this Court has personal jurisdiction over CVS Health. *See* Compl. ¶ 27.

The Third Circuit allows courts to establish personal jurisdiction for federal antitrust claims under the Clayton Act, 15 U.S.C. § 22,[10] and venue under the general venue statute, 28 U.S.C. § 1391. *Automotive Refinishing*, 358 F.3d at 296-97. Obfuscating this unambiguous controlling precedent, Defendants argue the opposite, citing the other side of a circuit split on the issue. But the Third Circuit has already considered and rejected Defendants' position, adopting the Ninth Circuit's approach and rejecting the holding in the case Defendants cite. *Id.* at 294-95 (considering and declining to follow *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1350 (D.C. Cir. 2000)); *see Go-Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406, 1413 (9th Cir. 1989).

The Third Circuit agreed with and adopted much of the Ninth Circuit's reasoning because Section 12 of the Clayton Act expanded the bounds of venue and rejected "hairsplitting legal technicalities." *Automotive Refinishing*, 358 F.3d at 295 (quoting *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 808 (1948)). The Supreme Court "has held that special venue statutes are supplemented by, and are to be read in light of, liberalizing provisions of the general venue statutes." *Id.* at 295–96 (citing *Go-Video*, 885 F.2d at 1409); *see Pure Oil v. Suarez*, 384 U.S. 202, 205 (1966) (reading the Jones Act's venue provision, which was arguably narrower than the general venue statute, to be consistent with the general venue statute). Applying a nationwide

---

[10] "Section 12 of the Clayton Act . . . permits nationwide service in antitrust cases, including those arising under the Sherman Act." *In re Chocolate Confectionary Antitrust Litig.*, 641 F. Supp. 2d 367, 382 n.22 (M.D. Pa. 2009); *see* 15 U.S.C. § 22 (applying to actions brought under "the antitrust laws"); 15 U.S.C. § 12(a) (defining "antitrust laws" to include the Sherman Act).

contacts test in the context of the Clayton Act's nationwide service of process provision was also consistent with prior circuit precedent that applied a national contacts test based on the Securities Act's nationwide service of process provision. *Automotive Refinishing*, 358 F.3d at 298 (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002)).

CVS attempts to distinguish *Automotive Refinishing* and limit it to its facts, arguing it does not apply to domestic corporations. This reading would violate Third Circuit precedent on *stare decisis*, which requires "adherence to both the reasoning and result of a case, and not simply to the result alone." *Planned Parenthood of Se. Pa. v. Casey*, 947 F.2d 682, 692 (3d Cir. 1991), *rev'd in part on other grounds* 505 U.S. 833 (1992). Courts in this district routinely follow this rule. *See, e.g.*, *Perry v. A.W. Chesteron Co., Inc.*, 985 F. Supp. 2d 669, 676 n.10 (E.D. Pa. 2013); *Rodriguez v. Nat'l City Bank*, 277 F.R.D. 148, 154 (E.D. Pa. 2011). Accordingly, this Court must not only follow a narrow fact-specific holding, but the rule applied to reach the holding. The reasoning of *Automotive Refinishing* applies squarely to domestic corporations. *See, e.g.*, *In re Fasteners Antitrust Litig.*, Civil Action No. 08-md-1912, 2011 WL 3563989, at *2 (E.D. Pa. Aug. 12, 2011).

Defendants point to two cases where courts restricted *Automotive Refinishing* to its facts without considering that *stare decisis* applies to the reasoning as well as the factual holding. *See* Defs.' Mem. at 22 n.14 (citing *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 516 F. Supp.2d 321, 337 (D. Del. 2007); *Radio Music License Comm., Inc. v. Global Music Rights, LLC*, Civil Action No. 16-6076, 2017 WL 8682117, at *13 (E.D. Pa. Nov. 29, 2017)).[11] These cases are not binding, contradict circuit precedent, did not consider the *stare decisis* weight that must be

---

[11] Contrary to Defendants' citation, the Third Circuit did not affirm the holding for which Defendants cited *Howard Hess*. *See Howard Hess Dental Labs Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 245 n.2 (3d Cir. 2010) ("The District Court also granted the motions of several of the Dealers in Jersey Dental to dismiss the amended complaint for lack of personal jurisdiction and improper venue. That portion of the District Court's ruling is not at issue here.").

given to the reasoning in *Automotive Refinishing*, and were wrongly decided. *See In re Heckmann Corp. Secs. Litig.*, 869 F. Supp. 2d 519, 535 (D. Del. 2012) (declining to follow *Howard Hess*); *Fink ex rel. Nation Safe Drivers Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 473 F. Supp. 3d 366, 373 (D. Del. 2020) (rejecting argument that national contacts test only applies to foreign defendants and citing Third Circuit precedent).

Critically, even if this Court were to accept Defendants' invitation to disregard binding circuit authority, they have raised, at most, a venue issue.[12] Even the Seventh Circuit, whose reasoning Defendants ask this court to adopt contrary to binding precedent, acknowledged: "Personal jurisdiction is easy: due process requires only that [defendant] have sufficient minimum contacts with the United States as a whole to support personal jurisdiction, and Congress has provided for nationwide service of process." *KM Enters., Inc. v. Global Traffic Technologies, Inc.*, 725 F.3d 718, 730–31 (7th Cir. 2013). But CVS Health has not moved to transfer venue nor has it invoked Rule 12(b)(3) as a basis for its motion. *See* Defs.' Mem. at 21; Defs.' Mot. at 1. Any improper venue defense is therefore waived. Fed. R. Civ. P. 12(h)(1).

Not only does Defendants' failure to raise a venue challenge constitute waiver, Defendants could not, and have not, proved improper venue. "Because improper venue is an affirmative defense, the burden of proving lack of proper venue remains—at all times—with the defendant." *Great W. Mining & Mineral Co. v. ADR Options, Inc.*, 434 F. App'x 83, 86 (3d Cir. 2011). As explained above, both the general venue statute and the Clayton Act apply. *See Automotive Refinishing*, 358 F.3d at 296–97. Under the general venue statute, venue is proper in "a judicial

---

[12] Perhaps tellingly, Defendants cited only to the Report and Recommendation in *Radio Music License*, failing to cite the district court opinion that rejected the magistrate judge's dismissal recommendation and instead transferred the action to another venue pursuant to a request under 28 U.S.C. § 1631 and § 1406(a). Civil Action No. 16-6076, 2019 WL 1437981, at *28 (E.D. Pa. Mar. 29, 2019).

district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). The tying conduct to which Plaintiff was subject occurred in this district, and Plaintiff contracted with CVS stores in this district. Compl. ¶¶ 2, 26, 31.

This Court has general personal jurisdiction over CVS Health through the Clayton Act's nationwide service of process provision, CVS Health has not raised a venue challenge and could not meet its burden for a venue transfer, and the Court should deny Defendants' request to dismiss CVS Health under Rule 12(b)(2).

## IV. PLAINTIFF STATES A CLAIM AGAINST CVS HEALTH

The Complaint alleges facts demonstrating CVS Health's involvement in the tying conspiracy. Defendants operated a single enterprise and, critically, CVS Health itself was involved in the tying conduct. "[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984); *see Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1135 (3d Cir. 1995). Of course, a corporate defendant may not be held liable merely by virtue of its corporate relationship with another defendant. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 341 n.44 (3d Cir. 2010); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 748 (E.D. Pa. 2011) (dismissing only one defendant in a corporate family where facts were not alleged about its involvement in an antitrust conspiracy). To be held liable, the defendant must have "independently participated in the enterprise's scheme." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017); *see Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 632 (9th Cir. 2018) ("A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme

of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single 'economic unit' of which it is a part.").

Plaintiff has alleged that CVS Health participated in the conduct at issue in this case, and not merely in a tangential way: through the acquisition of Wellpartner and tie between Wellpartner's TPA services and CVS Contract Pharmacy Services.[13] Specifically, CVS Health's acquisition of Wellpartner enabled CVS Pharmacy to tie its 340B Contract Pharmacy Services with TPA services. Compl. ¶ 85.[14] Executives at CVS Health discussed a strategy to increase their 340B market share and make Wellpartner the exclusive TPA for CVS Health's retail and specialty pharmacies. *Id.* Wellpartner and CVS Health planned to terminate covered entities' contracts with CVS pharmacies unless they switched to using Wellpartner as a TPA. *Id.* ¶¶ 84-85. Defendants engaged a different vendor to develop a TPA product before CVS Health acquired Wellpartner, but after that acquisition they reversed course and stopped developing a TPA integration product. *Id.* ¶¶ 72-77. Finally, CVS Health's control over the PBM business line allowed it to boost its market power and increase the effect of the tie between Wellpartner and CVS Pharmacy's Contract Pharmacy Services. *Id.* ¶¶ 50-64 (alleging that CVS has significant market share for pharmacy services, specialty pharmacy services, PBM services, and engages in steering).

CVS Health's conduct is an essential component of the anticompetitive tying scheme, so CVS Health can properly be held liable as a participant in that scheme.

---

[13] When considering whether Plaintiff has stated a claim against CVS Health, the Court must take the allegations in the Complaint as true and make all reasonable inferences in favor of Plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). Nothing in the affidavit submitted by CVS Health contradicts the facts alleged, but to the extent there is any inconsistency, the Court must credit Plaintiff's allegations.

[14] Defendants cannot dispute that CVS Health acquired Wellpartner on November 30, 2017. *See* CVS Health, Annual Report (Form 10-K), Ex. 13 at 49 (Feb. 14, 2018), https://www.sec.gov/Archives/edgar/data/64803/000155837018000707/cvs-20171231ex13075aa4b.htm.

## **CONCLUSION**

The Court should deny Defendants' motion to dismiss Plaintiff's Sherman Act claim.[15] First, Plaintiff has stated a per se tying claim against Defendants because a Covered Entity cannot substitute another Contract Pharmacy to obtain 340B Savings for the prescriptions its patients fill at CVS pharmacies, and thus there is zero cross-elasticity of demand. The relevant geographic market is the United States because Defendants operate nationwide and serve as Contract Pharmacies to Covered Entities on that basis. Defendants have market power in the market alleged by Plaintiff (as they concede), and the tie affects a substantial amount of commerce. Second, Plaintiff has also stated a tying claim, in the alternative, under the rule of reason because Plaintiff and the Class suffered anticompetitive harm in the tied product market through the payment of supracompetitive prices to Defendants for TPA services and the loss of choice. Third, the Court has personal jurisdiction over CVS Health based on its contacts with the United States as a whole. Finally, CVS Health directly participated in the alleged anticompetitive conduct and can be held liable on the basis of its own conduct.

---

[15] Plaintiff does not contest dismissal of its Clayton Act claim.

Respectfully submitted,

Dared: June 9, 2023

*/s/ Kristen G. Marttila*
W. Joseph Bruckner (*pro hac vice*)
David W. Asp (*pro hac vice*)
Kristen G. Marttila (*pro hac vice*)
Joseph C. Bourne (*pro hac vice*)
Derek C. Waller (*pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:  (612) 339-6900
Facsimile:  (612) 339-0981
wjbruckner@locklaw.com
dwasp@locklaw.com
kgmarttila@locklaw.com
jcbourne@locklaw.com
dcwaller@locklaw.com

Roberta D. Liebenberg, PA I.D. No. 31738
Adam J. Pessin, PA I.D. No. 92325
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Telephone:  (215) 567-6565
Facsimile:  (215) 568-5872
rliebenberg@finekaplan.com
apessin@finekaplan.com

Marco Cercone (*pro hac vice*)
Arthur N. Bailey (*pro hac vice*)
**RUPP PFALZGRAF LLC**
111 West 2nd Street, Suite 1100
Jamestown, NY 14701
Telephone:  (716) 854-3400
cercone@rupppfalzgraf.com
bailey@rupppfalzgraf.com

*Counsel for Plaintiff and the Proposed Class*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 9, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties as indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

/s/ Kristen G. Marttila
Kristen G. Marttila (*pro hac vice*)