IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRANDYWINE HOSPITAL, LLC,** | : | |
| | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| **CVS HEALTH CORPORATION, et al.,** | : | **NO. 23-1458** |
| | : | |
| Defendants. | | |

**Perez, J.**                                                                                                   **February 26, 2025**

## MEMORANDUM

Plaintiff Brandywine Hospital, LLC ("Plaintiff" or "Brandywine"), individually and on behalf of all others similarly situated, brings this putative class action against Defendants CVS Health Corporation ("CVS Health"); CVS Pharmacy, Inc. ("CVS Pharmacy"); CVS Specialty, Inc. ("CVS Specialty"); and Wellpartner, LLC ("Wellpartner") (collectively, "CVS" or "Defendants") pursuant to the federal antitrust laws. Before the Court is Defendants' motion to dismiss Plaintiff's Complaint. For the following reasons, the Court grants Defendants' motion.

**I.    BACKGROUND**

The 340B Drug Pricing Program ("340B Program"), established under the Veterans Health Care Act of 1992, allows eligible healthcare providers, known as "Covered Entities," to purchase outpatient drugs at discounted prices that are often substantially lower than wholesale or retail prices. ECF No. 1. ¶¶ 6–7, 33–35. Covered Entities often contract with pharmacies ("Contract Pharmacies") to dispense these drugs and engage third-party administrators ("TPAs") to manage compliance and administrative tasks. *Id.* ¶¶ 7, 48. Covered Entities rely on 340B savings, defined as the difference between the 340B price and insurance reimbursements, minus fees paid to Contract Pharmacies or TPAs, to fund critical healthcare services. *Id.* ¶¶ 7, 35, 39. Approximately

75% of these arrangements involve large for-profit retail chains, including CVS, which is the largest retail pharmacy chain in the U.S. *Id.* ¶¶ 47–49.

The Health Resources and Services Administration ("HRSA") oversees the 340B Program and imposes various compliance requirements. *See id.* ¶¶ 33, 40 45–46, 48. In 2010, HRSA issued guidance (the "2010 Guidance") allowing Covered Entities to contract with an unlimited number of outside pharmacies, leading to a rapid expansion of Contract Pharmacy arrangements. *See* Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010); ECF No. 1 ¶ 48. HRSA also included a provision that requires Covered Entities to "inform the patient of [their] freedom to choose a pharmacy provider," ensuring that patients retain autonomy over their pharmacy decisions. 75 Fed. Reg. at 10,278.[1] Failure to comply with the 2010 Guidance can result in significant penalties, including civil monetary fines, exclusion from federal healthcare programs, and criminal prosecution for knowingly submitting false certifications. *Id.* at 10,277.

Plaintiff, a Covered Entity, contends that Defendants conditioned access to 340B savings on Covered Entities' use of Wellpartner, a TPA that is wholly owned by CVS. Prior to CVS acquiring Wellpartner in 2017, Covered Entities could freely select TPAs. *Id.* ¶¶ 10, 72–73. Following the acquisition, CVS required Covered Entities to use Wellpartner for CVS-related prescriptions, which Plaintiff alleges significantly altered competition in the TPA Services Market.

---

[1] The 2010 Guidance provides:
> The covered entity will inform the patient of his or her freedom to choose a pharmacy provider. If the patient does not elect to use the contracted service, the patient may obtain the prescription from the covered entity and then obtain the drug(s) from the pharmacy provider of his or her choice.
> When a patient obtains a drug from a pharmacy other than a covered entity's contract pharmacy or the covered entity's in-house pharmacy, the manufacturer is not required to offer this drug at the 340B price.

*Id.*

*Id.* ¶¶ 11, 78–80. Plaintiff claims CVS effectively holds monopoly power in the "CVS Contract Pharmacy Market." *See id.* ¶¶ 15, 19, 96–97. As a result, Plaintiff alleges that CVS forced Covered Entities—like Plaintiff—either to forgo CVS's 340B savings or accept Wellpartner as their TPA for CVS Contract Pharmacies, incurring additional expense and regulatory risk. *Id.* ¶¶ 15, 80, 88–89.

According to Plaintiff, CVS's conduct constitutes an illegal tying arrangement in violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. *Id.* ¶¶ 19, 128–32. In its Complaint, Plaintiff contends that CVS's actions restrained both price and non-price competition, excluded independent TPAs, increased compliance risks for Covered Entities, and forced Covered Entities to pay inflated prices for Wellpartner's services while eliminating their ability to select preferred TPAs. *Id.* ¶¶ 113, 130. CVS now moves to dismiss the Complaint.

## II.      LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain enough factual matter to state a plausible claim for relief, though it need not show a probability of success at this stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Courts accept the complaint's facts as true and draw reasonable inferences in the plaintiff's favor, without imposing a heightened pleading standard for antitrust claims. *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 397 (3d Cir. 2000)). The issue before the court "is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## III.     DISCUSSION

In support of dismissal, CVS argues that Plaintiff's tying claim fails because Plaintiff has not sufficiently alleged that CVS has market power in a properly defined tying product market nor

market-wide anti-competitive impact in the tied product market. Plaintiff concedes that its Clayton Act claim should be dismissed. ECF No. 24 at 31 n.15. Therefore, the Court addresses only Plaintiff's tying claim under the Sherman Act.

A tying arrangement occurs when a seller conditions the sale of one product (the "tying product") on the purchase of another distinct product (the "tied product"). *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 80 (3d Cir. 2011). The violative nature of a tying arrangement "lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). As such, these arrangements may be challenged under various provisions of the antitrust laws, including Sections 1 and 2 of the Sherman Act, as well as Section 3 of the Clayton Act. *See Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 473–74 (3d Cir. 1992) (en banc).

Tying claims are analyzed under either the *per se* rule or the rule of reason framework. Under the *per se* rule, a tying arrangement violates the antitrust laws when: (1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product; and (3) the arrangement impacts a substantial amount of interstate commerce. *Warren Gen. Hosp.*, 643 F.3d at 80 n.2. Once these elements are established, anti-competitive effects are presumed, removing the plaintiff's burden to prove actual harm or rebut procompetitive justifications. *Town Sound*, 959 F.2d at 477. Alternatively, the rule of reason framework focuses on "the actual effect of the challenged conduct on competition in the *tied* market." *Kenney v. Am. Bd. of Internal Med.*, 847 F. App'x 137, 142 (3d Cir. 2021) (cleaned up) (emphasis added). Under the rule of reason, a

plaintiff must show anti-competitive effects in the tied product market and rebut any procompetitive justifications the defendant provides. *See Town Sound*, 959 F.2d at 482.

Before evaluating whether Plaintiff has plausibly alleged that CVS has market power in the relevant market, the Court must ensure that the market is properly defined. "A market has two components, product and geographic." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513 (3d Cir. 1998). Plaintiff identifies the tying product market as the "CVS Contract Pharmacy Market." ECF No. 1 ¶¶ 91, 126. The CVS Contract Pharmacy Market encompasses CVS's provision of pharmacy services to Covered Entities. *Id.* ¶ 92. Plaintiff alleges that CVS possesses market power in this market due to the structure of the 340B Program, which prohibits Covered Entities from steering patients to alternative pharmacies. *Id.* ¶¶ 93–94. Plaintiff further alleges that Covered Entities must rely on CVS to capture savings from CVS-filled prescriptions because no alternative pharmacy offers those savings. *Id.* ¶¶ 95–96.

Plaintiff identifies the tied product market as the "TPA Services Market." *Id.* ¶¶ 91, 126. The TPA Services Market involves the provision of administrative and compliance services to Covered Entities. *Id.* ¶ 100. Plaintiff alleges that CVS uses its dominance in the CVS Contract Pharmacy Market to foreclose competition in the TPA Services Market by requiring Covered Entities to use Wellpartner, its wholly owned subsidiary, and excluding independent TPAs from servicing CVS-related prescriptions. *Id.* ¶¶ 97–101. Finally, Plaintiff identifies the geographic market as the United States, asserting that "CVS retail and specialty pharmacies nationwide can serve as Contract Pharmacies to Covered Entities listed in the United States." *Id.* ¶ 99.

CVS moves to dismiss the *per se* tying claim on the grounds that Plaintiff has not alleged a valid tying product market nor proper geographic market for the tying product. CVS also moves

to dismiss the rule of reason claim, arguing that Plaintiff has not alleged a market-wide anti-competitive impact in the tied product market. The Court addresses each argument in turn.

### A.     *Per Se* Analysis

First, the Court considers whether Plaintiff's "CVS Contract Pharmacy Market" is a properly defined tying product market. The scope of a product market is defined by its "reasonable interchangeability of use" or the "cross-elasticity of demand" between the product and its substitutes. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). "Interchangeability of use" evaluates whether one product is "roughly equivalent" to another for its intended purpose, even if consumers might prefer one over the other. *Id.* at 437. This assessment considers the product's price, intended use, and characteristics. *Id.* Similarly, "cross-elasticity of demand" assesses the relationship between a product's price and consumer demand for alternative products. *Id.* at 438. When a price increase for one product "tend[s] to create" increased demand for another, those products are deemed part of the same market. *Id.*

Plaintiff alleges a single brand product market. That is, rather than alleging that the tying product market includes *all* pharmacies capable of serving as Contract Pharmacies to Covered Entities, Plaintiff limits the product market to the "CVS Contract Pharmacy Market." ECF No. 1 ¶¶ 92–98. Single brand product markets are disfavored because they do not encompass all competing products. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984) ("[A]bsent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market."). However, Plaintiff argues that CVS Contract Pharmacies are not interchangeable with other Contract Pharmacies because Covered Entities can only obtain 340B savings from CVS prescriptions through CVS's Contract Pharmacy services. ECF No. 1 ¶¶ 94–96.  Plaintiff also asserts that there is zero cross-elasticity of demand because

Covered Entities cannot direct business away from CVS and to another Contract Pharmacy in response to a price increase. *Id.* ¶ 97.

The bases for these arguments lie in Plaintiff's interpretation of the 2010 Guidance. According to Plaintiff, the 2010 Guidance prohibits Covered Entities from steering patients to specific pharmacies. *Id.* ¶ 94. That, however, is incorrect. A plain reading of the 2010 Guidance shows that Covered Entities are not prohibited from marketing or informing patients about 340B savings at specific pharmacies. The provision to which Plaintiff cites states that "[t]he covered entity will inform the patient of his or her freedom to choose a pharmacy provider." 75 Fed. Reg. at 10,278. "If the patient does not elect to use the contracted service, the patient may obtain the prescription from the covered entity and then obtain the drug(s) from the pharmacy provider of his or her choice." *Id*. And "[w]hen a patient obtains a drug from a pharmacy other than a covered entity's contract pharmacy or the covered entity's in-house pharmacy, the manufacturer is not required to offer this drug at the 340B price." *Id*. The text of the 2010 Guidance makes clear that Plaintiff's interpretation is unsupported.

Beyond the 2010 Guidance, Plaintiff makes no meaningful argument as to why CVS Contract Pharmacy services are non-interchangeable with other Contract Pharmacy services. Plaintiff's own allegations support the conclusion that it can replace lost savings from CVS transactions with savings from transactions at different Contract Pharmacies. "In March 2010, HRSA issued guidance allowing Covered Entities to contract with an unlimited number of third-party pharmacies." ECF No. 1 ¶ 48. Indeed, Covered Entities "typically contract with a network of pharmacies." *Id.* ¶ 7. As of April 1, 2020, there are 100,451 "[c]ontract [p]harmacy

arrangements under the 340B Program." *Id.* ¶ 48. Therefore, Covered Entities can and do contract with non-CVS pharmacies where their patients fill prescriptions.

As discussed, the Court declines to accept Plaintiff's legal arguments regarding the 2010 Guidance. And without more, Plaintiff's single brand market is unacceptable. *See Town Sound*, 959 F.2d at 479 ("[S]uch a narrow definition makes no sense in terms of real world economics, and as a matter of law we cannot adopt it."); *cf. Queen City Pizza*, 124 F.3d at 438 ("Indeed, it is the availability of interchangeable ingredients of comparable quality from other suppliers, at lower cost, that motivates this lawsuit."). "Where the plaintiff . . . alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza*, 124 F.3d at 436. Because Plaintiff has failed to properly define the tying product market, Plaintiff's *per se* tying claim fails as a matter of law.

### B. Rule of Reason Analysis

A plaintiff who fails to state a *per se* claim may still set forth a plausible rule of reason claim. *Brokerage Concepts*, 140 F.3d at 519. "Unlike a *per se* case where a showing that the defendant had market power in the tying market leads to a presumption that it is using that power to expand into the tied market, to succeed on a rule of reason claim the plaintiff must prove that the alleged tie unreasonably restrained competition." *Id.* (quotations omitted). To do so, the plaintiff must "show competitive harm to the tied market as a whole." *Id.*

Plaintiff alleges it and other putative class members suffered anti-competitive harm by being forced to pay "supracompetitive prices for the TPA services provided by Wellpartner" and by losing the power to choose which TPA to use when working with CVS Contract Pharmacies.

ECF No. 1 ¶¶ 17, 88. Defendants argue that Plaintiff's allegations are conclusory and fail to show anti-competitive effects to the TPA Services Market as a whole. The Court agrees.

Plaintiff's allegations regarding anti-competitive effects center on TPA services provided to Covered Entities working with CVS Contract Pharmacies, *not* the TPA Services Market as a whole. *See, e.g., id.* ¶ 105 ("The tie has foreclosed other TPAs from competing to provide TPA services to Covered Entities *using CVS Contract Pharmacies*." (emphasis added)); *id.* ¶ 113(a) ("Price competition for the provision of TPA services *at CVS Contract Pharmacies* has been restrained or eliminated . . . ." (emphasis added)); *id.* ¶ 113(b) ("Non-price competition for the provision of TPA services *at CVS Contract Pharmacies* has been restrained or foreclosed . . . ." (emphasis added)); *id.* ¶ 113(c) ("Covered Entities *contracting with CVS Contract Pharmacies* paid supracompetitive prices for TPA services during the Class Period . . . ." (emphasis added)); *id.* ¶ 113(d) ("Covered Entities *contracting with CVS Contract Pharmacies* suffered non-price injury when obtaining TPA services during the Class Period, including loss of choice and increased regulatory risk." (emphasis added)).

Showing anti-competitive effects to "only a small subset" of the tied product market is fatal to Plaintiff's claim. *Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399, 405 (3d Cir. 2016); *see also Eichorn v. AT&T Corp.*, 248 F.3d 131, 147-48 (3d Cir. 2001) (affirming dismissal where the proposed product market included only defendants and there was no anti-competitive effect within the broader product market). Moreover, conclusory allegations of supracompetitive prices, by themselves, are insufficient to state a rule of reason claim. *In re McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 137 (D.D.C. 2016). This is especially true where the allegations of

supracompetitive pricing are limited to only a portion of the product market. For these reasons, the Court dismisses the rule of reason claim as well.

## C. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted. Plaintiff's Sherman Act claim is dismissed without prejudice. Plaintiff's Clayton Act claim, which it concedes should be dismissed, is dismissed with prejudice. An appropriate order follows.