**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRANDYWINE HOSPITAL, LLC,** *et al.*, | : | **CIVIL ACTION** |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | **NO. 23-1458** |
| **CVS HEALTH CORPORATION,** *et al.*, | : | |
| | : | |
| Defendants. | : | |

**Perez, J.**                                                                                   **March 3, 2026**

**MEMORANDUM**

This case comes before the Court on Defendants' motion to dismiss the amended complaint. Plaintiffs Brandywine Hospital, LLC ("Brandywine") and Reading Hospital ("Reading") allege Defendants CVS Health Corporation, CVS Pharmacy, Inc., Caremark L.L.C. (together, "CVS"), and Wellpartner, LLC have unlawfully tied contracts for savings available under the 340B Drug Pricing Program with third-party administrator ("TPA") services from Wellpartner, in violation of Sections 1 and 2 of the Sherman Act. Defendants seek dismissal because (1) Plaintiffs failed to allege a proper tying product market in which CVS has market power; (2) Plaintiffs failed to allege a proper relevant geographic market for the tying product; (3) Plaintiffs' single-brand tied product market is insufficient; (4) the Court lacks personal jurisdiction over CVS Health; and (5) Plaintiffs failed to state a claim as to CVS Health. For the reasons discussed herein, the Court finds Plaintiffs have failed to state a claim for illegal tying because their single-brand tying product and tied product markets are legally insufficient. The Court further finds it lacks personal jurisdiction over CVS Health. Defendants' motion to dismiss is, therefore, granted.

1

## I.    Background[1]

The 340B Drug Pricing Program ("340B Program") is a federal program created to support healthcare providers that serve low-income patients ("Covered Entities") in response to the pharmaceutical industry's steeply escalating prices. 1st Am. Class Action Compl. ("FAC"), ECF No. 51 ¶ 6. Through the 340B Program, Covered Entities purchase prescription medications from manufacturers at a substantially discounted price. *Id.* ¶ 34. They then distribute the medication to patients either through their in-hospital pharmacy or through an outside Contract Pharmacy, like CVS or Walgreens. *Id.* ¶ 35. When patients fill an eligible prescription at an in-hospital pharmacy or a Contract Pharmacy, their insurance company or government insurance pays the retail price, and the Covered Entity retains the difference ("340B Savings"). *Id.* ¶ 36. Covered Entities cannot receive 340B Savings when their patients purchase prescriptions at a pharmacy with which they do not contract. *Id.* ¶ 38. Covered Entities may, nonetheless, contract with an unlimited number of Contract Pharmacies to maximize their 340B Savings. *See id.* ¶ 49.

Covered Entities cannot "effectively" steer their patients to fill their prescriptions at Contract Pharmacies, even if they are allowed to do so. Over 70% of patients choose their pharmacy based on its location. *Id.* ¶ 96 (citing studies). So, if CVS is more conveniently located than Walgreens, a patient is likely to fill their prescription at CVS, even if the hospital where they were treated does not contract with CVS and would, therefore, not receive any 340B Savings. *Id.* Additionally, some insurance companies only allow patients to use their benefits at certain pharmacies, limiting their choices. *Id.* ¶ 97. Because patients are driven to certain pharmacies based on convenience and insurance, Covered Entities cannot ensure they receive 340B Savings from every (or any) eligible prescription their patients fill.

---

[1] The factual background accepts the Complaint's allegations as true.

The 340B Program imposes many rules with which Covered Entities must comply to remain eligible. *Id.* ¶¶ 42–45. To ensure compliance, Covered Entities typically retain a third-party administrator ("TPA"), which Covered Entities may select from a variety of competing TPAs available in the market. *Id.* ¶¶ 9–10. Reading, for example, has used Macro Helix, CaptureRX, and Wellpartner. *Id.* ¶ 92. Covered Entities generally pay the TPA a flat fee or percentage of the price of filled 340B prescriptions. *See id.*

In 2018, CVS acquired Wellpartner, a 340B TPA, and began requiring Covered Entities to use Wellpartner as their TPA in order to participate in the 340B Program at CVS. *Id.* ¶¶ 10–11. If Covered Entities do not contract with CVS, they would lose a significant amount of 340B Savings because many of their patients fill prescriptions at CVS. *Id.* ¶ 14. Plaintiffs contend CVS's requirement that Covered Entities use Wellpartner, instead of the TPA of their choice, creates an anticompetitive result because Wellpartner need not compete with other TPAs in the market, and can charge supracompetitive prices. *Id.* ¶¶ 16–17. Indeed, Wellpartner's fees were higher than other TPA providers' fees. *Id.* ¶ 92 (comparing Macro Helix's $0.26 fee per 340B prescription, CaptureRX's $2.50 fee per 340B claim, and Wellpartner's $4.00 fee).

## II. Procedural History

On April 17, 2023, Brandywine filed the complaint, alleging violations of antitrust laws based on CVS's alleged illegal tying arrangement. ECF No. 1. On February 26, 2025, this Court dismissed the complaint for failure to state a claim. ECF No. 47. First, the Court found Brandywine's *per se* tying claim failed as a matter of law because Brandywine did not properly define the tying market wherein it defined the market as the "CVS Contract Pharmacy Market," and failed to encompass all competing products. *Id.* at 6–8. Second, the Court found Brandywine's rule of reason claim was deficient because Brandywine failed to show anti-competitive effects to

the TPA Services Market as a whole. *Id.* at 9. Additionally, the Court found Brandywine pled only conclusory allegations of supracompetitive prices. *Id.* at 9–10.

On April 1, 2025, Plaintiffs Brandywine and Reading filed a First Amended Class Action Complaint (FAC) against CVS and Wellpartner.[2] ECF No. 51. Plaintiffs raise a single count alleging Defendants have created an illegal tying arrangement in violation of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2. *Id.* at 33. Plaintiffs contend "CVS illegally tied Wellpartner TPA services—which had previously been just one of many TPA products available to Covered Entities who contract with CVS Contract Pharmacies—to CVS's Contract Pharmacy Services (the 'CVS Contract Pharmacy Market')." *Id.* ¶ 19. Plaintiffs allege this is a per se illegal tie, in violation of Section 1 of the Sherman Antitrust Act, and an unreasonable restraint of trade that substantially lessens competition in the relevant markets, in violation of Section 2 of the Sherman Antitrust Act. Plaintiffs define the relevant markets as "the CVS Contract Pharmacy Market and the TPA Services Market for CVS Pharmacies." *Id.* ¶ 93.

On May 6, 2025, Defendants moved to dismiss the FAC for failure to state a claim and for lack of personal jurisdiction. ECF No. 52. The parties' arguments have been fully briefed, and the Court heard oral argument on January 20, 2026.

## III.    Personal Jurisdiction

"Once challenged, the plaintiff bears the burden of establishing personal jurisdiction." *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 316 (3d Cir. 2007) (citation omitted). Where the court does "not hold an evidentiary hearing, the plaintiffs need only establish a prima

---

[2] Plaintiff Reading is a newly added party. *See* ECF No. 51-1 at 1. Additionally, the FAC reflects the substitution of CVS Specialty, Inc. for Caremark LLC, for which the parties jointly moved on May 19, 2023, ECF No. 17, and this Court granted on May 30, 2023, ECF No. 23. Caremark operates CVS's specialty pharmacy business and was named as CVS Specialty, Inc. in the Complaint. ECF No. 51 ¶ 12; ECF No. 51-1 ¶ 30.

facie case of personal jurisdiction and the plaintiffs are entitled to have their allegations taken as true and all factual disputes drawn in their favor." *Id.* (citation modified).

Defendants argue the FAC fails to establish personal jurisdiction over CVS Health. First, they argue CVS Health is not subject to personal jurisdiction under the Clayton Act, 15 U.S.C. § 22, because Plaintiffs have not established venue is proper. 1st Mot. Dismiss, ECF No. 20-1 at 28; *see also* ECF No. 52-1 (incorporating by reference arguments in first motion to dismiss). Next, they argue Plaintiffs have failed to show general or specific jurisdiction in Pennsylvania. ECF No. 20-1 at 28–29. Plaintiffs rely only on the Clayton Act to argue they have established personal jurisdiction over CVS Health. Opp. 1st Mot. Dismiss, ECF No. 24 at 29; ECF No. 55 at 23–24 (incorporating by reference Opposition to First Motion to Dismiss). The Court finds Plaintiffs have not established personal jurisdiction over CVS Health under the Clayton Act.

Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure provides that serving a summons "establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." The federal statute Plaintiffs contend authorizes personal jurisdiction by service is the Clayton Act.

Section 12 of the Clayton Act provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transact business; and all process *in such cases* may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22 (emphasis added). The first clause of Section 12 deals with venue, and the second creates personal jurisdiction "on the basis of a defendant's aggregate contacts with the United States as a whole," limited by the due process component of the Fifth Amendment. *In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 298–299 (3d Cir. 2004); *see also Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 122 (3d Cir. 2020) ("Where Congress has statutorily authorized nationwide service of process, such service establishes personal jurisdiction,

provided that the federal court's exercise of jurisdiction comports with Fifth Amendment due process." (citation omitted)).

The parties, in essence, dispute the meaning of "in such cases" in the second clause of Section 12—whether it refers to "[a]ny suit, action or proceeding under the antitrust laws" or whether it refers to only those antitrust cases brought in the judicial district where a corporation is an inhabitant, may be found, or transacts business. In other words, the issue is whether an antitrust plaintiff must first establish the corporate defendant is an inhabitant of, may be found in, or transacts business in the district, before triggering personal jurisdiction by nationwide service of process. *See Automotive Refinishing*, 358 F.3d at 293.

If "in such cases" refers to any antitrust case, this Court has personal jurisdiction over CVS Health so long as venue is proper under the general venue statute, 28 U.S.C. § 1391(b)(2).[3] *See Automotive Refinishing*, 358 F.3d at 293. If, however, to establish personal jurisdiction via Section 12, CVS Health must inhabit, be found in, or transact business in this district, the Court must dismiss the claims against CVS Health. CVS Health has established, and Plaintiffs do not dispute, that it does not inhabit or transact business in, nor can it be found in the Eastern District of Pennsylvania. *See id.*; *see also* Decl. of Thomas S. Moffatt, ECF No. 20-6 at 2.[4]

---

[3] The parties do not dispute that venue is proper under 28 U.S.C. § 1391(b)(2), which provides that venue is proper "in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." Defendants argue only that Plaintiffs cannot rely on § 1391(b)(2) in lieu of Section 12's venue requirement while relying on Section 12's nationwide service of process provision to establish personal jurisdiction.

[4] The court may consider matters extraneous to the pleadings in evaluating a motion to dismiss for lack of personal jurisdiction. *See, e.g.*, *Commodity Futures Trading Comm'n v. Worldwide Commodity Corp.*, 366 F. Supp. 2d 276, 278 n.1 (E.D. Pa. 2005).

Circuits are split on whether Section 12's clauses may be decoupled.[5] The Third Circuit, however, has held that in the context of serving a foreign corporation, "the service of process . . . does not require satisfaction of[] the specific venue provision under Section 12 of the Clayton Act." *Automotive Refinishing*, 358 F.3d at 290, 296–97. *Automotive Refinishing* found two cases involving foreign corporate defendants persuasive: *Go-Video, Inc. v. Akai Electric Co., Ltd.*, 885 F.2d 1406 (9th Cir. 1989) (involving Japanese corporate defendants), and *General Electric Co. v. Bucyrus-Erie Co.*, 550 F. Supp. 1037 (S.D.N.Y. 1982) (involving a British corporate defendant).

*Go-Video* looked to "the relationship of venue statutes generally, the purpose and history of the Clayton Act, particularly section 12, the prior caselaw, and the structure of the section itself" to "conclude that process may be served on an antitrust defendant pursuant to 15 U.S.C. § 22 in cases where venue is not established under that section but lies properly under [the alien venue statute, 28 U.S.C. § 1391(c)(3)],"[6] 885 F.2d at 1413. The alien venue statute establishes that venue for defendants not resident in the United States is proper in any judicial district. 28 U.S.C. § 1391(c)(3). *Go-Video* explained that generally, special venue provisions like Section 12 of the Clayton Act "supplement, rather than preempt, general venue statutes." 885 F.2d at 1413. Barring "evidence that Congress intended section 12's venue provisions to be exclusive, or that antitrust

---

[5] *See KM Enterprises, Inc. v. Global Traffic Techs., Inc.*, 725 F.3d 718, 728 (7th Cir. 2013) ("holding that Section 12's venue and service-of-process provisions must be read together"); *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000) (holding "in such cases" must refer to entire clause requiring corporate defendant to inhabit, be found in, or transact business in district); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005) (same); *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1179–80 (9th Cir. 2004) (holding that Section 12's service-of-process provision is not dependent upon its venue provision in context of domestic corporate defendant); *Automotive Refinishing*, 358 F.3d at 296–97 (holding plaintiff need not satisfy Section 12's specific venue provision to establish personal jurisdiction by service of process in context of foreign corporate defendant).

[6] Before the venue statutes were amended in 2012, this was 28 U.S.C. § 1391(d).

7

venue be narrowly conceived in scope," *Go-Video* "refuse[d] to nullify general venue laws, even in the face of apparently more narrow venue provisions in specific federal statutes." *Id.*[7]

In analyzing *Go-Video*, the Third Circuit stressed that the alien venue statute "is not like other general venue provisions." *Automotive Refinishing*, 358 F.3d at 296. Courts in this district have found this language limits *Automotive Refinishing*'s holding to cases involving foreign corporations. *See, e.g., Cumberland Truck Equipment Co. v. Detroit Diesel Corp.,* 401 F. Supp. 2d 415, 420–21 (E.D. Pa. 2005) ("The Third Circuit's decision in *Automotive Refinishing* suggests that this Circuit would . . . allow[] Section 12's venue clause to be supplemented for alien but not domestic defendants. Under this approach, Section [1391(c)(3)] may supplement the special venue requirements of Section 12 for alien corporations not because Section 12 may be supplemented by any general venue statute, but rather because Section [1391(c)(3)] reflects a unique tradition in the United States jurisdictional jurisprudence."); *see also Automotive Refinishing*, No. 1426, 2002 WL 31261330, at *9 (E.D. Pa. July 31, 2002), *aff'd* 358 F.3d 288 ("The broad grant of venue under the Alien Venue Statute [Section 1391(d)] is inapplicable to domestic corporations.").

Indeed, *Automotive Refinishing* also relied on *Brunette Machine Works, Ltd. v. Kockum Industries, Inc.*, which held that "[t]he principle of [§ 1391(c)(3)] cannot be confined in its application to cases that would otherwise fall under the general venue statutes." 406 U.S. 706, 714 (1972). There, the Court found a foreign corporation could be sued for patent infringement in any district under the alien venue statute, despite the patent law's limitation of venue to districts where a defendant resides or commits the infringing acts and has a regular place of business. *Id.* at 706–

---

[7] The Ninth Circuit later expanded *Go-Video*'s holding to a case involving domestic corporations, "hold[ing] that under Section 12 of the Clayton Act, the existence of personal jurisdiction over an antitrust defendant does not depend upon there being proper venue in that court." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1179–80 (9th Cir. 2004).

07; *see also Automotive Refinishing*, 358 F.3d at 296. The alien venue statute created venue for foreign corporations in patent litigation because it "is properly regarded, not as a venue restriction at all, but rather as a declaration of the long-established rule that suits against aliens are wholly outside the operation of all the federal venue laws, general and special." *Brunette Machine Works*, 406 U.S. at 714. The same is not true of the general venue law, which limits venue for domestic entities to judicial districts where a defendant resides or where "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(1)–(2).

Applying *Brunette* to a foreign antitrust defendant, the Third Circuit explained that "[a]bsent some express congressional intent to the contrary, a special venue provision should not . . . be deemed exclusively controlling when the defendant involved is an alien. The principle that an alien may be sued in any district is simply too deeply rooted to assume otherwise." *Automotive Refinishing*, 358 F.3d at 296 (quoting *Bucyrus-Erie*, 550 F. Supp. at 1040). This principle does not apply in cases involving domestic corporations. *See Automotive Refinishing*, 358 F.3d at 296 n.10 (explaining the distinction between out-of-state domestic corporations and foreign corporations "is crucial"); *Cumberland Truck Equipment*, 401 F. Supp. 2d at 421; *Bucyrus-Erie*, 550 F. Supp. at 1040 (holding that the alien venue statute supplements Section 12 venue, in part "because section [1391(c)(3)] is not like other general venue provisions").

In sum, this Court declines to extend *Automotive Refinishing* to a case involving a domestic corporation for three reasons. First, "the Third Circuit has never applied a 'national contacts' test for establishing personal jurisdiction over a domestic antitrust defendant." *Howard Hess Dental Lab'ys*, 516 F. Supp. 2d 324, 337–38 (D. Del. 2007) (declining to extend "*Automotive Refinishing* in a manner that would counterindicate traditional long-arm jurisprudence with respect to [domestic antitrust] defendants"). Second, in applying such a test to a foreign corporation, the

Third Circuit relied only on cases involving foreign corporations. *Automotive Refinishing*, 358 F.3d at 296. Third, in decoupling Section 12's two clauses for purposes of a foreign corporation, the Third Circuit stressed the "crucial" distinctions between foreign and domestic corporations and the corresponding general venue statutes. *Id.* at 296 n.10. Therefore, although establishing personal jurisdiction through service of process may be appropriate for foreign corporations under Section 12, it is not for domestic corporations. *Cumberland Truck Equipment*, 401 F. Supp. 2d at 421. Accordingly, Plaintiffs must establish that CVS Health is an inhabitant of, is found in, or transacts business in Pennsylvania as a prerequisite to relying on Section 12's nationwide service of process provision to establish personal jurisdiction. *See Daniel*, 428 F.3d at 423. CVS Health is not an inhabitant of or "found" in Pennsylvania, nor does it transact business in the state, so the Court lacks personal jurisdiction over CVS Health under Section 12 of the Sherman Act.

Plaintiffs' remaining avenues to establish personal jurisdiction are through general or specific jurisdiction. Plaintiffs have made no argument, however, that they have met their burden of establishing personal jurisdiction beyond that pertaining to the Clayton Act, nor have they attempted to rebut Defendants' evidence that CVS Health does not have sufficient contacts with Pennsylvania to allow this Court to constitutionally exercise personal jurisdiction over CVS Health. Arguments not made are waived. Plaintiffs' claims against CVS Health are therefore dismissed for lack of personal jurisdiction.[8]

---

[8] Even if Plaintiffs had not waived the argument, they have not met their burden to establish general or specific jurisdiction over CVS Health. Under Rule 4(k) of the Federal Rules of Civil Procedure, a district court generally "exercises personal jurisdiction according to the law of the state where it sits." *O'Connor*, 496 F.3d at 316. Pennsylvania's long-arm statute provides for jurisdiction "based on the most minimum contact with th[e] Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons. Stat. Ann. § 5322(b).

To establish general jurisdiction under Pennsylvania law, a plaintiff must show the defendant conducts "a continuous and systematic part" of its business in the state, 42 Pa. Cons. Stat. § 5301(a)(2)(iii); *see also Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 300 (3d Cir. 2008). General jurisdiction is limited to a "corporation's place of incorporation and

**IV.      Failure To State a Claim**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain enough factual matter to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Courts accept the complaint's facts as true and draw reasonable inferences in the plaintiff's favor, without imposing a heightened pleading standard for antitrust claims. *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 397 (3d Cir. 2000); *see also Bellevue Drug Co. v. Advance PCS*, No. 03-4731, 2004 WL 724490, at *2 (E.D. Pa. Mar. 2, 2004). The court "need not credit a complaint's bald assertions or legal conclusions." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997) (citation modified).

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992) (cleaned up). A tying arrangement violates antitrust laws when "the seller's exploitation of its control over the tying product [forces] the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 422 U.S. 2, 12 (1984). Courts apply two frameworks to analyze tying claims: the *per se* rule or the rule of reason.

---

its principal place of business." *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017). CVS Health is incorporated in Delaware and headquartered in Rhode Island. ECF No. 20-6 ¶¶ 4–5. It conducts no business in Pennsylvania. *Id.*

To determine whether a court has specific jurisdiction over a defendant, the court considers whether the defendant has "purposefully directed its activities at the forum" and whether plaintiffs' claims "arise out of or relate to" the defendant's contacts with the forum. *O'Connor*, 496 F.3d at 316–19 (cleaned up). There are no allegations that CVS Health engaged in or directed any of its activities at this forum. Further, CVS Health's ownership of CVS Pharmacy, Caremark, and Wellpartner is insufficient to establish personal jurisdiction. To establish specific jurisdiction over a corporate parent based on a subsidiary's contacts, the plaintiff must show the parent controls its subsidiaries. *Kehm Oil*, 537 F.3d at 300. Defendants presented unrebutted evidence that CVS Health does not control its subsidiaries. ECF No. 20-6 ¶¶ 6–7. The Court, therefore, does not have general or specific personal jurisdiction over CVS Health. *See Kehm Oil*, 537 F.3d at 300.

11

A plaintiff states a tying claim under the *per se* rule when it shows: (1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product; and (3) the arrangement impacts a substantial amount of interstate commerce. *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992) (en banc). If the plaintiff establishes all three elements, anticompetitive effects are presumed, and the plaintiff need not prove actual harm or rebut procompetitive justifications. *Id.*

Under the rule of reason, by contrast, courts examine "the actual effect of the challenged conduct on competition in the tied market." *Kennedy v. Am. Bd. of Internal Med.*, 847 F. App'x 137, 142 (3d Cir. 2021) (brackets omitted) (quoting *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 519 (3d Cir. 1998)). A plaintiff need not show a defendant seller possesses market power, but it must show anti-competitive effects in the tied product market and rebut any procompetitive justifications. *See Town Sound*, 959 F.2d at 481–82.

Under the *per se* rule, a plaintiff must properly define the tying product market, and under the rule of reason, a plaintiff must properly define the tied product market. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *Brokerage Concepts*, 140 F.3d at 519. "A market has two components, product and geographic." *Brokerage Concepts*, 140 F.3d at 513.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Queen City Pizza*, 124 F.3d at 436 (quoting *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962)). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for one over the other, either would work effectively." *Id.* at 437 (quoting *Allen-Myland, inc. v. Int'l Bus. Machines Corp.*,

12

33 F.3d 194, 206 (3d Cir. 1994)). Cross-elasticity of demand, a measure of reasonable interchangeability, exists when consumers would respond to "the rise in the price of a good within a relevant product market" by switching to "other like goods in that market." *Id.* at 437–38 (quoting *Tunis Brothers Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991)). A market definition "that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor . . . is legally insufficient." *Queen City Pizza*, 124 F.3d at 436. A single-brand market is disfavored but may constitute a relevant market if "the commodity is unique, and therefore not interchangeable with other products." *Id.* at 439. If there is a question of fact as to whether a proposed derivative market is cross-elastic with the primary market, dismissal is inappropriate. *Id.* (discussing *Eastman Kodak*, 504 U.S. at 451).

The relevant geographic market, meanwhile, is circumscribed to "the area of effective competition" where the buyer may rationally look for the good or service. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).

### A.    Per Se Analysis

As an initial matter, Plaintiffs read the Court's opinion dismissing the prior claim too narrowly. They assert dismissal was "for a single reason: [the Court] disagreed with Plaintiff's interpretation of the [HSRA] 2010 guidance and, as a result, found Plaintiff's tying product market definition of CVS Contract Pharmacies implausibly narrow." ECF No. 55 at 11 (citing ECF No. 47 at 7–8). While the Court did disagree with Plaintiff's interpretation of the HSRA guidance, that was not the only reason for dismissal. The Court highlighted that the Complaint did not establish that 340B Savings from CVS were not interchangeable with 340B Savings from other pharmacies. *See* ECF No. 47 at 7–8 ("Plaintiff's own allegations support the conclusion that it can replace lost savings from CVS transactions with savings from transactions at different Contract Pharmacies. . . . Indeed, Covered Entities 'typically contract with a network of pharmacies. As of April 1, 2020,

13

there are 100,451 contract pharmacy arrangements under the 340B Program. Therefore, Covered Entities can and do contract with non-CVS pharmacies where their patients fill prescriptions." (internal citations and punctuation omitted)).

Nonetheless, Plaintiffs have doubled down on their proposed product market. Like in the original complaint, Plaintiffs' proposed tying product market is a single-brand market—the "CVS Contract Pharmacy Market," which encompasses "CVS's provision of Contract Pharmacy services to Covered Entities." ECF No. 51 ¶ 94. Plaintiffs contend that the 340B Savings available from CVS are not interchangeable with 340B Savings available from other pharmacies because Covered Entities cannot legally or *practically* steer patients toward their Contract Pharmacies. *Id.* ¶¶ 96 (citing studies showing consumers choose pharmacy based on location and asserting any attempt to steer patients would be ineffective), 97 (discussing effect of pharmacy benefit managers on patients' pharmacy selection, which would make attempts to steer patients ineffective). Plaintiffs further assert that Covered Entities can contract with and recover 340B Savings from an unlimited number of 340B pharmacies, so they cannot replace the loss of 340B Savings from one pharmacy by merely contracting with another. *Id.* ¶¶ 99–100. Therefore, they argue, 340B Savings from CVS are not "roughly equivalent" to those available from other Contract Pharmacies, and Plaintiffs argue "there is zero cross-elasticity of demand." ECF No. 55 at 18.

In opposition, Defendants argue Plaintiffs have gerrymandered the product market and excluded all other pharmacies that could act as a 340B Contract Pharmacy. *See* ECF No. 56 at 6–7. They stress that single-brand markets are "disfavored" and argue "Plaintiffs still provide no 'meaningful' explanation 'as to why CVS Contract Pharmacy services are non-interchangeable with other Contract Pharmacy services.'" ECF No. 52-1 at 18–19 (quoting ECF No. 47 at 7). The Court agrees with Defendants.

## 1.    Tying Product Market

The dispute surrounding the sufficiency of Plaintiffs' tying product market boils down to one issue: whether the market for 340B Savings is so unique as to warrant recognition of a single-brand product market. Plaintiffs' theory is novel. The parties have not identified, nor has this Court found, directly on-point precedent from this Circuit or any other.[9] Single-brand product markets, however, are generally disfavored, and the Court finds this case fits more neatly into the category of cases courts regularly reject. *See, e.g.*, *Tunis Bros.*, 952 F.2d at 725 (finding evidence did not support jury's finding of single-brand Ford tractor market because evidence showed cross-elasticity of demand between Ford tractors and comparable tractors sold by other manufacturers); *Queen City Pizza,* 124 F.3d at 433, 437–38 (3d Cir. 1997) (affirming dismissal of claim for failure to properly define relevant market where "ingredients, supplies, materials, and distribution services used by and in the operation of Domino's pizza stores" were interchangeable with same ingredients and supplies of similar quality from other suppliers); *Satnam Distribs. LLC v. Commonwealth-Altadis, Inc.*, 140 F. Supp. 3d 405 (E.D. Pa. 2015) (rejecting market limited to distribution of a single brand of cigars based on theory that distributors must carry all major brands of mass market cigars); *compare Eastman Kodak,* 504 U.S. at 481–82 (holding single brand market for repair services for Kodak photocopiers is valid relevant market because repair parts and services for Kodak machines were not interchangeable with service and parts to fix other copiers).

---

[9] Defendants do point to a nearly identical case that was brought in New York state court under New York state antitrust laws. Mar. 2, 2023 Hearing Tr., *New York v. CVS Pharmacy, Inc.*, No. 452197/2022 (N.Y. Sup. Ct. Mar. 7, 2023). There, the court interpreted the antitrust claims consistently with federal antitrust law and precedent. *Id.* at 49:11–14. The court held that the state's claims failed because they pled a single brand tying market "that includes only the CVS brand of contract pharmacies." *Id.* at 50:4–10. The case was affirmed by the New York Appellate Division while this motion was pending. *See People v. CVS Pharmacy, Inc.*, 238 A.D.3d 494 (N.Y. App. Div. 2025) ("Supreme Court properly dismissed the complaint, as plaintiff has failed to plead a proper relevant tying market. Instead, plaintiff relies on the single-brand market definition, consisting solely of defendant CVS's own pharmacies, that does not properly consider the interchangeability of other pharmacies.").

This is because not all tying arrangements violate antitrust laws. "The antitrust concern over tying arrangements is limited to those situations in which the seller can exploit its power in the market for the tying product to force buyers to purchase the tied product when they otherwise would not, thereby restraining competition in the tied product market." *Queen City Pizza*, 124 F.3d at 442–43.

While it may be true that Covered Entities who want to contract with CVS would rather use a different TPA than Wellpartner, Covered Entities are not required to contract with CVS. In fact, the FAC establishes that Covered Entities may contract with an unlimited number of Contract Pharmacies. ECF No. 51 ¶ 49. Covered Entities may factor the cost of Wellpartner's services into their decision to contract with CVS for 340B Savings. The Court is not persuaded that recognition of a single-brand market is warranted based on the mere fact that if Covered Entities choose not to contract with CVS, they will lose out on 340B Savings from eligible patients who prefer to fill their prescriptions at CVS. *See CVS Pharmacy, Inc.*, 238 A.D.3d at 496 (finding patients' preferences to fill prescriptions at CVS "are not sufficient to support a single-brand market definition"); *City of New York v. Grp. Health, Inc.*, 649 F.3d 151, 156 (2d Cir. 2011) ("A single purchaser's preferences . . . cannot define a market.").

The Third Circuit's analysis in *Queen City Pizza* is instructive. There, the court found that Domino's Pizza could contractually require franchisees to purchase specific pizza supplies and ingredients without running afoul of antitrust laws. *Queen City Pizza*, 124 F.3d at 443. The court rejected the plaintiffs' suggested market of the "ingredients, supplies, materials, and distribution services *used by and in the operation of Domino's pizza stores*" because the supplies and ingredients allowable under the Domino's franchise agreement were interchangeable with the supplies and ingredients from other suppliers. *Id.* at 437 (emphasis added). The Court noted that

16

"Plaintiffs need not have become Domino's franchisees. If the contractual restrictions in . . . the general franchise agreement were viewed as overly burdensome or risky at the time they were proposed, plaintiffs could have purchased a different form of restaurant, or made some alternative investment." *Id.* at 441. There was presumably nothing preventing a Domino's franchisee from entering an unlimited number of franchise agreements with multiple pizza restaurants. Of course, if the *Queen City Pizza* plaintiffs elected not to contract with Domino's, they would lose out on the opportunity to earn any profit they could have made from customers who prefer Domino's pizza, even if the plaintiffs chose to open a Pizza Hut instead. Franchisees could have opened both a Domino's and a Pizza Hut and earned profits from the patrons of each. Or, they could choose to open one or the other. Here, too, Plaintiffs may choose to contract with CVS or Walgreens or any and all pharmacies they choose. If CVS's requirement of using Wellpartner is "overly burdensome or risky," despite some or many of Plaintiffs' patients filling prescriptions there, Plaintiffs may still contract with a different pharmacy to obtain 340B Savings from other patients. The fact that Plaintiffs cannot steer their patients to their Contract Pharmacies does not save their claim. *See CVS Pharmacy, Inc.*, 238 A.D.3d at 496 ("Plaintiff also alleges that some patients either prefer CVS or are required by their insurers to use CVS to fill prescriptions. However, such preferences are not sufficient to support a single-brand market definition.").

Furthermore, there is a reason courts disfavor single-brand markets.

[O]ne can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

*United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956).

17

Here, CVS unquestionably has power over the price and conditions it places on contracting with Covered Entities. However, having power over its own Contract Pharmacy services is not an illegal monopoly. The Court must determine "whether there are substitutes reasonably available to [Covered Entities]." *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993). Like in the original complaint, the FAC's own allegations show there are substitutes reasonably available to Covered Entities. *See* ECF No. 51 ¶ 49 ("In March 2010, HRSA issued guidance allowing Covered Entities to contract with an unlimited number of third-party pharmacies. They quickly began doing so, and between April 1, 2010, and April 1, 2020, the number of Contract Pharmacy arrangements under the 340B Program increased from 2,321 to 100,451. Approximately 75% of Contract Pharmacy arrangements are with large for-profit retail chain pharmacies, such as CVS."); ¶ 51 (In 2023, out of 194,016 contractual relationships between Covered Entities and participating pharmacies, 130,616 did not involve CVS.). Furthermore, at oral argument, Plaintiffs stated they did not anticipate amending to allege a tying product market encompassing all Contract Pharmacies. *See* Tr. Mot. Dismiss Hrg. at 27:14–22 (Jan. 20, 2026) ("[I]f the Court's decision were the tying product market has to be all contract pharmacies, that would not be an amendment that we would pursue.").

Covered Entities can and do contract with other Contract Pharmacies to earn 340B Savings. Accordingly, Plaintiffs have not properly defined the tying product market and do not argue they could allege a tying product market that would encompass all reasonably available substitutes. Thus, their per se tying claim fails.

### 2.    Geographic Market

Even if Plaintiffs' proposed single-brand tying product market was legally sufficient, their proposed national geographic market is not. Plaintiffs define the geographic scope as the United

States, asserting that "CVS retail and specialty pharmacies nationwide can serve as Contract Pharmacies to Covered Entities located in the United States." ECF No. 51 ¶ 102. Defendants argue Plaintiffs have failed to allege a proper geographic market for the tying product because Plaintiffs' proposed national market is contradictory to Plaintiffs' position that "location and convenience are *the most critical factors* for patients choosing a pharmacy" and that Covered Entities "typically contract with a network of pharmacies . . . that are *frequented by their patient population*." ECF No. 52-1 at 24 (quoting ECF No. 51 ¶¶ 7, 96). Plaintiffs respond that a national market is appropriate, in part, because CVS operates nationally and has a nationwide mail-order specialty pharmacy segment. *See* ECF No. 20. The Court agrees with Defendants.

"The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Tunis Bros.*, 952 F.2d at 726; *see also Brokerage Concepts*, 140 F.3d at 515. The inquiry does not turn on where the seller operates; rather, it turns on "where [its] customer would look to buy [its] product." *Tunis Bros.*, 952 F.2d at 726. Accordingly, a plaintiff must delineate the geographic market with reference to consumer behavior. *Id.* at 727. It is not enough to focus only on the seller's operations. *Id.*

Applied to this case, the inquiry must focus not on whether CVS has a national footprint, but whether the Covered Entities would practically look for pharmacy services nationwide. To assess whether a geographic market is properly defined, the Court must consider "the commercial realities of the industry under consideration." *Borough of Lansdale v. Phila. Elec. Co.*, 692 F.2d 307, 311 (3d Cir. 1982). In view of the realities of this industry as explained in the FAC, the Court considers how far Covered Entities would go to obtain a contract for 340B Savings from a different Contract Pharmacy in response to a price increase by CVS, and how likely it is that a price increase

19

by CVS will induce other pharmacies to enter the geographic market and increase competition. *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006).

Looking first to where a Covered Entity's patients turn for pharmacy services, the FAC shows that patients largely limit their search to a localized market. ECF No. 51 ¶ 7. While patients may be price sensitive and change pharmacies in response to raised drug prices, pharmacy customers typically will not travel out of their local area to fill their prescriptions. Plaintiffs themselves allege that "patients choose where to fill their prescriptions based on . . . factors that matter to them, such as location and convenience." ECF No. 51 ¶ 96. Given that Covered Entities choose contracts based on their patients' choices, it would not make sense for Pennsylvania hospitals to contract with pharmacies in, for example, Alaska, where their patients are unlikely to fill their prescriptions. The FAC does not support a finding that Covered Entities would look for replacement 340B Savings across a nationwide market. Plaintiffs' own allegations of patient choice suggest a far narrower scope.

Plaintiffs assert that CVS is "an integrated healthcare company" with "the largest chain of retail pharmacies in the United States." ECF No. 51 ¶¶ 12, 32. Where Plaintiffs fall short is that they refer only to the *seller's* ownership and operation practices, and the *seller's* perception of where it would like to offer services. The appropriate inquiry is where the "*buyer* may rationally look for the goods or services he or she seeks." *Brokerage Concepts*, 140 F.3d at 515 (emphasis added). Plaintiffs' stress on CVS Specialty's nationwide mail-order operations, ECF No. 51 ¶ 53, is likewise insufficient because again, this focuses on the seller's conduct, not the buyer's. The FAC also lacks sufficient factual content regarding whether, how, or to what extent Plaintiffs contract with CVS Specialty.

20

Plaintiffs also rely heavily on *Sentry Data Systems v. CVS Health*, where Sentry, the plaintiff and a TPA service provider, put forth a similar definition of a nationwide geographic market. 379 F. Supp. 3d 1320 (S.D. Fla. 2019). The bases for Sentry's proposed national geographic market included "allegations regarding CVS's nationwide footprint," coupled with Covered Entities' tendencies "to contract with Contract Pharmacies located both in geographic proximity to their locations and across the country." *Id.* at 1328. In *Sentry*'s view, even if some pharmacy operations are local, the allegations of local and national markets were "not incongruous." *Id.* at 1329.

However, there are key distinguishing factors between *Sentry* and this case. Sentry was one of Wellpartner's competitors as a TPA service provider. Sentry provided its software product to Covered Entities nationwide to help them monitor their compliance with the 340B Program. *See* Redacted Am. Compl. ¶ 71, *Sentry Data Sys. v. CVS Pharmacy*, No. 0:18-cv-60257 (S.D. Fla. Sept. 10, 2018), ECF No. 121. Unlike Covered Entities, Sentry operated nationally and need not base its decisions about to whom to offer its services on patients' choice. Although *Sentry* found persuasive that CVS "competes with other national pharmacy chains" and administers 340B Contract Pharmacy services nationally, *id.* at 1329, this Court finds this reasoning inapplicable to the distinct fact pattern here. Unlike Sentry which participated in a national market, Plaintiffs assert the opposite. Covered Entities like Plaintiffs contract with pharmacies their patients frequent, and their patients frequent pharmacies that are conveniently located. A CVS in Pennsylvania, therefore, does not compete with Contract Pharmacies across the country for 340B Contracts with Pennsylvania Covered Entities or for their patients' business.

The FAC lacks sufficient allegations that Plaintiffs serve patients who may purchase their prescriptions outside of a more localized market such that Plaintiffs would rationally seek to

contract with pharmacies nationwide for 340B Savings. The Court therefore finds Plaintiffs have not pled a plausible geographic market.[10]

### B.    The Rule of Reason

Under the rule of reason, Plaintiffs must show anti-competitive effects in the tied product market and rebut any procompetitive justifications. *Town Sound*, 959 F.2d at 481–82. Therefore, they must first properly define the tied product market, then "show competitive harm to the tied market as a whole." *Brokerage Concepts,* 140 F.3d at 519.

The Court previously dismissed Plaintiffs' rule of reason claim because the complaint's "allegations regarding anti-competitive effects center[ed] on TPA services provided to Covered Entities working with CVS Contract Pharmacies, *not* the TPA Services Market as a whole," and this "show[ed] anti-competitive effects to 'only a small subset' of the tied product market." ECF No. 47 at 9 (quoting *Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399 (3d Cir. 2016)). Plaintiffs have now narrowed their tied product market from the "TPA Services Market" to the "TPA Services Market for CVS Contract Pharmacies." Plaintiffs argue that the alleged illegal tie means "there is no possibility of substitution" for TPA services for Covered Entities that contract with CVS. ECF No. 55 at 21. They further contend that "there is no question that Defendants' tie entirely forecloses competition in the market to provide TPA services for CVS Contract Pharmacies." *Id.* at 22. Additionally, because Covered Entities have no choice but to work with Wellpartner in connection with their CVS contracts, Wellpartner is able to charge higher fees than other TPAs. *Id.*; *see also* ECF No. 55 ¶ 92.

---

[10] The Court also notes that although *Sentry* recognized a national geographic market, it found that CVS did not have sufficient market power within that market to sustain a claim. 379 F. Supp. 3d at 1332. However, the plaintiff there was able to sufficiently plead market power for a series of local markets where CVS had a 30% or greater share of Contract Pharmacy locations. *Id.*

Defendants argue in opposition that Plaintiffs' "artificially narrow market definition suffers from the very same defects that plague Plaintiffs' tying product market definition." ECF No. 52-1 at 27. They argue that the FAC establishes that "Covered Entities retain a multitude of choices" of TPA providers and that TPAs "'compete' against one another 'for the *entirety* of a Covered Entity's Contract Pharmacy book of business.'" *Id.* (quoting ECF No. 55 ¶¶ 73–74, 109). The Court again agrees with Defendants. Limiting the tied product market only to TPA services available in connection with contracts with CVS ignores that Covered Entities can and do contract with a variety of TPA providers. It also ignores Plaintiffs' admission that TPA service providers compete for Covered Entities' business.

In *Jefferson Parish*, the Supreme Court found that the plaintiff, an anesthesiologist, did not show that the defendant, a New Orleans hospital which required surgical patients to use the services of one group of anesthesiologists, unreasonably restrained competition among anesthesiologists. 466 U.S. at 29–30. Specifically, the Court explained that even though patients at East Jefferson Hospital were limited to the selected anesthesiologists, patients could choose to go to a different hospital where they could have their anesthesiologist of choice. *Id.* at 30. Here, too, the FAC makes clear that Covered Entities who wish to contract with CVS are limited to the selected TPA service provider, but those that do not wish to use Wellpartner can contract with a different pharmacy that will allow them to use their TPA service provider of choice.

Plaintiffs try to limit the tied product market to TPA services for CVS pharmacies to avoid having to establish anti-competitive effects on the TPA services market as a whole. This clearly excludes a majority of reasonably interchangeable TPA services available to Covered Entities, even if those services are not available for contracts with CVS. Plaintiffs concede that "[o]f course TPA

services are—or *should be*—substitutable," ECF No. 55 at 21, but they cite no case law supporting their narrow, single-brand tied product market definition.

Like with a tying product market, a tied product market must include all "products . . . reasonably interchangeable by consumers for the same purpose." *Thomson Reuters Enter. Ctr. GmbH v. Ross Intelligence Inc.*, 751 F. Supp. 3d 381, 390 (D. Del. 2024) (quoting *Brokerage Concepts*, 140 F.3d at 513). Antitrust plaintiffs must not so narrowly define a product market such that "it only includes the defendants." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 147 (3d Cir. 2001). Such a definition is "unrealistic" where the market for the tied product is, in reality, much broader. *Id.* Here, the tied product market is, in reality, much broader than what Plaintiffs propose. They cannot exclude all TPA services available to Covered Entities and assert there was harm only to competition between TPA service providers with respect to contracts with CVS. Instead of alleging anticompetitive effects on the tied product market as a whole, Plaintiffs narrowed their tied product market definition to exclude all TPA providers except Wellpartner. Such a narrow tied product market cannot sustain a rule of reason claim.

## V.    Conclusion

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss. In amending their complaint, Plaintiffs doubled down on the single-brand tying product market definitions that the Court already rejected, and their new factual allegations relating to the inability to steer patients to specific Contract Pharmacies do not "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Plaintiffs have not indicated they could amend to allege a legally cognizable tying or tied product market. The Court will, therefore, dismiss the FAC with prejudice. *See City of Cambridge Retirement Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018) ("Leave to amend is properly denied if amendment would

be futile, i.e., if the proposed complaint could not withstand a renewed motion to dismiss." (citation modified)).